**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC BROADCASTING SERVICE, 1225 South Clark Street Arlington, V.A. 22202; and NORTHERN MINNESOTA PUBLIC TELEVISION, INC. *d.b.a.* LAKELAND PBS, 108 Grant Avenue NE Bemidji, M.N. 56601, | |
| *Plaintiffs,* | |
| *v.* | **Civil Action No. _____** |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, 1600 Pennsylvania Avenue NW Washington, D.C. 20500; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF THE TREASURY, 1500 Pennsylvania Avenue NW Washington, D.C. 20220; | |
| SCOTT BESSENT, *in his official capacity as Secretary of the United States Department of the Treasury,* 1500 Pennsylvania Avenue NW Washington, D.C. 20220; | |
| UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, 725 17th Street NW Washington, D.C. 20503; | |
| RUSSELL VOUGHT, *in his official capacity as Director of the United States Office of Management and Budget,* 725 17th Street NW Washington, D.C. 20503; | |

UNITED STATES DEPARTMENT OF
EDUCATION,
400 Maryland Avenue SW
Washington, D.C. 20202;

LINDA MCMAHON, *in her official
capacity as Secretary of the United
States Department of Education*,
400 Maryland Avenue SW
Washington, D.C. 20202;

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
245 Murray Lane SW, Mail Stop 0485
Washington, D.C. 20528-0485;

KRISTI NOEM, *in her official capacity
as Secretary of the Department of
Homeland Security*,
245 Murray Lane SW, Mail Stop 0485
Washington, D.C. 20528-0485;

FEDERAL EMERGENCY
MANAGEMENT AGENCY,
500 C Street SW
Washington, D.C. 20472;

DAVID RICHARDSON, *in his official
capacity as Senior Official Performing
the Duties of FEMA Administrator,*
500 C Street SW
Washington, D.C. 20472;

                    *Defendants.*

The Public Broadcasting Service ("PBS") and Northern Minnesota Public Television, Inc. *d.b.a* Lakeland PBS ("Lakeland PBS") bring this action for declaratory and injunctive relief and state the following in support thereof:

## PRELIMINARY STATEMENT

1.    This action challenges an unprecedented presidential directive attacking PBS and its member stations ("PBS Member Stations") in a manner that will upend public television.  Consistent with Congress's mandate and funding, PBS has provided trusted and award-winning educational, cultural, scientific, and public affairs programming—like *Mister Rogers' Neighborhood*, *Sesame Street*, *NOVA*, *Frontline*, and numerous Ken Burns films (*e.g.*, *The Civil War*, *Baseball*, *The National Parks: America's Best Idea*, and *Country Music*)—to millions of viewers of all ages and communities across the United States for more than half a century.  Yet in an Executive Order issued on May 1, 2025, the President declared that government funding of private sources of non-commercial media is "corrosive," and singled out PBS (alongside National Public Radio) as failing to provide "fair, accurate, unbiased, and nonpartisan news."  Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415, 19,415 (May 1, 2025) (the "EO").  PBS disputes those charged assertions in the strongest possible terms.  But regardless of any policy disagreements over the role of public television, our Constitution and laws forbid the President from serving as the arbiter of the content of PBS's programming, including by attempting to defund PBS.

2.     Indeed, since Congress laid the foundations for the growth of public television over 50 years ago, it has repeatedly protected the flow of federal funds from political interference by filtering them through a non-federal, non-profit, and non-partisan entity—the Corporation for Public Broadcasting ("CPB")—and by providing for long-term appropriations.  Lest there be any doubt that the Executive Branch should have no power to influence CPB's decision-making, Congress enacted a specific "[p]rohibition": no "department, agency, officer, or employee of the United States" may "exercise any direction, supervision, or control over public telecommunications, *or over [CPB] or any of its grantees*"—including with respect to "the *content* or *distribution* of public telecommunications programs and services."  47 U.S.C. § 398(a), (c) (emphases added).

3.     The EO violates not only those straightforward statutory restrictions but also the First Amendment.  The EO makes no attempt to hide the fact that it is cutting off the flow of funds to PBS because of the content of PBS programming and out of a desire to alter the content of speech.  That is blatant viewpoint discrimination and an infringement of PBS and PBS Member Stations' private editorial discretion.  The EO also seeks to impose an unconstitutional condition on PBS Member Stations' receipt of federal funds by prohibiting them from using federal funds to access PBS programming and services.  And the EO smacks of retaliation for, among other things, perceived political slights in news coverage.  That all transgresses the First Amendment's protection of both speech and freedom of the press.

4.     If allowed to stand, the EO would override Congress's decision to remove the administration of federal funding for public television from the government's editorial purview.  And it would have profound impacts on the ability of PBS and PBS Member Stations to provide a rich tapestry of programming to all Americans.  PBS and Lakeland PBS bring suit to preserve their ability to serve their viewers and communities without political interference, as both Congress and the First Amendment mandate.

## PARTIES

5.     Plaintiff PBS, a private non-profit corporation headquartered in Arlington, Virginia, is a membership organization comprising 336 local public television broadcast stations throughout the United States and its territories.  PBS Member Stations pay dues to PBS and elect a majority of PBS's board of directors from the ranks of PBS Member Station managers.

6.     Plaintiff Lakeland PBS is a non-profit public broadcasting service organization serving approximately 490,000 people in northern and central Minnesota and has been a PBS Member Station since its inception in 1979.  Lakeland PBS pays PBS annual membership dues.

7.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the EO and is being sued in his official capacity.

8.     Defendant United States Department of the Treasury ("Treasury") is a federal executive agency responsible for managing federal finances, government accounts, and public debt, including by disbursing funds to CPB.

9.  Defendant Scott Bessent is the Secretary of the Treasury.  He is being sued in his official capacity.

10.  Defendant Office of Management and Budget ("OMB") is a federal executive agency within the Executive Office of the President responsible for assisting the President in overseeing the preparation and execution of the federal budget, as well as supervising the management, regulatory, and policy implementation activities of Executive Branch agencies.

11.  Defendant Russell Vought is the Director of OMB.  He is being sued in his official capacity.

12.  Defendant United States Department of Education ("ED") is a federal executive agency tasked with establishing policy for, administering, and coordinating most federal assistance for education, including by providing grants to PBS.

13.  Defendant Linda McMahon is the Secretary of ED.  She is being sued in her official capacity.

14.  Defendant United States Department of Homeland Security ("DHS") is a federal executive agency responsible for safeguarding the American people, the homeland, and national values from a wide range of threats, including by providing grants to CPB and PBS Member Stations.

15.  Defendant Kristi Noem is the Secretary of DHS.  She is being sued in her official capacity.

16.  Defendant Federal Emergency Management Agency ("FEMA") is a federal executive agency within DHS responsible for safeguarding the American

people before, during, and after disasters, including by providing grants to CPB and PBS Member Stations.

17.     Defendant David Richardson is the Senior Official Performing the Duties of FEMA Administrator.  He is being sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under federal law, including the U.S. Constitution, the Public Broadcasting Act of 1967, 47 U.S.C. §§ 396 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

19.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district and this action seeks relief against federal agencies and officials acting in their official capacities.

## BACKGROUND

### A.     PBS and PBS Member Stations Fulfill the Goals Set Forth in the Public Broadcasting Act

20.     PBS was formed in 1969 by local public television stations seeking to leverage their combined resources and better serve their communities through public television, as envisioned by the Public Broadcasting Act of 1967 (the "Act").  As Congress found and declared in the Act, "it is in the public interest to encourage the growth and development of public . . . television broadcasting, including the use of such media for instructional, educational, and cultural purposes," and to "encourage the development of programming that involves creative risks and that addresses the

5

needs of unserved and underserved audiences, particularly children and minorities." 47 U.S.C. § 396(a)(1), (6).  Congress recognized that "it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence," and that the "expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels." *Id.* § 396(a)(3), (5).  Congress determined that this "national policy" of federal funding without federal control over content would "most effectively make public telecommunications services available to all citizens of the United States." *Id.* § 396(a)(7).

21.    For more than a half-century, PBS and PBS Member Stations have fulfilled that mission by providing commercial-free, educational television programing and services that reflect the interests of the American people.  Their informative, enriching content is free to the public and available to nearly 97% of the United States' population, serving parts of the country not profitable for commercial media.

22.    The demographic composition of PBS's audience mirrors the overall U.S. population with respect to geography, income, education, race, and ethnicity.  Sixty percent of PBS viewers live outside of urban areas.  The breakdown of viewers is almost evenly split among Democrats, Republicans, and independents according to an MRI-Simmons Fall 2024 Doublebase survey.

6

23.    PBS reaches more children, and more parents of young children, than any other children's television network. PBS KIDS is a dedicated children's media service that delivers free educational content via television and digital platforms, including PBS Member Stations, the 24-hour PBS KIDS channel and live stream, pbskids.org, and the PBS KIDS Video and Games apps. PBS KIDS averages 16 million monthly users and 350+ million monthly streams across digital platforms. Similarly, PBS LearningMedia—a digital library of free assets, interactive videos, media galleries, lesson plans, content from partners (like NASA, the Library of Congress, and the Smithsonian), and other resources for teachers and students— hosts nearly 1.5 million unique users on its website each month during the school year. As academic studies have shown, PBS's educational programming for children is highly effective at improving math, science, and literacy skills, and has helped millions of preschool-aged children prepare for and ultimately succeed in school.[1] For example, children who used PBS KIDS resources gained literacy skills equivalent to 1.5 months of classroom instruction.[2] Indeed, PBS is particularly vital to early-childhood education in America because less than half of preschool-aged children attend formal preschool.[3]

---

[1] *See, e.g.*, Todd Grindal et al., *Early Science and Engineering: The Impact of The Cat in the Hat Knows a Lot About That! on Learning*, EDUC. DEV. CTR., INC., & SRI INT'L (2019), *available at* https://tinyurl.com/2444ruxh; Michelle Tiu et al., *Odd Squad: Learning math with PBS KIDS transmedia content at school and home*, WESTED (2015), *available at* https://tinyurl.com/3h73emfr.

[2] *See* Lisa B. Hurwitz, *Getting a Read on Ready To Learn Media: A Meta-analytic Review of Effects on Literacy*, 90 CHILD DEV., 1754-1771 (2019).

[3] *See Kids Count Data Center*, THE ANNIE E. CASEY FOUND., https://tinyurl.com/2p9smce6 (last updated Mar. 2025).

24.    PBS also provides a broad array of iconic educational and cultural programs for Americans of all ages.  For example, PBS has offered landmark history programs designed to educate viewers on American events and periods (*e.g.*, *Journey to America: With Newt and Callista Gingrich*, *Chasing the Moon: The Road to Apollo*, and *The Vietnam War*, a Ken Burns and Lynn Novick film) and critically acclaimed presidential documentaries (showcasing, for example, Ulysses S. Grant, Jimmy Carter, and Ronald Reagan).  In addition, PBS provides groundbreaking science and natural history programs (*e.g.*, *NOVA* and *Nature*) that support scientific understanding and inspire the next generation of scientists and researchers.  And PBS has offered content on such varied topics as music and the arts (*e.g.*, *Austin City Limits*, *Southern Storytellers*, and *Great Performances*) and regional American culinary traditions (*e.g.*, *The Great American Recipe*, *A Chef's Life*, and *La Frontera with Pati Jinich*) that helps Americans better understand their neighbors, communities, and country.

25.    PBS's in-depth public affairs programming, while comprising less than 10% of PBS's broadcast schedule, is highly valued by viewers.  *PBS News Hour* is the only nightly hour-long television news program on a free broadcast (rather than cable) network in the country, with a nightly audience of 2.1 million viewers in 2025.  *Frontline*, a long-form news and current affairs series, has won every major journalism and broadcasting award, including 108 Emmy Awards, 31 Peabody Awards, and a Pulitzer Prize.  PBS's new program, *Breaking the Deadlock*—the first episode of which was introduced by Supreme Court Justices Amy Coney Barrett and

8

Sonia Sotomayor—is a modern reimagining of PBS's previously long-running *Fred Friendly Seminars*.  On *Breaking the Deadlock*, high-profile Americans from a wide variety of ideological backgrounds work through hypothetical ethical dilemmas.  As another example, in *Firing Line*, host Margaret Hoover interviews leaders across the political spectrum on pivotal issues facing Americans today.  These programs and other award-winning content bring the news to the American people, empowering them with information and a range of viewpoints.

26.    In addition to developing and acquiring content for distribution through PBS Member Stations and other PBS platforms, PBS harnesses the resources it receives from congressional appropriations (both directly and indirectly through PBS Member Station dues) to serve as a vital source of support for PBS Member Stations. For example, PBS manages the public television interconnection system—a 24/7/365 cloud-based, terrestrial broadband and satellite video distribution system among PBS, PBS Member Stations, content distributors (*e.g.*, American Public Television, National Educational Television Association), and digital platforms—for the benefit of PBS Member Stations.  PBS further supports PBS Members Stations by negotiating distribution arrangements with national cable and satellite systems and digital streaming platforms (*e.g.*, YouTube TV, Amazon Prime Video), as well as by representing the interests of PBS Member Stations in various regulatory proceedings. And PBS supports PBS Member Stations through procurement and distribution of proven on-air pledge programs, development training for local station staff, market research and fundraising assets, national promotion of content, brand management,

story and program amplification, audience insights and cross-platform data monitoring, and continuing education for station managers and employees. By providing those and other services, PBS enables PBS Member Stations to leverage economies of scale to optimize their programming and operations, and to achieve savings they can reinvest in, among other things, producing local content, organizing local screenings and events to bring their community together, and coordinating emergency alert services with local public safety officials.

27.    PBS also plays a critical role in public safety. The PBS Warning, Alert, Response Network ("WARN") ensures that public television stations meet the federal mandate to provide a nationwide backup to the Wireless Emergency Alert system. PBS receives wireless alerts directly from FEMA and transmits the alerts to public television stations via the interconnection system. Those stations, in turn, disseminate the alerts over their broadcast transmitters. These alerts are available to all cellular carriers to ensure their customers receive wireless emergency alerts, even if the primary delivery method fails. PBS also operates the WARN website, which is the only immediate source for validating a wireless emergency alert in real time.

28.    A recent survey of a politically representative sample of U.S. adults (conducted by YouGov) showed that PBS is the number one most trusted institution in the United States, as compared to video streaming services, commercial cable television, news publications, commercial broadcast television, the federal

government, Congress, courts of law, and social media platforms.[4]  The same survey found that PBS is the most trusted news network.  Ninety percent of parents agree that PBS KIDS helps prepare children for success in school, and nearly the same percentage of parents agree that PBS KIDS is a safe and trusted source for kids to watch television and play digital games and apps.  Seventy-six percent of respondents believe PBS provides excellent value to the community, and a similar percentage agree that having a strong public television system is important.  Another recent survey found that PBS is the least biased and most accurate source of news in the United States.[5]

29.    Lakeland PBS has been a PBS Member Station since it began operating in 1979.  Lakeland PBS currently holds two non-commercial, educational television broadcast station licenses: KAWE in Bemidji, Minnesota and KAWB in Brainerd, Minnesota.  Through those stations, Lakeland PBS offers free content that is broadly viewed by over 490,000 persons across approximately 7,500 square miles in northern and central Minnesota.  There are no towns or cities with a population greater than 20,000 people in Lakeland PBS's service area, which includes some of the poorest counties in Minnesota and several tribal reservations.

30.    Like many PBS Member Stations, Lakeland PBS airs a combination of local and national programming.

---

[4] *See* PBS, *Trusted. Valued. Essential* (2025), https://tinyurl.com/4mdknmjd (describing results of YouGov survey conducted from January 6 to January 10, 2025).

[5] *See Perceived Accuracy and Bias in the News Media*, KNIGHT FOUND., at 15, https://tinyurl.com/4snvz87u (last visited May 23, 2025).

31.    Lakeland PBS's local programming includes *Lakeland Learns*, which offers curriculum-aligned videos, interactives, lesson plans, and other resources for community educators.  In addition, Lakeland PBS produces *Lakeland News*, the region's only program covering local news, weather, and sports.  Without Lakeland PBS, many residents in its coverage area would have no access to television covering local issues.

32.    Lakeland PBS selects national programming from PBS based on the needs and interests of the people in Lakeland PBS's coverage area.  Lakeland PBS relies heavily on PBS's roster of quality programs: 56% of programming on Lakeland-Prime (Lakeland PBS's main channel) comes from PBS, and 100% of programming on Lakeland-PBS Kids (Lakeland PBS's 24/7 educational channel) comes from PBS.  Beyond programming, Lakeland PBS relies on PBS for the broad range of support services that PBS offers PBS Member Stations.

**B.    Congress Expressly Insulated PBS and PBS Members Stations from Political Interference**

33.    Congress took pains to ensure that the development of public television would be free from political interference, including with respect to content and funding decisions.

34.    The Public Broadcasting Act instructs that the entity responsible for "facilitat[ing] the development of public telecommunications"—CPB—shall be a "private corporation" precisely "to *afford maximum protection from extraneous interference and control*."  47 U.S.C. § 396(a)(10) (emphasis added).  To that end, the Act states that CPB "will not be an agency or establishment of the United States

Government." *Id.* § 396(b). Similarly, the Act ensures that the nine members of the CPB Board "shall not, by reason of such membership, be deemed to be officers or employees of the United States," *id.* § 396(d)(2), shall comprise "[n]o more than 5 members . . . of the same political party," *id.* § 396(c)(1), and must "not [be] regular full-time employees of the United States," *id.* § 396(c)(2).

35.  The Act also establishes a fund in the Treasury known as the "Public Broadcasting Fund" to be administered by the Secretary of the Treasury, 47 U.S.C. § 396(k)(1)(A), and mandates several actions by the Secretary to ensure CPB receives funding intended for public television providers such as PBS and PBS Member Stations.

36.  Specifically, the Act provides that the Secretary "shall make available to [CPB]" appropriated funds. 47 U.S.C. § 396(k)(2)(A). The Act states that "[f]unds appropriated" to CPB "shall remain available until expended." *Id.* § 396(k)(1)(E). And the Act instructs that "[f]unds appropriated and made available" "shall be disbursed by the Secretary of the Treasury on a fiscal year basis." *Id.* § 396(k)(2)(B).

37.  Of the funding that the Secretary is required to disburse to CPB, the Act provides that "75 percent" of such funds remaining after administrative and capital costs "shall be allocated" for public television. 47 U.S.C. § 396(k)(3)(A)(i) & (k)(3)(A)(ii). The 75% of CPB funding dedicated for public television, in turn, is divided into two parts.

38.  First, "75 percent of such amounts shall be available for distribution among the licensees and permittees of public television stations." 47 U.S.C.

§ 396(k)(3)(A)(ii)(I). That funding occurs through "a basic grant" in "accordance with eligibility criteria . . . that promote the public interest in public broadcasting, and on the basis of a formula designed to . . . provide for the financial needs and requirements of stations in relation to the communities and audiences such stations undertake to serve." *Id.* § 396(k)(6)(B). The funding should "maintain existing, and stimulate new, sources of non-Federal financial support for stations by providing incentives for increases in such support." *Id.* § 396 (k)(6)(B)(ii).

39. Second, "25 percent of such amounts shall be available for distribution . . . for national public television programming" in two further subcategories. 47 U.S.C. § 396(k)(3)(A)(ii)(II). The first subcategory reserves funds for "grants for production of public television" to certain categories of "entities outside [CPB]." *Id.* § 396(k)(3)(B)(i), (ii). The second subcategory expressly gives PBS a role in allocating funds, stating such funds "shall be available for distribution" "in accordance with any plan implemented" after CPB "conduct[s] a study . . . in consultation with public television licensees . . . and the *Public Broadcasting Service*, on how funds available to [CPB] . . . can be best allocated to meet the objectives of this chapter with regard to national public television programming." *Id.* § 396(k)(3)(A)(ii)(II) & (k)(6)(A) (emphasis added).

40. In addition to the funds distributed as part of the Public Broadcasting Fund, the Act provides that certain appropriations should be deposited into a Public Broadcasting Satellite Interconnection Fund, also administered by the Secretary of the Treasury. 47 U.S.C. § 396(k)(10). Such funds "shall be distributed by [CPB] to

14

the licensees and permittees of noncommercial educational television broadcast stations providing public telecommunications services or the national entity they designate for satellite interconnection purposes, . . . exclusively for the capital costs of the replacement, refurbishment, or upgrading of their national satellite interconnection systems and associated maintenance of such systems." *Id.* § 396(k)(10)(D).

41.    Notably, "[c]ongressional experience with the Act following its passage in 1967 . . . reaffirmed [Congress's] commitment to preserving broad editorial discretion for local stations" and resulted in "a firm congressional commitment to develop[] long-range financing for public broadcasting to provide adequate insulation against Government interference." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 392 n.21 (1984) (internal quotation marks omitted).  Congress realized that the only way "[to ensure] strong local programming" was to mandate "unrestricted support" via such financing.  *Id.* (alteration in original).  That practice "ha[s] been carried forward in subsequent amendments to the Act."  *Id.*

42.    To that end, the Act expressly states that the funds allocated to public television stations "may be used at the discretion of the recipient for purposes related primarily to the production or acquisition of programming."  47 U.S.C. § 396(k)(7).  Likewise, CPB must "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities."  *Id.* § 396(g)(1)(D).  In "facilitat[ing] the full

15

development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities," *id.* § 396(g)(1)(A), CPB is required to "adhere strictly to a standard of 'objectivity and balance' in disbursing federal funds to local stations," *League of Women Voters*, 468 U.S. at 389 (quoting 47 U.S.C. § 396(g)(1)(A)).

43.    The federal government's role is even more limited.  In a provision of the Act entitled "Federal interference or control," Congress set forth a "Prohibition" that no "department, agency, officer, or employee of the United States" may "exercise any direction, supervision, or control over public telecommunications, *or over [CPB] or any of its grantees.*" 47 U.S.C. § 398(a) (emphasis added).  Another provision confirms that "[n]othing in this section shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the *content* or *distribution* of public telecommunications programs and services." *Id.* § 398(c) (emphases added).

44.    Congress explained its reasons for structuring the Act to protect public television programming and services against federal interference.  The House Report accompanying the Act acknowledged that the federal government would "provide a source of funds to pay part of the cost of educational broadcasting." H.R. REP. NO. 90-572, at 15 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 1799, 1805.  But the House Report was resolute that the federal government should "not control the final product." *Id.*  To prevent that from happening, "funds for programs should not be provided

16

directly by the Federal Government." *Id.* Rather, the funds would be disbursed by CPB—"a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, [to] provide *the most effective insulation from Government control or influence over the expenditure of funds*." *Id.* (emphasis added).

45. The Senate Report accompanying the Act was even more emphatic. It recognized that, although "Federal financial assistance is required to provide the resources necessary for quality programs," "this assistance should in no way involve the Government in programming or program judgments." S. REP. NO. 90-222, at 4, 11 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 1772, 1775. Thus, the Senate Report concluded, an "independent entity supported by Federal funds is required to provide programs *free of political pressures*." *Id.* (emphasis added). And lest its intent be missed, the Senate Report further expressed a "wish to state *in the strongest terms possible* that it is our intention that local stations be *absolutely free to determine for themselves what they should or should not broadcast*." *Id.* at 1782 (emphases added).

46. The Supreme Court has long recognized Congress's objectives in the Act:

When Congress first decided to provide financial support for the expansion and development of noncommercial educational stations, all concerned agreed that this step posed some risk that these traditionally independent stations *might be pressured into becoming forums devoted solely to programming and views that were acceptable to the Federal Government*. That Congress was alert to these dangers cannot be doubted. It sought through the Public Broadcasting Act to fashion a system that would provide local stations with sufficient funds to foster their growth and development *while preserving their tradition of autonomy and community-orientation*.

*League of Women Voters*, 468 U.S. at 386-387 (emphases added) (citation omitted).

47.    The Supreme Court also recounted how Congress achieved that goal. First, the Act's "elaborate structure"—including CPB's "private, bipartisan structure" and the "variety of important limitations on its powers"—"operates to insulate local stations from governmental interference."  468 U.S. at 388-389.  Second, the Act "protect[s] the stations from governmental coercion and interference" through express prohibitions against federal government interference with programming decisions, as well as through "long-term appropriations" that "give [local stations] greater autonomy in defining the uses to which those funds should be put."  *Id.* at 389-390.

48.    "[T]he unifying theme of these various statutory provisions is that they substantially reduce the risk of governmental interference with the editorial judgments of local stations without restricting those stations' ability to speak on matters of public concern."  468 U.S. at 390.

## C.    The President Targets PBS and PBS Member Stations, and Ultimately Issues an Executive Order Attempting to Defund PBS

49.    Despite the Act's intended insulation of PBS and public television broadcasters from political pressure, the President has waged a campaign against PBS based on his disagreement with the purported views expressed through its programs and editorial decisions—culminating in the issuance of the EO.

50.    On April 1, 2025, on his Truth Social account, the President posted: "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT 'MONSTERS' THAT SO

BADLY HURT OUR COUNTRY!"  Donald J. Trump (@realDonaldTrump), TRUTH

SOCIAL (Apr. 1, 2025, 4:17 PM) (the "Truth Social Post").[6]

51.    On April 14, 2025, the White House published a statement alleging that

PBS has "spread radical, woke propaganda disguised as 'news.'"  *The NPR, PBS Grift

Has Ripped Us Off for Too Long*, THE WHITE HOUSE (Apr. 14, 2025) (the "White House

Statement"). [7]    In addition to targeting National Public Radio, the Statement

proclaims that "taxpayer funding of . . . PBS's biased content is a waste."  *Id.*  As

examples of such purported waste—or what the White House refers to as "trash that

passes for 'news' at . . . PBS"—the Statement points to, among other things:

- a 2024 documentary allegedly "making the case for reparations";

- a 2023 *Washington Week* roundtable that allegedly "covered up Joe
  Biden's clear mental decline, with far-left 'journalist' Jeff Goldberg
  *claiming* Biden is actually 'quite acute'";

- a 2021 children's program that "featured a drag queen";

- a 2020 town hall featuring Sesame Street allegedly "aimed [at]
  presenting children with a one-sided narrative to 'address racism' amid
  the Black Lives Matter riots";

- a 2017 panel allegedly "devoted to what it 'mean[s] to be woke' and
  'white privilege'"; and

---

[6] https://tinyurl.com/ydytaf8z.

[7] https://tinyurl.com/2pt9hcnx.

- a 2017 film which purportedly "celebrat[ed] a transgender teenager's so-called 'changing gender identity.'"

*Id.* (emphasis omitted).  PBS disputes those examples and assertions as inaccurate—and misrepresentative of the variety of PBS programming discussed above.

52.    The White House Statement also alleges that PBS has "zero tolerance for non-leftist viewpoints."  White House Statement (emphasis omitted).  As examples, the Statement points to:

- a 2023 "study" which allegedly "found that congressional Republicans saw 85% negative coverage while congressional Democrats saw 54% positive coverage on PBS's flagship news program";

- a 2024 "study" allegedly showing "PBS news staff used 162 variations of the term 'far-right,' but only six variations of 'far-left'"; and

- a 2024 "Media Research Center study" which allegedly found that "PBS's coverage of the Republican National Convention was 72% negative, while coverage of the Democratic National Convention was 88% positive."

*Id.*  Once again, PBS disputes these cherry-picked "studies," which are inaccurate and misrepresent the balanced range of viewpoints presented on PBS programs.

53.    Also on April 14, 2025, several news outlets reported that the White House was planning to request from Congress a "rescission" of PBS funding under the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et*

*seq.* (the "ICA").[8]   The President, however, has not transmitted the statutorily required "special message" to Congress formally requesting rescission under the ICA. *Id.* § 683(a).

54.     Instead, the President acted unilaterally and issued the EO on May 1, 2025.

55.     The EO begins by proclaiming that, "[u]nlike in 1967," when the Act was enacted, "today the media landscape is filled with abundant, diverse, and innovative news options," and therefore, "[g]overnment funding of news media . . . is not only outdated and unnecessary but corrosive to the appearance of journalistic independence." EO § 1.

56.     The EO then asserts that CPB "fails to abide by" the principles of "impartiality" reflected in the Act "to the extent it subsidizes . . . PBS." EO § 1. The EO purports to take the position that "[w]hich viewpoints . . . PBS promote[s] do[] not matter." *Id.* But in the next sentence, the EO declares that what "does matter" is that PBS "presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." *Id.*

57.     Based on its assertions of bias, the EO then "instruct[s]" the CPB Board and "all executive departments and agencies" to "cease Federal funding for . . . PBS." EO § 1.

---

[8] *See* Jennifer Scholtes & Megan Messerly, *White House to Send Congress a Formal Request to Nix $9.3B for PBS, NPR, State Department*, Politico (Apr. 14, 2025), https://tinyurl.com/3yts7529; Benjamin Mullin et al., *White House to Ask Congress to Claw Back Funding from NPR and PBS*, The N.Y. Times (Apr. 14, 2025), https://tinyurl.com/ydsda2fz.

(a)   The CPB Board shall cease direct funding to . . . PBS, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage.  The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding.

(b)   The CPB Board shall cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS.

*Id.* § 2.

58.   "To effectuate this directive," the EO directs the CPB Board to revise the "2025 Television Community Service Grants General Provisions and Eligibility Criteria," under which PBS Member Stations receive federal funds, to "prohibit direct or indirect funding of . . . PBS" by June 30, 2025.  EO § 2; *see also* CPB, *2025 Television Community Service Grants General Provisions and Eligibility Criteria* (updated Apr. 2025).[9]  The EO also directs the CPB Board, "[t]o the extent permitted by the 2024 Television Community Service Grants General Provisions and Eligibility Criteria" and "applicable law," to "prohibit parties subject to these provisions from funding . . . PBS after the date of [the EO]."   EO § 2; *see also* CPB, *2024 Television Community Service Grants General Provisions and Eligibility Criteria* (Jan. 2024).[10]

59.   Lastly, the EO instructs the "heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of . . . PBS."  EO § 3.

_____

[9] https://tinyurl.com/yc33frc6.

[10] https://tinyurl.com/2993ecwe.

60.    To support the EO, the President contemporaneously published a document styled as a "Fact Sheet" (the "EO Fact Sheet").[11]  The EO Fact Sheet accuses PBS of having "fueled partisanship and left-wing propaganda with taxpayer dollars, which is highly inappropriate and an improper use of taxpayers' money."  EO Fact Sheet.  The EO Fact Sheet includes the same misleading assertions as the White House Statement.  *See id.*

61.    On May 2, 2025, the day after the EO issued, ED sent notice to CPB that it was terminating a federal award under which CPB had granted PBS $78 million to develop and distribute "Ready to Learn" educational content for children.  *See* Exhibit A (the "ED Termination Notice").  The ED Termination Notice states that ED has:

> undertaken a review of grants and determined that the grant [to CPB] provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

ED Termination Notice at 1.  A spokesperson for ED explained its view "that the Ready to Learn grants"—which were used to support programs like *Sesame Street*, *Reading Rainbow*, and *Clifford the Big Red Dog*—"were funding 'racial justice education programming,'" as well as "divisive ideologies and woke propaganda."[12]

---

[11] *Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, THE WHITE HOUSE (May 1, 2025), https://tinyurl.com/ymnewhh6.

[12] Benjamin Mullin et al., *Department of Education Eliminates Grant for PBS Children's Shows*, THE N.Y. TIMES (May 6, 2025), https://tinyurl.com/2fjz37ev.

62.    For its part, CPB has taken the position that it is "not a federal executive agency subject to the President's authority.  Congress directly authorized and funded CPB to be a private nonprofit corporation wholly independent of the federal government."[13]  The President, however, has attempted to remove three of the five members of the CPB board (which otherwise has four vacancies).  CPB's lawsuit challenging the purported removal remains pending.  *See generally Corporation for Pub. Broad. v. Trump*, No. 1:25-cv-1305 (D.D.C.).

### D.    The EO Will Significantly Harm PBS and PBS Member Stations

63.    If left intact, the EO will cause substantial harm to PBS and PBS Member Stations.  The EO directs the cancellation of all federal funding for PBS.  It also conditions federal funding to PBS Member Stations on their decision not to provide any portion of that funding to PBS.  Without congressionally appropriated funds granted by CPB and certain federal agencies, PBS and PBS Member Stations will be unable to fulfill the goals set forth in the Act, to the detriment of communities across the country.

64.    PBS depends on federal funding for its operation.  For 2025, PBS has a budget of $373.4 million.  PBS Member Station dues comprise 61% of that budget ($227 million).  CPB grants comprise another 16% ($59.8 million).  Other federal grants comprise 6% ($20.7 million).

65.    Public television stations receive approximately $325 million in annual federal funding from CPB, nearly all of which goes to PBS Member Stations.  Those

---

[13] CPB, *Corporation for Public Broadcasting Statement Regarding Executive Order on Public Media* (May 2, 2025), https://tinyurl.com/2wkyfub6.

funds, which comprise more than 50% of the overall budgets of certain PBS Member Stations, are instrumental to enabling them to operate, to produce programming that serves their local communities, and to pay PBS dues that make PBS programming and services possible.

66.    Accordingly, the EO jeopardizes a considerable portion of PBS's 2025 budget: the 22% that comes directly from CPB and certain federal agencies, and the 61% that comes from PBS Member Station dues, which includes millions of dollars in federal funds.

67.    The EO also purports to cancel all PBS federal funding for Fiscal Years 2026 and 2027, which has already been appropriated by Congress into the Public Broadcasting Fund. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 696; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1112, 1113, 139 Stat. 9, 14-15; 47 U.S.C. § 396(k)(1)(A).

68.    In total, the EO threatens or outright eliminates millions of dollars in annual funding for PBS on a going forward basis, comprising (based on fiscal year 2025 numbers, at least) $81 million per year in federal grants and a substantial portion of the $227 million per year that PBS Member Stations pay in the form of dues to PBS.

69.    Given the EO's drastic impact on PBS's budget for 2025 and beyond, the EO will negatively affect both the programming that PBS is able to fund and acquire and the services that PBS provides to PBS Member Stations.

70.     The EO would immediately strip $24.7 million in federal funding for PBS that is committed and unpaid (in addition to the $13.3 million "Ready to Learn" grant that ED has already purported to terminate).  That amount includes $17.7 million for PBS's National Programming Service.  The loss of those funds would disrupt program production and existing contractual obligations for many PBS programs that PBS Member Stations air.

71.     The EO would also impair PBS's ability to provide essential support services to PBS Member Stations.  Those services range from distribution infrastructure and a content delivery system to fundraising support, cybersecurity education and training, access to emergency information and alerts, and beyond.

72.     The programming and services provided by PBS to PBS Member Stations are not readily (or affordably) available from other sources.  The disruption to PBS programming would thus constrain PBS Member Stations' programming choices.  And because PBS Member Stations rely on the host of other services that PBS provides, any harm to those services resulting from PBS's diminished funding will harm PBS Member Stations in turn.  The loss or limitation of such services will require PBS Member Stations to devote substantial portions of their budget, personnel, and focus to alternatives—to the extent such alternatives exist.

73.     Because many PBS Member Stations rely heavily on federal funding (in some cases over 50% of their overall budgets), the EO's prohibition on providing federal funds to PBS will preclude many PBS Member Stations from continuing to access critical resources made possible by the pooling of resources via PBS dues.  *See*

26

EO § 2.  Other PBS Member Stations will need to choose between revamping their budgets to shift money from other areas to cover PBS dues (and maintaining the quality of the programming and services that those dues provide for) or ceasing to be PBS Member Stations.  Because other funds (*e.g.*, from donors and private grants) are often earmarked for specified purposes or otherwise restricted, many PBS Member Stations cannot easily (if at all) allocate other funds to cover PBS dues.  And because there is no other comparable source of programming or services for PBS Member Stations, many will suffer both in their finances and in their mission of delivering quality programming and services to the public—particularly smaller stations and those in rural areas.  Indeed, some PBS Member Stations may be forced to cease operation.

74.    Lakeland PBS is a prime example of a PBS Member Station that will be negatively impacted by the EO.

75.    The EO's prohibition on direct federal funding for PBS, and the resulting damage to PBS content and services, would significantly harm Lakeland PBS. Lakeland PBS relies heavily on PBS content, which makes up the vast majority of its programming.  If Lakeland PBS's access to PBS content is limited or eliminated, Lakeland PBS would be unable to identify and acquire comparable replacement programming, if at all, without a substantial disruption to its broadcasting.  Lakeland PBS also relies on PBS for many services to support its operations, including fundraising services, that Lakeland PBS could not obtain individually.   Any

degradation of PBS's member services will therefore significantly impair Lakeland PBS's ability to serve its local viewers and secure financial support.

76.    Lakeland PBS will also be severely impacted by the EO's prohibition on federal funds reaching PBS indirectly.  Lakeland PBS operates on an annual budget of $2.7 million (based on 2025 numbers).  Of that amount, roughly $1 million, or 37%, comes from federal grants awarded by CPB.  Nearly that entire amount is from a single annual Community Service Grant (CSG), the funds from which are restricted to certain categories of expenses.  Lakeland PBS currently pays the entirety of its annual PBS dues—$421,832 for fiscal year 2025 and an estimated $400,697 for fiscal year 2026—using CSG funds.

77.    Non-federal grants, donations, and other funds that must be spent for specified purposes, not including PBS dues, comprise roughly $1,075,000, or 40%, of Lakeland PBS's budget.

78.    The remaining $625,000, or 23%, of Lakeland PBS's budget is unrestricted revenue from a variety of sources, such as paid local registered-viewer benefits and local underwriting (*i.e.*, sponsorships for shows).  But Lakeland PBS cannot simply use those funds to cover PBS dues.  Given the relatively low amount of the unrestricted budget and the restrictions on federal and other funds, Lakeland PBS would be faced with a shortfall in attempting to cover expenses that were previously paid out of unrestricted funds.

79.    If Lakeland PBS could somehow find a way to pay PBS dues despite the indirect funding bar, Lakeland PBS would still suffer substantial harm.  The

unrestricted portion of Lakeland PBS's budget—unlike the federal grant from which it currently pays PBS dues—is subject to business and economic risks, such that Lakeland PBS would lack any sure way to pay PBS dues. Indeed, Lakeland PBS's sponsorship revenue has *declined* more than 5% over the past ten years. And despite strenuous efforts, Lakeland PBS has found it increasingly difficult to obtain local foundation grants for operations. Thus, it is exceedingly unlikely that Lakeland PBS will be able to reliably cover its PBS dues using non-federal funds. Regardless, Lakeland PBS would have to expend valuable resources determining how to reallocate its entire budget to cover its PBS dues while minimizing losses in other areas (if possible).

80.    If unable to pay its PBS dues, Lakeland PBS would be unable to use *any* PBS content and services. Lakeland PBS cannot readily or affordably replace such content and services. The EO's indirect funding bar thus poses an existential threat to Lakeland PBS, the only local source of television programming for hundreds of thousands of Minnesotans.

## CAUSES OF ACTION

### COUNT I

### *Ultra Vires* Conduct:
### Unlawful Interference in Violation of Act
### (Against All Defendants)

81.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

82.    The Supreme Court has repeatedly allowed equitable relief against federal officials, including the President, who act "beyond th[e] limitations" imposed

29

by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). "When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). "Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *American Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated.").

83.    The President's "instruct[ion]" in the EO that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS," EO § 1, and ED's subsequent issuance of the ED Termination Notice, are contrary to law and outside of Defendants' authority.

84.    As a threshold matter, the President lacks the authority to compel CPB and its Board to take particular actions. As Congress made clear, CPB—a "private corporation"—is "not . . . an agency or establishment of the United States Government." 47 U.S.C. § 396(a)(10), (b). Likewise, the members of the CPB Board "shall not, by reason of such membership, be deemed to be officers or employees of the United States." *Id.* § 396(d)(2).

85.    Accordingly, the President's directives to CPB were not promulgated pursuant to any "authority to act . . . stem[ming] either from an act of Congress or

from the Constitution itself," and thus lack the force of law. *Medillín v. Texas*, 552 U.S. 491, 524 (2008) (internal quotation marks omitted).

86.    In addition, the Act expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over [CPB] or any of its grantees . . . or over . . . any . . . public telecommunications entity." 47 U.S.C. § 398(a). Congress underscored that nothing in the Act shall be "construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services." *Id.* § 398(c).

87.    The EO runs afoul of those provisions by instructing that "[t]he CPB Board shall cease direct funding to . . . PBS"; "shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding"; "shall cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS"; and "shall take all other necessary steps to minimize or eliminate its indirect funding of . . . PBS." EO § 2. The EO is explicit that the government is undertaking those actions to "determine which categories of [news] activities to subsidize" and to provide, in the President's view, "a fair, accurate, or unbiased portrayal of current events." *Id.* § 1. In other words, the EO seeks to provide direction, supervision, and control over PBS Member Stations, including with respect to the content and distribution of their programs and services.

31

88.    Further still, the EO effectively end-runs the "protections which serve to protect . . . stations from governmental coercion and interference," including through "long-term appropriations" that "give [local stations] greater autonomy in defining the uses to which those funds should be put." *League of Women Voters*, 468 U.S. at 389-390.    Specifically, the Act "strictly define[s] the percentage of appropriated funds that must be disbursed by [CPB] to local stations, § 396(k)(3)(A)-(B)," and "define[s] objective criteria under which local television and radio stations receive basic grants from [CPB] to be used at the discretion of the station, §§ 396(k)(6)(A)-(B), 396(k)(7)." *Id.* at 389.

89.    Notably, the President contemplated attempting a formal rescission of funds to PBS and PBS Member Stations under the ICA.  *See* ¶ 53, *supra*.  But rather than engaging in that process, which preserves the separation of powers with respect to congressional appropriations, the President acted unilaterally to purport to force CPB and other federal actors to alter the decades-long flow of funds to PBS and eliminate PBS Member Stations' statutorily protected discretion as to how best to use federal funds to effectuate the goals of the Act.

90.    The first sentence of the EO makes plain that the President is attempting to circumvent Congress.  The EO begins by declaring that the reasons motivating Congress to enact the Act, "[u]nlike in 1967," do not apply today.  EO § 1. But whether the Act remains good policy is for Congress—which has consistently appropriated funds pursuant to the Act—to decide.

## COUNT II

### Violation of the First Amendment, U.S. Const. amend. I:
### Viewpoint Discrimination
### (Against All Defendants)

91.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

92.     This Court has inherent equitable power to enjoin unconstitutional executive conduct. *See Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).   "The ability to sue to enjoin unconstitutional actions by . . . federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

93.     "[A]s a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 790-791 (2011) (alteration and ellipsis in original).   Indeed, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

94.     "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 828.   "Viewpoint discrimination is thus an egregious form of content discrimination," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

33

95.     Although "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances . . . in which the government used private speakers to transmit specific information pertaining to its own program," this "latitude which may exist for restrictions on speech where the government's own message is being delivered" does not apply when the government "instead expends funds to encourage a diversity of views from private speakers." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-542 (2001) (citations and internal quotation marks omitted); *see also id.* at 544 (invalidating a "substantial restriction" on "private, nongovernmental speech" that the federal "program presume[d] . . . is necessary"). When a government "program [i]s designed to facilitate private speech, not to promote a governmental message," *id.* at 542, the Supreme Court has repeatedly "reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits," and the government may not rely on "distinction[s] based on the content or messages of . . . speech," *Rosenberger*, 515 U.S. at 834.

96.     The Act is a quintessential example of the government expending funds to "encourage a diversity of views" rather than to convey its own message. After all, the Act's express purpose is to provide funding for public broadcasting while "afford[ing] maximum protection from extraneous interference and control," including by the federal government. 47 U.S.C. § 396(a)(10); *see also id.* § 398(a) (affirming that no "department, agency, officer, or employee of the United States [may] exercise any direction, supervision, or control over public telecommunications, or over [CPB]"). Congress recognized that federal financial assistance "should in no way

involve the Government in programming or program judgments" (or in "the expenditure of funds"). *League of Women Voters*, 468 U.S. at 386 n.17.

97.     The President's "instruct[ion]" in the EO that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS" immediately, including with respect to already appropriated funds, violates the First Amendment by unconstitutionally discriminating against PBS based on PBS's perceived viewpoint.  EO § 1.

98.     The President's additional "[i]nstruction[]" in the EO that "[t]he CPB Board . . . cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS"—by revising the CSG criteria for 2025 and even for 2024, and by "tak[ing] all other necessary steps to minimize or eliminate its indirect funding of . . . PBS"—likewise violates the First Amendment by unconstitutionally discriminating based on PBS's viewpoint.  EO § 2.

99.     The same is true of the President's further instruction that "[t]he heads of all agencies shall identify and terminate, to the maximum extent consistent with appliable law, any direct or indirect funding of . . . PBS."  EO § 3.

100.     Plaintiffs are private entities entitled to First Amendment protection.

101.     Plaintiffs have engaged in activity protected by the First Amendment, including the production and distribution of children's educational programming and public affairs programming.

102.    By purporting to unilaterally cut off all existing and future appropriated CPB funding to PBS on the basis that the President believes PBS provides "biased and partisan news coverage" and fails to "present[] a fair, accurate, [and] unbiased portrayal of current events to taxpaying citizens," the EO discriminates against Plaintiffs based on perceived viewpoint and thus violates their First Amendment rights.  EO §§ 1, 2.

103.    The Truth Social Post, the White House Statement, and the EO Fact Sheet confirm that the President targeted PBS specifically because he disagreed with the content and viewpoint of its speech.  *See* Truth Social Post; White House Statement; EO Fact Sheet.

## COUNT III

### Violation of the First Amendment, U.S. Const. amend. I:
### Editorial Discretion
### (Against All Defendants)

104.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

105.    The "expression of editorial opinion" "lies at the heart of First Amendment protection." *League of Women Voters*, 468 U.S. at 381.  The "special place of the editorial" in First Amendment jurisprudence "simply reflects the fact that the press, of which the broadcasting industry is indisputably a part, carries out a historic, dual responsibility in our society of reporting information and of bringing critical judgment to bear on public affairs." *Id.* at 382 (citation omitted).  "[T]he government cannot get its way just by asserting an interest in improving, or better balancing, the

marketplace of ideas." *Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024). "However imperfect the private marketplace of ideas, . . . a worse proposal [is] the government itself deciding when speech [is] imbalanced." *Id.* at 733.

106.   Plaintiffs are private entities entitled to First Amendment protection, including as entities engaged in the production and distribution of television media.

107.   The President's "instruct[ion]" in the EO that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS" due to PBS's "portrayal of current events to taxpaying citizens" violates the First Amendment by interfering with Plaintiffs' editorial discretion.  EO § 1.

108.   The President's additional "[i]nstruction[]" in the EO that "[t]he CPB Board . . . cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS" likewise violates the First Amendment by interfering with Plaintiffs' editorial discretion.  EO § 2.

109.   The same is true of the President's further instruction that "[t]he heads of all agencies shall identify and terminate, to the maximum extent consistent with appliable law, any direct or indirect funding of . . . PBS."  EO § 3.

110.   Specifically, through those instructions, the EO openly engages in impermissible balancing by stating that the federal subsidization of PBS must cease in order to provide "fair, accurate, or unbiased portrayal of current events."  EO § 1. In support of the assertion that PBS does not provide such coverage, the EO Fact Sheet criticizes several decisions to disseminate certain programming on issues of

37

public concern, and cites statistics showing a supposed disparity in news coverage of political parties. *See* ¶¶ 51-52, 60, *supra*. That is an effort to "silence[] . . . editorial speech." *League of Women Voters*, 468 U.S. at 398.

## COUNT IV

### Violation of the First Amendment, U.S. Const. amend. I: Unconstitutional Condition (Against All Defendants)

111.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

112.   The government cannot "deny a benefit . . . on a basis that infringes [one's] constitutionally protected interests—especially, [one's] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Within the grant context, the government cannot "seek to leverage funding to regulate speech outside the contours of the federal program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013). That is, the government cannot "compel[] a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 218.

113.   The President's "[i]nstructions" in the EO to CPB to "cease indirect funding" to PBS "by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS," and to "[t]he heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any . . . indirect funding of . . . PBS," violates the First Amendment by placing an unconstitutional condition on funding for PBS Member Stations. EO §§ 2, 3.

114.    PBS and PBS Member Stations are private entities entitled to First Amendment protection.

115.    PBS Member Stations' choices to use congressionally appropriated funding for PBS membership dues, which fund the creation and distribution of programming that PBS Member Stations broadcast, is protected by the First Amendment.

116.    Defendants have placed an unconstitutional condition on congressionally appropriated funding for PBS Member Stations by instructing the CPB Board to revise the guidelines and eligibility criteria under which PBS Member Stations receive grants of federal funds to prohibit funding PBS.   In doing so, Defendants seek to leverage congressionally appropriated funding to regulate speech outside the contours of the Act.   Because PBS Member Stations must pay dues to access PBS programming, and because prohibiting the use of federal funding to pay dues would preclude access to PBS programming for many PBS Member Stations, the EO's restriction dictates the programming PBS Member Stations can air more broadly.   Accordingly, the restriction is a means by which the government is engaged in unconstitutional viewpoint discrimination, interference with editorial discretion, and interference with freedom of the press.

## COUNT V

**Violation of the First Amendment, U.S. Const. amend. I:**
**Retaliation**
**(Against All Defendants)**

117.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

118.    "[T]he First Amendment bars retaliation for protected speech." *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). "A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead," but "[w]hat she cannot do . . . is use the power of the State to punish or suppress disfavored expression." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (citation omitted). Such unconstitutional retaliation occurs where a person "engage[s] in conduct protected under the First Amendment," the government "t[akes] some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," and there is a "causal link" between the protected First Amendment activity and "the adverse action taken against" the person. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

119.    The President's "instruct[ion]" in the EO that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS," and ED's subsequent issuance of the ED Termination Notice, violates the First Amendment by unconstitutionally retaliating against PBS based on PBS's protected speech. EO § 1.

120.    The President's additional "[i]nstruction[]" in the EO that "[t]he CPB Board . . . cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS" likewise violates the First Amendment by unconstitutionally retaliating against PBS based on PBS's protected speech.  EO § 2.

121.    The same is true of the President's further instruction that "[t]he heads of all agencies shall identify and terminate, to the maximum extent consistent with appliable law, any direct or indirect funding of . . . PBS."  EO § 3.

122.    Plaintiffs are private entities entitled to First Amendment protection.

123.    Plaintiffs have engaged in activity protected by the First Amendment, including the production and distribution of children's educational programming and public affairs programming.

124.    Plaintiffs' First Amendment activity was the but-for cause of, and a motivating factor in, Defendants' decision to take retaliatory action against Plaintiffs through the EO.  *See* EO § 1 ("What does matter is that" PBS allegedly does not "present[] a fair, accurate, or unbiased portrayal of current events," and "*therefore* . . . the CPB Board of Directors . . . and all executive departments and agencies" must "cease Federal funding for . . . PBS.") (emphasis added).

125.    Defendants' public statements in the Truth Social Post, the White House Statement, and the EO Fact Sheet make clear that the EO was issued in response to Plaintiffs' protected First Amendment activity.  Those documents identify specific

PBS programs or actions that, in the President's view, justify the cessation of funding to PBS.

126.    Defendants' purported termination of funding to PBS through the EO and all actions associated therewith would likely deter the First Amendment activity of a person of ordinary firmness in Plaintiffs' position by coercing Plaintiffs to modify their speech or else face government retaliation.

**COUNT VI**

**Violation of the First Amendment, U.S. Const. amend. I:
Freedom of the Press
(Against All Defendants)**

127.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

128.    The First Amendment prohibits the government from "abridging the freedom of . . . the press."  U.S. CONST. amend. I; *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980).  "[F]reedom of the press . . . is one of the basic features of American institutions[.]"  *Liberty Lobby, Inc. v. Pearson*, 261 F. Supp. 726, 727 (D.D.C. 1966).  "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."  *Richmond Newspapers*, 448 U.S. at 575-576 (alteration in original).

129.    The President's "instruct[ion]" in the EO that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS," and ED's issuance of the ED Termination Notice, violates the First Amendment's protection of the freedom of the press.  EO § 1.

42

130.    The President's additional "[i]nstruction[]" in the EO that "[t]he CPB Board . . . cease indirect funding to . . . PBS, including by ensuring that licensees and permittees of public . . . television stations, as well as any other recipients of CPB funds, do not use Federal funds for . . . PBS" likewise violates the First Amendment's protection of the freedom of the press.  EO § 2.

131.    The same is true of the President's further instruction that "[t]he heads of all agencies shall identify and terminate, to the maximum extent consistent with appliable law, any direct or indirect funding of . . . PBS."  EO § 3.

132.    Plaintiffs are private entities entitled to First Amendment protection, including as entities engaged in journalistic activities such as the production and distribution of PBS's public affairs programming.

133.    Plaintiffs have engaged in activity protected by the Speech Clause and Press Clause of the First Amendment, including the curation, aggregation, and distribution of public affairs programming.

134.    Defendants have deprived Plaintiffs of their First Amendment right to freedom of the press by terminating PBS funding based on allegations that PBS provides "biased and partisan news coverage" and fails to "present[] a fair, accurate, [and] unbiased portrayal of current events to taxpaying citizens."  EO § 1; *see* Truth Social Post; White House Statement; EO Fact Sheet.

135.    The EO chills news coverage and compromises reporting of valuable news stories and opinion pieces by terminating funding to PBS based on those allegations and the President's criticism that PBS news media is "outdated and

unnecessary" and "corrosive to the appearance of journalistic independence."  EO § 1. Further, the EO, through its termination of funding to PBS, has impinged on the exercise of Plaintiffs' journalistic activities.

## COUNT VII

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### (Against Agency Defendants)

136.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

137.    The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

138.    The EO instructs that "the CPB Board of Directors . . . and all executive departments and agencies . . . cease Federal funding for . . . PBS," including by altering their policies.  EO § 1.

139.    Treasury, at the direction of Secretary Bessent, could implement the EO's prohibition of direct and indirect funding to PBS by managing appropriations deposited in the Public Broadcasting Fund.

140.    OMB, at the direction of Director Vought, could implement the EO's prohibition of direct and indirect funding to PBS by managing the policy implementation activities related to the EO by every relevant federal agency, including Treasury, FEMA, DHS, and ED.

141.    FEMA and DHS, at the direction of Mr. Richardson and Secretary Noem, could implement the EO's prohibition on indirect funding to PBS by conditioning funding for public emergency alert services to PBS Member Stations.

142.    ED, at the direction of Secretary McMahon, has already and could continue to implement the EO's prohibition of funding to PBS by cancelling and denying grants to PBS.

143.    Agency Defendants' actions implementing the EO are "final" agency actions because they finally "determine" the "rights or obligations" of the parties and are backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).

144.    Those actions are unlawful under the Act and the First Amendment for all of the reasons stated above. *See* ¶¶ 81-135, *supra*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1.    Declare that the EO's instruction to cease federal funding to PBS and to place restrictions on federal funding to PBS Member Stations is *ultra vires* and in violation of the Act.

2.    Declare that the EO's instruction to cease federal funding to PBS and to place restrictions on federal funding to PBS Member Stations violates the First Amendment.

3.    Declare that actions of federal agencies to implement the unlawful EO instructions to terminate federal funding to PBS and to place restrictions on federal funding to PBS Member Stations violate the APA.

4.    Issue injunctive and other expedited relief barring Defendants from implementing the EO's termination of funding to PBS and placement of restrictions on federal funding to PBS Member Stations.

5.    Award Plaintiffs reasonable costs and attorneys' fees.

6.    Grant such other relief as the Court deems necessary and proper.

Dated: May 30, 2025                    Respectfully submitted,

                                       */s/ Z.W. Julius Chen*
                                       Z.W. Julius Chen
                                         D.C. Bar No. 1002635
                                       Pratik A. Shah
                                         D.C. Bar No. 497108
                                       AKIN GUMP STRAUSS HAUER & FELD LLP
                                       2001 K Street, NW
                                       Washington, D.C. 20006
                                       202-887-4000
                                       chenj@akingump.com

                                       *Counsel to the Public Broadcasting Service
                                       and Northern Minnesota Public Television,
                                       Inc. d.b.a. Lakeland PBS*