## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC BROADCASTING SERVICE, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants.* | Case No. 1:25-cv-01722-RDM <br><br> **ORAL ARGUMENT REQUEST** |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Public Broadcasting Service ("PBS") and Northern Minnesota Public Television, Inc. *d.b.a.* Lakeland PBS hereby move for summary judgment against Defendants Donald J. Trump, in his official capacity as President of the United States; the United States Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the United States Department of the Treasury; the United States Office of Management and Budget; Russell Vought, in his official capacity as Director of the United States Office of Management and Budget; the United States Department of Education; Linda McMahon, in her official capacity as Secretary of the United States Department of Education; the United States Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; the Federal Emergency Management Agency ("FEMA"); and David Richardson, in his official capacity as Senior Official Performing the Duties of FEMA Administrator.

In support of this motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities, Statement of Undisputed Material Facts, and Declarations of Paula Kerger and Jeff Hanks.  A proposed order is attached.

WHEREFORE, Plaintiffs respectfully request that the Court grant PBS and Lakeland PBS summary judgment; declare unlawful Executive Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025); and permanently enjoin its implementation.

Dated: June 13, 2025                    Respectfully submitted,

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen
  D.C. Bar No. 1002635
Pratik A. Shah
  D.C. Bar No. 497108
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street, NW
Washington, D.C. 20006
chenj@akingump.com
(202) 887-4000

*Counsel for Plaintiffs Public Broadcasting Service and Northern Minnesota Public Television, Inc. d.b.a. Lakeland PBS*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC BROADCASTING SERVICE, *et al.*,

         *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

         *Defendants*.

Case No. 1:25-cv-01722-RDM

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 3

    A.    The Public Broadcasting Act Of 1967 Codifies Congress's
Commitment To Public Television—Free From Political
Interference ................................................................................... 3

    B.    PBS And PBS Member Stations Fulfill The Act's Purposes ........... 10

    C.    The President's Executive Order Purports To Cut Off All Direct
And Indirect PBS Funding ............................................................. 14

    D.    The EO Threatens Devastating Consequences For PBS And PBS
Member Stations .............................................................................. 18

    E.    Procedural History ........................................................................... 19

STANDARD OF REVIEW ............................................................................ 21

ARGUMENT .............................................................................................. 21

    I.    THE PUBLIC BROADCASTING ACT SQUARELY FORECLOSES
THE EXECUTIVE ORDER ..................................................................... 23

    II.    THE EXECUTIVE ORDER VIOLATES THE FIRST AMENDMENT
RIGHTS OF PBS AND PBS MEMBER STATIONS ............................. 27

CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

C̲ASES:

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ...................................................................... 32, 33

*American Forest Res. Council v. United States,*
    77 F.4th 787 (D.C. Cir. 2023) ................................................................ 23

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ................................................................ 31

*Arkansas Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998) ................................................................................ 31

*BEG Invs., LLC v. Alberti,*
    144 F. Supp. 3d 16 (D.D.C. 2015) ......................................................... 32

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................................ 22

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 21, 22

*Corporation for Pub. Broad. v. Trump,*
    --- F. Supp. 3d ---, No. 25-cv-1305 (RDM), 2025 WL 1617191 (D.D.C.
    June 8, 2025) ................................................................................*passim*

*FCC v. League of Women Voters of Cal.,*
    468 U.S. 364 (1984) .....................................................................*passim*

*Harrison v. Federal Bureau of Prisons,*
    298 F. Supp. 3d 174 (D.D.C. 2018) ...................................................... 32

*Jenner & Block LLP v. U.S. Dep't of Just.,*
    --- F. Supp. 3d ---, No. 25-cv-916 (JDB), 2025 WL 1482021 (D.D.C.
    May 23, 2025) ................................................................... 27, 31, 33

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ............................................................. 27, 28, 29, 34

*Lozman v. City of Riviera Beach,*
    585 U.S. 87 (2018) ................................................................................. 31

*Medillín v. Texas,*
    552 U.S. 491 (2008) ................................................................................ 21

*Mills v. Alabama,*
   384 U.S. 214 (1966) ........................................................................... 29

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ..................................................................... 29, 30

*Mountain States Legal Found. v. Bush,*
   306 F.3d 1132 (D.C. Cir. 2002)......................................................... 23

*National Rifle Ass'n of Am. v. Vullo,*
   602 U.S. 175 (2024) ............................................................. 28, 31, 33

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ........................................................................... 32

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980) ........................................................................... 34

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ........................................................................... 28

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Off. of*
   *President,*
   --- F. Supp. 3d ---, No. 25-cv-917 (RJL), 2025 WL 1502329 (D.D.C.
   May 27, 2025) ....................................................................... 31, 32, 33

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ..................................................................... 21, 26

**STATUTES:**

2 U.S.C.
   § 683(a)............................................................................................. 16

5 U.S.C.
   § 706(2)(A)........................................................................................ 22
   § 706(2)(B)........................................................................................ 22
   § 706(2)(C)........................................................................................ 22

47 U.S.C.
    § 396(a) ........................................................................................... 26
    § 396(a)(1) ................................................................................. 5, 11
    § 396(a)(3) ................................................................................. 5, 29
    § 396(a)(5) ......................................................................................... 5
    § 396(a)(6) ......................................................................................... 5
    § 396(a)(10) ........................................................................... 23, 29
    § 396(b) ........................................................................................... 23
    § 396(c)(1) ......................................................................................... 6
    § 396(c)(2) ......................................................................................... 6
    § 396(d)(2) ................................................................................. 6, 23
    § 396(g)(1)(A) .................................................................................. 8
    § 396(g)(1)(D) ........................................................................... 7, 25
    § 396(k)(1)(A) .................................................................................. 9
    § 396(k)(1)(E) .................................................................................. 9
    § 396(k)(2)(A) .................................................................................. 9
    § 396(k)(2)(B) .................................................................................. 9
    § 396(k)(3)(A) ................................................................................ 25
    § 396(k)(3)(A)(i) .............................................................................. 9
    § 396(k)(3)(A)(ii) ............................................................................. 9
    § 396(k)(3)(A)(ii)(I) ......................................................................... 9
    § 396(k)(3)(A)(ii)(II) ..................................................................... 10
    § 396(k)(3)(B) ................................................................................ 25
    § 396(k)(6)(A) ......................................................................... 10, 25
    § 396(k)(6)(B) ........................................................................... 9, 25
    § 396(k)(6)(B)(i) ............................................................................ 10
    § 396(k)(6)(B)(ii) ........................................................................... 10
    § 396(k)(7) ................................................................................. 7, 25
    § 398(a) ..................................................................... 2, 7, 24, 29
    § 398(c) ......................................................................... 2, 7, 24

Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C.
    §§ 681 *et seq.* ................................................................................ 16

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub.
    L. No. 119-4, §§ 1112, 1113, 139 Stat. 9, 14-15 ...................... 9

Public Broadcasting Financing Act of 1975, Pub. L. No. 94-192, § 2, 89
    Stat. 1099, 1099 ............................................................................. 8

**OTHER AUTHORITIES:**

CPB, *Corporation for Public Broadcasting Statement Regarding
Executive Order on Public Media* (May 2, 2025) .................................. 20

CPB, *History Timeline: November 3, 1969, CPB Establishes PBS* (last visited June 13, 2025) ........................................................................... 10

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 1, 2025, 4:17 PM) ............................................................................................ 15, 30

Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025) ......................................*passim*

*Fact Sheet:  President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, THE WHITE HOUSE (May 1, 2025) ..................... 18

FED. R. CIV. P. 56(a) ............................................................................... 21

H.R. REP. NO. 90-572 (1967) .................................................................... 6

Kennedy, John F., *Statement by the President Upon Signing Bill Providing for Educational Television*, THE AM. PRESIDENCY PROJECT, May 1, 1962 ............................................................................ 4

*Kids Count Data Center*, THE ANNIE E. CASEY FOUND. (last updated Mar. 2025) ........................................................................................... 11

Mulling, Benjamin et al., *White House to Ask Congress to Claw Back Funding from NPR and PBS*, THE N.Y. TIMES (Apr. 14, 2025) ........................... 16

PBS, *Trusted. Valued. Essential.* (2025) ..................................................... 13

*Perceived Accuracy and Bias in the News Media*, KNIGHT FOUND. (last visited June 13, 2025) ........................................................................... 13

Rescission Proposal Nos. 25-21, 25-22 (May 28, 2025) .............................. 16

S. REP. NO. 90-222 (1967) ...................................................................... 6

*Scholtes, Jennifer & Megan Messerly, White House to Send Congress a Formal Request to Nix $9.3B for PBS, NPR, State Department*, POLITICO (Apr. 14, 2025) ...................................................................... 16

*The NPR, PBS Grift Has Ripped Us Off for Too Long*, THE WHITE HOUSE (Apr. 14, 2025) .......................................................... 15, 16, 18, 30

## INTRODUCTION

On May 1, 2025, President Trump issued an unprecedented—and unlawful—directive attacking public broadcasting, with grave implications for Plaintiff Public Broadcasting Service ("PBS") and its member stations like Plaintiff Northern Minnesota Public Television, Inc. d.b.a Lakeland PBS.  *See* Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025) (the "EO").  The EO attempts to withhold federal funding simply because the President disagrees with the speech of the private non-profit entities that Congress has charged with developing and distributing non-commercial programming free from Executive Branch interference.  Neither the Public Broadcasting Act of 1967 (the "Act") nor the First Amendment countenances such brazen overreach.

Pursuant to Congress's mandate and funding under the Act, PBS has provided trusted and award-winning educational, cultural, scientific, and public affairs programming—like *Mister Rogers' Neighborhood*, *Sesame Street*, *NOVA*, *Frontline*, and numerous Ken Burns films (*e.g.*, *The Civil War*, *Baseball*, *The National Parks: America's Best Idea*, and *Country Music*)—to PBS member stations and their millions of viewers of all ages and communities across the United States for more than half a century.  Yet the EO seeks to cut off all direct and indirect federal funding to PBS. Why upend public broadcasting now?  As the EO itself explains, the President believes that PBS content is not "fair, accurate, unbiased, and nonpartisan."  EO § 1. PBS disputes those charged assertions in the strongest possible terms.  Regardless, the Act and the First Amendment forbid the President from serving as the arbiter of appropriate content and suppressing the speech of public media he disfavors,

including by attempting to defund PBS and control the editorial decisions of member stations.

Indeed, since Congress laid the foundations for the growth of public television over 50 years ago, it has protected the flow of federal funds from political interference by filtering them through the Corporation for Public Broadcasting ("CPB")—a non-federal, non-profit, and non-partisan entity—and by providing for longer-term advance appropriations. Lest there be any doubt that the Executive Branch should have no power to influence CPB's decisionmaking, Congress enacted a specific "[p]rohibition": no "department, agency, officer, or employee of the United States" may "exercise any direction, supervision, or control over public telecommunications, *or over [CPB] or any of its grantees*"—including with respect to "the *content* or *distribution* of public telecommunications programs and services." 47 U.S.C. § 398(a), (c) (emphases added). The EO disregards Congress's will and CPB's independent status by purporting to prohibit (i) CPB from giving any funds to PBS and (ii) member stations from using any federal funds they receive to access PBS programming and resources.

In doing so, the EO not only flouts multiple provisions of the Act but also violates the First Amendment. The EO makes no attempt to hide the fact that it is seeking to cut off the flow of funds to PBS because of the content of PBS programming and out of a desire to alter that protected private speech. That is blatant viewpoint discrimination, an infringement of PBS and member stations' editorial discretion, and retaliation against PBS for (among other things) perceived political slights in

news coverage.  The EO also seeks to impose an unconstitutional condition on member stations' receipt of federal funds by leveraging federal funding as a means to control the content that will air on local channels around the country.  Indeed, the chilling effect of the EO goes beyond PBS programming: public television stations risk reprisal if they broadcast speech the President dislikes.  For all those reasons, the EO is an unconstitutional attack on the First Amendment's protections of both free speech and a free press.

The Court should grant PBS and Lakeland PBS's motion for summary judgment, declare the EO unlawful, and permanently enjoin its implementation.

## BACKGROUND

### A.    The Public Broadcasting Act Of 1967 Codifies Congress's Commitment To Public Television—Free From Political Interference

For nearly a century, the federal government has sought to foster and protect public media.  As commercial broadcasting rapidly expanded in the 1930s and the percentage of broadcast licenses held by non-commercial stations began to shrink, the Federal Communications Commission ("FCC") reserved certain frequencies for educational radio in order to mitigate the "potential effect of *** commercial pressures on educational stations." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 367 (1984).  "[I]n 1952, with the advent of television, the FCC reserved certain television channels solely for educational stations" for the same reason. *Id.*

In the Education Television Act of 1962, Congress went a step further by providing "direct financial assistance to noncommercial, educational broadcasting" through a $32 million grant program (equivalent to well over $300 million today).

*League of Women Voters*, 468 U.S. at 367-368.  When President Kennedy signed that bill, he explained that "the wide availability of quality education is vital to our national growth and security," that as a Nation "we must make effective use of all of our educational resources," and that public television is an "important educational medium" that had not lived up to its potential "[i]n spite of the vigorous efforts of many states and communities."[1]

In 1967, a special commission reviewed the state of educational broadcasting. *See League of Women Voters*, 468 U.S. at 368.  "Finding that the prospects for an expanded public broadcasting system rested on 'the vigor of its local stations,' but that these stations were hobbled by chronic under financing, the *** [c]ommission called upon the Federal Government to supplement existing state, local, and private financing so that educational broadcasting could realize its full potential as a true alternative to commercial broadcasting."  *Id.*  The commission thus "recommended the creation of a nonprofit, nongovernmental 'Corporation for Public Television' to provide support for noncommercial broadcasting."  *Id.*  In doing so, the commission also endorsed "a larger view" for the future of public broadcasting centered on not just educational programming, but also "political[] and cultural programming broadly defined."  *Id.* at 368 n.3.

The commission's report was "met with widespread approval" and "its proposals became the blueprint for the Public Broadcasting Act of 1967, which

---

[1] John F. Kennedy, *Statement by the President Upon Signing Bill Providing for Educational Television*, THE AM. PRESIDENCY PROJECT, May 1, 1962, https://tinyurl.com/5n6k8nm6.

established the basic framework of the public broadcasting system" that continues to this day. *League of Women Voters*, 468 U.S. at 368. As Congress found and declared in the Act, "it is in the public interest to encourage the growth and development of public *** television broadcasting, including the use of such media for instructional, educational, and cultural purposes," and to "encourage the development of programming that involves creative risks and that addresses the needs of unserved and underserved audiences." 47 U.S.C. § 396(a)(1), (6). Congress recognized that "it furthers the general welfare to encourage public telecommunications services which will be responsive to the interests of people both in particular localities and throughout the United States, which will constitute an expression of diversity and excellence," and that the "expansion and development of public telecommunications and of diversity of its programming depend on freedom, imagination, and initiative on both local and national levels." *Id.* § 396(a)(3), (5).

Although Congress had "decided to provide financial support" for public television, "all concerned agreed that this step posed some risk that these traditionally independent stations might be pressured into becoming forums devoted solely to programming and views that were acceptable to the Federal Government." *League of Women Voters*, 468 U.S. at 386. Congress thus "sought *** to fashion a system that would provide local stations with sufficient funds to foster their growth and development while preserving their tradition of autonomy and community-orientation." *Id.* As the Senate Report accompanying the Act explained, that system "should in no way involve the Government in programming or program judgments."

*Id.* at 386 n.17 (quoting S. REP. NO. 90-222, at 4, 11 (1967)).  Indeed, the Senate Report stated "*in the strongest terms possible* that it is our intention that local stations be *absolutely free to determine for themselves what they should or should not broadcast.*"  S. REP. NO. 90-222, at 11 (emphases added).  Relatedly, as the accompanying House Report made clear, Congress contemplated a system that would "provide the most effective insulation from Government control or influence over the expenditure of funds."  *League of Women Voters*, 468 U.S. at 386 n.17 (quoting H.R. REP. NO. 90-572, at 15 (1967)).  To those ends, Congress "created the Corporation for Public Broadcasting" and adopted a series of "measures designed both to ensure the autonomy of the Corporation and to protect the local stations from governmental interference and control."  *Id.* at 369.

To start, CPB's "private, bipartisan structure" inherently "insulate[s]" grantees "from governmental influence."  *League of Women Voters*, 468 U.S. at 388-389.  Although the President nominates and the Senate confirms CPB Board members, they serve staggered six-year terms, may comprise "[n]o more than 5 [out of 9 total] members of *** the same political party," and must "not [be] regular full-time employees of the United States."  47 U.S.C. § 396(c)(1), (2); *see also id.* § 396(c)(5).  In addition, Board members "shall not, by reason of such membership, be deemed to be officers or employees of the United States."  *Id.* § 396(d)(2).

Beyond those structural protections, the Act expressly protects both CPB and its grantees from "governmental coercion and interference."  *League of Women Voters*, 468 U.S. at 389-390.  In a provision entitled "Federal interference or control,"

Congress set forth a "Prohibition" that no "department, agency, officer, or employee of the United States" may "exercise any direction, supervision, or control over public telecommunications, *or over [CPB] or any of its grantees*."  47 U.S.C. § 398(a) (emphasis added).  Another provision confirms that "[n]othing in this section shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the *content* or *distribution* of public telecommunications programs and services."  *Id.* § 398(c) (emphases added).  As the Supreme Court has recognized, a "unifying theme of these various statutory provisions is that they substantially reduce the risk of governmental interference with the editorial judgments" of grantees "without restricting [their] ability to speak on matters of public concern."  *League of Women Voters*, 468 U.S. at 390.

The Act also expressly confirms that funds allocated by CPB to public television stations "may be used *at the discretion of the recipient* for purposes related primarily to the production or acquisition of programming."  47 U.S.C. § 396(k)(7) (emphasis added).  That is consistent with the Act's broader requirement that CPB "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities."  *Id.* § 396(g)(1)(D).  And in "facilitat[ing] the full development of public telecommunications in which programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made

available to public telecommunications entities," *id.* § 396(g)(1)(A), CPB is required
to "adhere strictly to a standard of 'objectivity and balance' in disbursing federal
funds to local stations," *League of Women Voters*, 468 U.S. at 389 (quoting 47 U.S.C.
§ 396(g)(1)(A)).

Rather than subject CPB and grantees to the uncertainties of the annual
appropriations process, Congress ultimately provided for "long-term appropriations"
that give grantees "greater autonomy in defining the uses to which those funds should
be put." *League of Women Voters*, 468 U.S. at 389-390.  "Congressional experience
with the Act following its passage in 1967"—namely, President Nixon's veto of a CPB
funding bill based on objections to "nationally distributed public affairs programs" of
which his "administration was critical"—"reaffirmed [Congress's] commitment to
preserving broad editorial discretion for local stations" and resulted in "a firm
congressional commitment to develop[] long-range financing for public broadcasting
to provide adequate insulation against Government interference."  *Id.* at 392 n.21
(internal quotation marks omitted).  Congress realized that the only way to "[ensure]
strong local programming" was to mandate "unrestricted support" via such financing.
*Id.* (alteration in original).  So, beginning in 1975, Congress has provided two-year
advance appropriations to CPB outside the standard annual budget cycle.  *See* Public
Broadcasting Financing Act of 1975, Pub. L. No. 94-192, § 2, 89 Stat. 1099, 1099.
That practice "ha[s] been carried forward in subsequent amendments to the Act."
*League of Women Voters*, 468 U.S. at 392 n.21.  In 2025, for example, Congress

appropriated funds through 2027.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1112, 1113, 139 Stat. 9, 14-15.

The Act's provisions governing how such funding is distributed reinforce the Executive Branch's limited role.  The Act establishes a fund in the Department of the Treasury, known as the "Public Broadcasting Fund," to be administered by the Secretary of the Treasury.  47 U.S.C. § 396(k)(1)(A).  The Act further instructs that the Secretary "shall make available to [CPB]" appropriated funds, that "[f]unds appropriated" to CPB "shall remain available until expended," and that "[f]unds appropriated and made available" "shall be disbursed by the Secretary *** on a fiscal year basis."  *Id.* § 396(k)(1)(E), (2)(A), (2)(B).

Of the funding that the Secretary is required to disburse to CPB, the Act provides that "75 percent" of such funds remaining after administrative and capital costs "shall be allocated" for public television.  47 U.S.C. § 396(k)(3)(A)(i) & (k)(3)(A)(ii).  That 75% of CPB funding dedicated for public television is further divided into two parts.

First, "75 percent of such amounts shall be available for distribution among the licensees and permittees of public television stations" (like Lakeland PBS).  47 U.S.C. § 396(k)(3)(A)(ii)(I).  That funding occurs through "a basic grant" in "accordance with eligibility criteria *** that promote the public interest in public broadcasting, and on the basis of a formula designed to *** provide for the financial needs and requirements of stations in relation to the communities and audiences such stations undertake to serve."  *Id.* § 396(k)(6)(B).  The funding should "maintain

existing, and stimulate new, sources of non-Federal financial support for stations by providing incentives for increases in such support." *Id.* § 396(k)(6)(B)(ii).

Second, "25 percent of such amounts shall be available for distribution *** for national public television programming" in two further subcategories. 47 U.S.C. § 396(k)(3)(A)(ii)(II). The first subcategory reserves funds for "grants for production of public television." *Id.* § 396(k)(3)(B)(i). The second subcategory expressly gives PBS a role in allocating funds, stating that such funds "shall be available for distribution" "in accordance with any plan implemented" after CPB "conduct[s] a study *** in consultation with public television licensees *** and the Public Broadcasting Service, on how funds available to [CPB] *** can be best allocated to meet the objectives of this chapter with regard to national public television programming." *Id.* § 396(k)(3)(A)(ii)(II) & (k)(6)(A).

## B.    PBS And PBS Member Stations Fulfill The Act's Purposes

In 1969, just two years after Congress enacted the Act, CPB facilitated the formation of PBS—a membership organization currently comprising 336 local television stations seeking to leverage their combined resources and better serve their communities through public television. Decl. of Paula Kerger (Ex. A) ¶¶ 1, 6 ("Kerger Decl.").[2] For decades, PBS and member stations have provided commercial-free television programming that reflects the interests of the American people. *Id.* ¶¶ 4, 6-7.

---

[2] *See also* CPB, *History Timeline: November 3, 1969, CPB Establishes PBS*, https://tinyurl.com/py2x3dkk (last visited June 13, 2025).

In particular, PBS and member stations have fulfilled the promise of public broadcasting as a means "to permit nationwide distribution of educational programs to all local stations that wish[] to receive and use them." *League of Women Voters*, 468 U.S at 368. PBS reaches more children, and more parents of young children, than any other children's television network. Kerger Decl. ¶ 9. PBS KIDS averages 16 million monthly users and over 350 million monthly streams across digital platforms. *Id.* Similarly, PBS LearningMedia—a digital library of free assets, interactive videos, media galleries, lesson plans, content from partners (like NASA, the Library of Congress, and the Smithsonian), and other resources for teachers and students—hosts nearly 1.5 million unique users on its website each month during the school year. *Id.* Academic studies have shown that PBS's educational programming is highly effective at improving children's math, science, and literacy skills, and has helped millions of preschool-aged children prepare for and ultimately succeed in school. *Id.* PBS is especially vital to early-childhood education in America because less than half of preschool-aged children attend formal preschool.[3]

As Congress envisioned, PBS and member stations offer "cultural" programming as well. 47 U.S.C. § 396(a)(1). To list just a few examples, PBS has provided content on music and the arts (*e.g.*, *Austin City Limits*, *Southern Storytellers*, and *Great Performances*) and regional American culinary traditions (*e.g.*, *The Great American Recipe*, *A Chef's Life*, and *La Frontera with Pati Jinich*) that

---

[3] *See Kids Count Data Center*, THE ANNIE E. CASEY FOUND., https://tinyurl.com/2p9smce6 (last updated Mar. 2025).

helps Americans better understand their neighbors, communities, and country. Kerger Decl. ¶ 10.

PBS's in-depth public affairs programming, while comprising less than 10% of PBS's broadcast schedule, is likewise highly valued by viewers. Kerger Decl. ¶ 11. *PBS News Hour* is the only nightly hour-long television news program on a free broadcast (rather than cable) network in the country, with a nightly audience of 2.1 million viewers in 2025. *Id. Frontline*, a long-form news and current affairs series, has won every major journalism and broadcasting award, including 108 Emmy Awards, 31 Peabody Awards, and a Pulitzer Prize. *Id.* And PBS's new program, *Breaking the Deadlock*—the first episode of which was introduced by Supreme Court Justices Amy Coney Barrett and Sonia Sotomayor—is a modern reimagining of PBS's previously long-running *Fred Friendly Seminars*. *Id.* On *Breaking the Deadlock*, high-profile Americans from a wide variety of ideological backgrounds work through hypothetical ethical dilemmas. *Id.*

All the foregoing content—and more—is free to the public and available to nearly 97% of the United States' population, serving parts of the country not profitable for commercial media. Kerger Decl. ¶ 7. Unsurprisingly, PBS's audience mirrors the overall U.S. population with respect to geography, income, education, race, and ethnicity. *Id.* ¶ 8. Sixty percent of PBS viewers live outside of urban areas. *Id.* And PBS viewers are almost evenly split among Republicans, Democrats, and independents. *Id.*

Notably, a recent survey of a politically representative sample of U.S. adults (conducted by YouGov) showed that PBS is the most trusted institution in the United States, as compared to video streaming services, commercial cable television, news publications, commercial broadcast television, the federal government, Congress, courts of law, and social media platforms. Kerger Decl. ¶ 14.[4] The same survey found that PBS is the most trusted news network. *Id.* Another recent survey found that PBS is the most accurate source of news in the United States. *Id.*[5]

None of the community-focused flexibility, creativity, and initiative contemplated by Congress would be possible without the partnership between PBS and member stations. PBS harnesses the resources it receives from congressional appropriations (directly and indirectly through member station annual dues) to serve as a vital source of both content and support for member stations. *See* Kerger Decl. ¶ 12. For example, PBS manages the public television interconnection system—a 24/7/365 cloud-based, terrestrial broadband and satellite video distribution system among PBS, member stations, content distributors, and digital platforms. *Id.* PBS further supports member stations by negotiating with national cable and satellite systems and digital streaming platforms (*e.g.*, YouTube TV, Amazon Prime Video). *Id.* And PBS supports member stations' fundraising efforts (*e.g.*, through procurement and distribution of proven on-air pledge programs, development

---

[4] *See* PBS, *Trusted. Valued. Essential.* (2025), https://tinyurl.com/4mdknmjd (describing results of YouGov survey conducted from January 6 to January 10, 2025).

[5] *See Perceived Accuracy and Bias in the News Media*, KNIGHT FOUND., at 15, https://tinyurl.com/4snvz87u (last visited June 13, 2025).

training for local station staff, and market research).  *Id.*  By providing these and other services, PBS enables member stations to leverage economies of scale to optimize their programming and operations, and to achieve savings that they can reinvest in, among other things, the production of local content, organizing local screenings and events to bring their communities together, and coordinating emergency alert services with local public safety officials.  *Id.*

Lakeland PBS is a paradigmatic example of a PBS member station that provides essential broadcast services to unserved and underserved people, in reliance on PBS programming and services.  Decl. of Jeff Hanks (Ex. B) ¶¶ 3-4, 10 ("Hanks Decl.").  Based in northern and central Minnesota, Lakeland PBS has been a member station since it began operating in 1979.  *Id.* ¶¶ 2-3.  It currently holds two station licenses (KAWE in Bemidji and KAWB in Brainerd).  *Id.* ¶ 2.  Lakeland PBS's free content is broadly viewed across roughly 7,500 square miles, including some of the poorest counties in the state and several tribal reservations.  *Id.* ¶¶ 3-4.  That service area includes over 490,000 people, none of whom lives in a town or city with a population greater than 20,000.  *Id.* ¶ 4.  For all those people, Lakeland PBS is the only source of local programming—and provides commercial-free national programming at no cost as well.  *Id.* ¶¶ 7-8.

## C.  The President's Executive Order Purports To Cut Off All Direct And Indirect PBS Funding

Despite the Act's intended insulation of CPB, PBS, and local public television broadcasters from political pressure, the President has waged a campaign against

14

PBS based on his disagreement with the views purportedly expressed through PBS's programs and editorial decisions—culminating in the EO.

On April 1, 2025, the President posted on his Truth Social account: "REPUBLICANS MUST DEFUND AND TOTALLY DISASSOCIATE THEMSELVES FROM NPR & PBS, THE RADICAL LEFT 'MONSTERS' THAT SO BADLY HURT OUR COUNTRY!" Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Apr. 1, 2025, 4:17 PM) (the "Truth Social Post").[6] Similarly, on April 14, 2025, the White House published a statement alleging that PBS has "spread radical, woke propaganda disguised as 'news.'" *The NPR, PBS Grift Has Ripped Us Off for Too Long*, THE WHITE HOUSE (Apr. 14, 2025) (the "White House Statement").[7] In addition to targeting National Public Radio, the Statement proclaims that "taxpayer funding of *** PBS's biased content is a waste." *Id.* As examples of such purported waste—or what the White House refers to as "trash that passes for 'news' at *** PBS"—the Statement points to, among other things:

> -a 2024 documentary allegedly "making the case for reparations";
>
> -a 2023 *Washington Week* roundtable that allegedly "covered up Joe Biden's clear mental decline, with far-left 'journalist' Jeff Goldberg *claiming* Biden is actually 'quite acute'";
>
> -a 2021 children's program that "featured a drag queen";
>
> -a 2020 town hall featuring *Sesame Street* allegedly "aimed [at] presenting children with a one-sided narrative to 'address racism' amid the Black Lives Matter riots";

---

[6] https://tinyurl.com/ydytaf8z.

[7] https://tinyurl.com/2pt9hcnx.

> -a 2017 panel allegedly "devoted to what it 'mean[s] to be woke' and 'white privilege'"; and
>
> -a 2017 film that allegedly "celebrat[ed] a transgender teenager's so-called 'changing gender identity.'"

*Id.*  The Statement also alleges that PBS has "zero tolerance for non-leftist viewpoints" based on several "stud[ies]" purporting to demonstrate that PBS covers Republicans more negatively than Democrats. *See id.*  PBS disputes those examples, assertions, and cherry-picked "stud[ies]" as inaccurate and misrepresentative of the variety and balance of PBS programming.

The same day that the White House Statement was released, several news outlets reported that the White House was planning to request from Congress a "rescission" of PBS funding under the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*.[8]  Before eventually doing so, however, the President acted unilaterally and issued the EO on May 1, 2025.  *See* EO.[9]

The EO begins by proclaiming that, "[u]nlike in 1967," when the Act was enacted, "today the media landscape is filled with abundant, diverse, and innovative

---

[8] *See* Jennifer Scholtes & Megan Messerly, *White House to Send Congress a Formal Request to Nix $9.3B for PBS, NPR, State Department*, POLITICO (Apr. 14, 2025), https://tinyurl.com/3yts7529; Benjamin Mullin et al., *White House to Ask Congress to Claw Back Funding from NPR and PBS*, THE N.Y. TIMES (Apr. 14, 2025), https://tinyurl.com/ydsda2fz.

[9] On May 28, 2025, the President formally requested that Congress rescind the full amounts appropriated to CPB for fiscal years 2026 and 2027.  *See* Rescission Proposal Nos. 25-21, 25-22 (May 28, 2025), https://tinyurl.com/4kpsuzb4; *see also* 2 U.S.C. § 683(a).  To date, Congress has not agreed to a resolution approving the President's rescission request.

news options," and therefore, "[g]overnment funding of news media *** is not only outdated and unnecessary but corrosive to the appearance of journalistic independence." EO § 1. The EO then asserts that CPB "fails to abide by" the principles of "impartiality" reflected in the Act "to the extent it subsidizes *** PBS." *Id.* The EO purports to take the position that "[w]hich viewpoints *** PBS promote[s] do[] not matter." *Id.* But in the next sentence, the EO declares that what "does matter" is that PBS "presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." *Id.*

Based on the President's view that PBS's content is not fair, accurate, or unbiased, the EO then "instruct[s]" the CPB Board and "all executive departments and agencies" to "cease Federal funding for *** PBS." EO § 1. With respect to CPB in particular, the EO states:

> (a) The CPB Board shall cease direct funding to *** PBS, consistent with my Administration's policy to ensure that Federal funding does not support biased and partisan news coverage. The CPB Board shall cancel existing direct funding to the maximum extent allowed by law and shall decline to provide future funding.

> (b) The CPB Board shall cease indirect funding to *** PBS, including by ensuring that licensees and permittees of public *** television stations, as well as any other recipients of CPB funds, do not use Federal funds for *** PBS.

*Id.* § 2. The EO further instructs the "heads of all agencies" to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of *** PBS." EO § 3.

17

To support the EO, the President contemporaneously published a document styled as a "Fact Sheet" (the "EO Fact Sheet").[10]  The EO Fact Sheet accuses PBS of having "fueled partisanship and left-wing propaganda with taxpayer dollars, which is highly inappropriate and an improper use of taxpayers' money."  EO Fact Sheet. And the EO Fact Sheet includes the same misleading assertions as the White House Statement.  *See id.*

On May 2, 2025, the day after the EO issued, the Department of Education ("ED") sent a notice to CPB that it was terminating a federal award under which CPB had granted PBS $78 million to produce and distribute "Ready to Learn" educational content for children.  *See* Compl. Ex. A, ECF No. 1-1.

### D.  The EO Threatens Devastating Consequences For PBS And PBS Member Stations

Both PBS and member stations like Lakeland PBS rely heavily on the federal funding that the EO eliminates (for PBS) and restricts (for member stations). Roughly 22% of PBS's budget comes directly from federal grants (primarily from CPB).  Kerger Decl. ¶ 17.  Another 61% comes from member station dues—and many member stations pay those dues with the federal funds the EO now purports to restrict (which constitute more than 50% of some member stations' budgets).  *Id.* ¶¶ 17, 18.  The EO thus jeopardizes a significant portion of PBS's budget.

Of course, any such reduction to PBS's budget would negatively affect both the programming and the services that PBS provides to member stations.  Kerger Decl.

---

[10] *Fact Sheet:  President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, THE WHITE HOUSE (May 1, 2025), https://tinyurl.com/ymnewhh6.

¶¶ 15, 20. For example, 56% of programming on Lakeland-Prime (Lakeland PBS's main channel) and 100% of programming on Lakeland-PBS Kids (Lakeland PBS's educational channel) comes from PBS. Hanks Decl. ¶ 9. Lakeland PBS also relies on PBS services to serve its local viewers, fundraise, and more. *Id.* ¶¶ 10-11.

The EO's prohibition on federal funds reaching PBS indirectly (through member stations) is no less consequential than the EO's prohibition on PBS receiving federal funds directly. Many stations necessarily use federal funds to pay their PBS dues. Kerger Decl. ¶¶ 18, 21. To illustrate, Lakeland PBS currently pays the entirety of its PBS dues with federal funds, and Lakeland PBS cannot use non-federal funds to cover PBS dues without facing significant shortfalls in other areas given various restrictions. Hanks Decl. ¶¶ 13, 17. The EO would thus force Lakeland PBS to choose between such shortfalls and ceasing payment of PBS dues. *Id.* ¶ 17. Without paying dues, Lakeland PBS would lose access to *all* PBS content and services, replacements for which are not readily or affordably available from other sources. *Id.* The EO's indirect funding bar thus presents an existential threat to Lakeland PBS—the only local source of television programming for hundreds of thousands of Minnesotans—and many similar member stations. *Id.*

### E.    Procedural History

Given the threats posed by the EO, PBS and Lakeland PBS brought this lawsuit to protect themselves and member stations across the country. They seek a declaration that the EO is unlawful and a permanent injunction barring its

implementation by various federal agencies and their heads that disburse millions of dollars in federal grants that benefit PBS and member stations. *See* Compl. 45.[11]

For its part, CPB has taken the position that it is "not a federal executive agency subject to the President's authority. Congress directly authorized and funded CPB to be a private nonprofit corporation wholly independent of the federal government."[12] The President, however, has attempted to remove three of the five members of the CPB board (which otherwise has four vacancies). In CPB's pending lawsuit challenging the purported removal, this Court denied CPB's motion for a preliminary injunction because, "[f]or present purposes and on the present record," CPB had not carried its burden of demonstrating that the President could not remove the Board members and that CPB was likely to suffer irreparable harm. *Corporation for Pub. Broad. v. Trump*, --- F. Supp. 3d ---, No. 25-cv-1305 (RDM), 2025 WL 1617191, at *2 (D.D.C. June 8, 2025). In doing so, the Court left "questions regarding the status of the Corporation and its relationship with the federal government *** for another

---

[11] In addition to the Department of the Treasury and Secretary of the Treasury Scott Bessent (whose roles in disbursing funds to CPB are spelled out in the Act and discussed above), PBS and Lakeland PBS are suing: (i) the Office of Management and Budget ("OMB") and OMB director Russell Vought because OMB supervises the activities of Executive Branch agencies; (ii) ED and Secretary of ED Linda McMahon because ED provides grants to PBS (and has already terminated a significant grant immediately after the EO, *see* p. 18, *supra*); and (iii) the Department of Homeland Security ("DHS"), Secretary of DHS Kristi Noem, the Federal Emergency Management Agency ("FEMA"), and David Richardson, the Senior Official Performing the Duties of FEMA Administrator because FEMA (which is an agency within DHS) provides grants to CPB and PBS member stations relating to emergency warning systems.

[12] CPB, *Corporation for Public Broadcasting Statement Regarding Executive Order on Public Media* (May 2, 2025), https://tinyurl.com/2wkyfub6.

day." *Id.* In addition, given the Act's "focus on non-interference," the Court clarified that CPB could "renew[] [its] motion should Defendants (or those acting in concert with them) take steps to interfere in the independence of [CPB]." *Id.* at *2, 9.

Regardless, the EO plainly assumes the President has the authority to instruct CPB to cease direct federal funding to PBS and to prohibit PBS member stations from continuing to leverage federal funds to support and access PBS content and services. The EO's directive is currently in effect and purports to bind the Executive Branch, including the grant-making agencies identified above (note 11, *supra*).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties agree that this lawsuit, which challenges the legality of an executive order, should be resolved on cross-motions for summary judgment. *See* ECF No. 10, at 2.

## ARGUMENT

"The president's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

The EO is *ultra vires* because it violates the Public Broadcasting Act and the First Amendment. Congress could not have been clearer that the federal government

should have no role in CPB's distribution of federal funds to private entities, which in turn must be allowed to make decisions—free from political intrusion—about the national and local programming that will best serve their communities. Reinforcing those statutory protections, the Constitution forbids the federal government from influencing the balance of viewpoints broadcast on public television to remove purported bias, including by restricting the use of federal funds provided to private speakers exercising their editorial and journalistic discretion.

For the same reasons, the agency Defendants' implementation of the EO is "not in accordance with law," "contrary to constitutional right," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(A)-(C)—and must be declared unlawful and enjoined as well, *see Reich*, 74 F.3d at 1327 ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."). Agency implementation constitutes "final" action because it "determine[s]" the "rights or obligations" of PBS and member stations and is backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997); *cf. Reich*, 74 F.3d at 1328 ("We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'") (alteration in original).

## I.    THE PUBLIC BROADCASTING ACT SQUARELY FORECLOSES THE EXECUTIVE ORDER

"Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President acts within those limits." *American Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated.").  The EO blows past the limits spelled out in numerous provisions of the Act and "is irreconcilable with the congressional commitment to independence." *Corporation for Pub. Broad.*, 2025 WL 1617191, at \*7.

As an initial matter, Congress did not give the President *any* authority to compel CPB to take *any* action, including actions that interfere with direct and indirect PBS funding.  Instead, Congress provided that CPB—a "private corporation"—is "not \*\*\* an agency or establishment of the United States Government," and members of the CPB Board are "not \*\*\* officers or employees of the United States."  47 U.S.C. § 396(a)(10), (b), (d)(2).  The President has no more power to instruct CPB what to do than the President has power to instruct any other private corporation what to do.  Accordingly, the President's instructions to CPB—to "cease direct \*\*\* [and] indirect funding to \*\*\* PBS, including by ensuring that licensees and permittees of public \*\*\* television stations, as well as any other recipients of CPB funds, do not use Federal funds for \*\*\* PBS," EO § 2—is not rooted in any statutory authority.

But Congress did not just stop short of giving the President supervisory power over CPB. Congress also took affirmative "steps to ensure the Corporation's independence." *Corporation for Pub. Broad.*, 2025 WL 1617191, at *2. Specifically, Congress forbade "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over [CPB] or any of its grantees, *** or over *** any *** public telecommunications entity." 47 U.S.C. § 398(a). In open contravention of that statutory command, the EO purports to "direct[]," "supervis[e]," and "control" how both CPB and public-television-station grantees disburse and expend funds by prohibiting them from giving funds to PBS.

Another provision confirms that the Act's general prohibition on Executive Branch "direction, supervision, or control" applies to "the content or distribution of public telecommunications programs and services." 47 U.S.C. § 398(c). Yet the EO is explicit that the government is seeking to "determine which categories of [news] activities to subsidize" and to provide, in the President's view, "a fair, accurate, or unbiased portrayal of current events." EO § 1. Both the manifest purpose and inevitable effect of the EO are to alter the balance of content that is broadcast on public television, while impairing PBS's ability to provide vital services to local stations. In other words, the EO does exactly what the statute forbids: direct, supervise, and control the content and distribution of public television programs and services.

The EO's indirect funding bar on PBS member stations also violates the Act's instructions that funds allocated by CPB "may be used *at the discretion of the recipient* for purposes related primarily to the production or acquisition of programming," 47 U.S.C. § 396(k)(7) (emphasis added), and that CPB must "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the *maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities*," *id.* § 396(g)(1)(D) (emphasis added). The indirect funding bar does the opposite. It instructs CPB to *eliminate* the discretion of grantees by preventing them from putting federal funds towards their PBS dues—effectively substituting the President's discretion for their discretion. And it instructs CPB to condition grants in a manner that *limits* (rather than maximizes) grantees' freedom over program content and other activities.

Further still, the EO's directives have the effect of end-running the "protections" against "governmental coercion and interference" embedded in Congress's "long-term appropriations." *League of Women Voters*, 468 U.S. at 389-390. Congress "strictly defined the percentage of appropriated funds that must be disbursed by [CPB], [47 U.S.C.] § 396(k)(3)(A)-(B)," and "defined objective criteria under which local television *** stations receive basic grants from [CPB] to be used at the discretion of the station, §§ 396(k)(6)(A)-(B), 396(k)(7)," *League of Women Voters*, 468 U.S. at 389. Yet the EO contravenes the Act's guarantees by purporting

to stop the flow of already appropriated funds to PBS and to prohibit member stations from spending funds as they see fit—including on PBS programming and services.

By declaring that the reasons motivating Congress to enact the Act, "[u]nlike in 1967," no longer apply, EO § 1, the EO's very first sentence lays bare the President's desire to circumvent the carefully constructed scheme that Congress created to support public television "in the public interest" and to "further[] the general welfare." 47 U.S.C. § 396(a). So, too, does the President's decision to take unilateral action through the EO, all while contemplating and then subsequently sending a rescission request to Congress. *See* p. 16, *supra*. Irrespective of whether Congress accedes to that request, the EO takes matters into its own hands by preemptively defunding PBS, including by directing CPB to add PBS-specific restrictions to the existing 2024 and 2025 grant criteria used to disburse funds to member stations. *See* EO § 2.

Put simply, the Act is law, and the President cannot flout its protections against political control by purporting to "interfere in the independence of the Corporation." *Corporation for Pub. Broad.*, 2025 WL 1617191, at *2. Nor can the agency Defendants by implementing the EO. The EO "does not direct that a congressional policy be executed in [the] manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. Given that conflict with the Act, "[t]he order cannot properly be sustained." *Id.* at 587.

## II. THE EXECUTIVE ORDER VIOLATES THE FIRST AMENDMENT RIGHTS OF PBS AND PBS MEMBER STATIONS

The Public Broadcasting Act's prohibitions against Executive Branch interference are enough to declare the core provisions of the EO unlawful. But the EO (and all agency action implementing it) also runs headlong into the First Amendment's guarantees of free speech and a free press. By prohibiting CPB and all federal agencies from funding PBS, and prohibiting member stations from using federal funds to pay their PBS dues, the EO discriminates on the basis of viewpoint and editorial expression, retaliates against PBS on the same basis, and imposes an unconstitutional condition on PBS member stations' federal funding. In short, the EO purports to "us[e] a[] lever in the President's arsenal to extinguish speech he dislikes." *Jenner & Block LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, No. 25-cv-916 (JDB), 2025 WL 1482021, at *12 (D.D.C. May 23, 2025). That is unconstitutional.

As an initial matter, the EO triggers full First Amendment scrutiny. To be sure, "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances *** in which the government use[s] private speakers to transmit specific information pertaining to its own program." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-542 (2001) (citation and internal quotation marks omitted). But that "latitude which may exist for restrictions on speech where the government's own message is being delivered" does not apply when the government "instead expends funds to encourage a diversity of views from private speakers." *Id.*; *see also id.* at 544 (invalidating a "substantial restriction" on "private, nongovernmental speech" that the federal "program presume[d] *** is necessary").

When a government "program [i]s designed to facilitate private speech, not to promote a governmental message," *id.* at 542, the Supreme Court has repeatedly "reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). In those circumstances, the government may not rely on "distinction[s] based on the content or messages of *** speech." *Id.*

In other words, when a government funding program aims to promote a range of private speech, the bedrock principle that "[d]iscrimination against speech because of its message is presumed to be unconstitutional" applies in full. *Rosenberger*, 515 U.S. at 828. And "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. Such "viewpoint discrimination is uniquely harmful to a free and democratic society." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). It "is thus an egregious form of content discrimination," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

Those principles apply with particular force to the "expression of editorial opinion," which "lies at the heart of First Amendment protection." *League of Women Voters*, 468 U.S. at 381. The "special place of the editorial" in First Amendment jurisprudence "simply reflects the fact that the press, of which the broadcasting industry is indisputably a part, carries out a historic, dual responsibility in our

society of reporting information and of bringing critical judgment to bear on public affairs." *Id.* at 382 (citation omitted); *see Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press *** to play an important role in the discussion of public affairs."). Thus, as speakers air their views on current events and social issues, "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas." *Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024). "However imperfect the private marketplace of ideas, *** a worse proposal [is] the government itself deciding when speech [is] imbalanced." *Id.* at 733.

The EO runs roughshod over those fundamental First Amendment principles. The Act is a quintessential example of the government expending funds to "encourage a diversity of views" from private speakers rather than to convey its own message. *Legal Servs. Corp.*, 531 U.S. at 542. Indeed, the Act proclaims a desire to "expan[d] and develop[]" the "diversity" of public television programming, and recognizes that doing so "depend[s] on freedom, imagination, and initiative on both local and national levels." 47 U.S.C. § 396(a)(3). Far from promoting any governmental message, moreover, the Act aims to "afford maximum protection from extraneous interference and control," especially by the federal government. *Id.* § 396(a)(10); *see also id.* § 398(a) (affirming that no "department, agency, officer, or employee of the United States [may] exercise any direction, supervision, or control over public telecommunications, or over [CPB]"). To quote the Supreme Court, Congress mandated in the Act that the provision of federal financial assistance "should in no

29

way involve the Government in programming or program judgments" (or in "the expenditure of funds" by grantees). *League of Women Voters*, 468 U.S. at 386 n.17. All of that means the government, notwithstanding its decision to provide federal funds, may not engage in viewpoint discrimination or require a particular balance of opinions to be aired by public television stations.

Yet that is what the EO does in plain terms: "decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased." *Moody*, 603 U.S. at 719. The EO attempts to cut off federal funding to PBS because the President believes PBS provides "biased and partisan news coverage" and fails to "present[] a fair, accurate, [and] unbiased portrayal of current events to taxpaying citizens." EO §§ 1, 2. The materials accompanying the EO (*i.e.*, The Truth Social Post, the White House Statement, and the EO Fact Sheet)—which detail purported examples of PBS content with which the President takes issue—confirm that the President is targeting PBS specifically because he disagrees with PBS's viewpoint and seeks to "silence[] *** editorial speech." *League of Women Voters*, 468 U.S. at 398.

Presumably because the President is aware that viewpoint discrimination is presumptively unconstitutional, the EO contains a disclaimer that "[w]hich viewpoints *** PBS promote[s] does not matter." EO § 1. Such an afterthought cannot save the EO from First Amendment scrutiny. Indeed, it can hardly be taken seriously when considered in the context of (i) the very next sentence, which states that PBS does not "present[] a fair, accurate, or unbiased portrayal of current events," *id.*; (ii) the rest of the EO, which assails PBS's purportedly "biased and partisan news

coverage," *id.* § 2; and (iii) the accompanying materials, which repeatedly criticize specific PBS content as radical, one-sided, and partisan.

For similar reasons, the EO violates the First Amendment's anti-retaliation doctrine by purporting to "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188; *see also Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."). "[T]he government may regulate but it may not regulate in retaliation for speech." *Jenner & Block*, 2025 WL 1482021, at *15 (citing *Vullo*, 602 U.S. at 190). Unconstitutional retaliation occurs where (i) a person "engage[s] in conduct protected under the First Amendment," (ii) the government takes "some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," and (iii) there is a "causal link" between the protected First Amendment activity and "the adverse action taken against" the person. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

The EO "is, on its face, retaliation for *** protected speech." *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Off. of President*, --- F. Supp. 3d ---, No. 25-cv-917 (RJL), 2025 WL 1502329, at *14 (D.D.C. May 27, 2025) ("*Wilmerhale*"). First, both PBS's development of "original programming" and member stations' "editorial discretion in the selection and presentation of [their] programming" constitute "speech activity" under the First Amendment. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). Second, the EO seeks to silence PBS by withdrawing millions of dollars in direct federal funds and by barring member

31

stations from using their federal funds to support PBS.  EO § 2.  "These consequences are sufficiently severe to deter future protected activity." *Harrison v. Federal Bureau of Prisons*, 298 F. Supp. 3d 174, 183 (D.D.C. 2018).  Third, the EO (in addition to the accompanying materials) makes clear that the President issued the EO "*because of*" protected speech activity.  *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015).  According to the EO: "What *** matter[s] is that [PBS does not] present[] a fair, accurate, or unbiased portrayal of current events to taxpaying citizens.  I *therefore* instruct the CPB Board *** and all executive departments and agencies *** to cease Federal funding for *** PBS."  EO § 1 (emphasis added); *see also Wilmerhale*, 2025 WL 1502329, at *14-15 (holding that executive "[o]rder is retaliation for protected speech in violation of the First Amendment" where it "outlines the [President's] motivations," including by accusing target of "partisan" behavior, and imposes "severe economic consequences").

If that were not enough, the EO also violates the unconstitutional conditions doctrine, which precludes the government from "deny[ing] a benefit *** on a basis that infringes [one's] constitutionally protected interests—especially [one's] interest in freedom of speech."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  Within the grant context, the government cannot "seek to leverage funding to regulate speech outside the contours of the federal program itself."  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013).  As the Supreme Court has explained in the public broadcasting context in particular, the government cannot "leverage[] the federal funding to regulate the stations' speech outside the scope of

the program." *Id.* at 216 (citing *League of Women Voters*, 468 U.S. at 399); *see also* *Wilmerhale*, 2025 WL 1502329, at *31 ("[T]he Government 'cannot do indirectly what [it] is barred from doing directly.'") (second alteration in original) (quoting *Vullo*, 602 U.S. at 190).

One of the manifest purposes and inevitable effects of the EO is to leverage congressionally appropriated funding to regulate the speech of PBS member stations more broadly. The EO purports to instruct CPB to deny federal funding to grantees unless they agree not to put those funds towards PBS dues. But that pressure reverberates across member stations' entire budgets, which are made up of a combination of federal, other public, and private funds. *See* Kerger Decl. ¶ 21; Hanks Decl. ¶¶ 13, 17. Member stations' access to PBS programming is made possible by member stations' dues, and prohibiting the use of federal funding to pay dues would preclude access to PBS programming for many member stations. Kerger Decl. ¶¶ 18, 21; Hanks Decl. ¶ 17. The EO's restriction thus effectively dictates the programming member stations can air. *See, e.g.*, *Jenner & Block*, 2025 WL 1482021, at *15 ("[A] government entity's threat of invoking legal sanctions *and other means of coercion* against a third party to achieve the suppression of disfavored speech violates the First Amendment.") (internal quotation marks omitted) (quoting *Vullo*, 602 U.S. at 180). And because the EO unmistakably pressures member stations not to air *any* programming the President "doesn't like" (or else face similar conditions in the future), the EO generally "seeks to chill" their speech. *Id.* at *1.

Lakeland PBS illustrates the point. The EO purports to prevent Lakeland PBS from spending federal funds on its PBS dues. That condition puts significant financial pressure on Lakeland PBS to forgo airing PBS programs and seek to replace PBS programs with other programming the President has not singled out for disfavored treatment. Hanks Decl. ¶ 17. Because Lakeland PBS cannot readily or affordably replace that programming, *id.*, and may face new conditions if the President dislikes any alternative programming, the condition chills Lakeland PBS's speech across the board.

In sum, the EO is a stark departure from our constitutional tradition. It openly seeks to remake "the stock of information from which members of the public may draw" based on the President's preferences. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980). But the First Amendment does not tolerate such "suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp.*, 531 U.S. at 549. This Court should not either.

**CONCLUSION**

This Court should grant PBS and Lakeland PBS summary judgment, declare the EO unlawful, and permanently enjoin its implementation.

Dated: June 13, 2025

Respectfully submitted,

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen
  D.C. Bar No. 1002635
Pratik A. Shah
  D.C. Bar No. 497108
Akin Gump Strauss Hauer &
  Feld LLP
2001 K Street, NW
Washington, D.C. 20006
chenj@akingump.com
(202) 887-4000

*Counsel for Plaintiffs Public Broadcasting Service and Northern Minnesota Public Television, Inc. d.b.a. Lakeland PBS*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PUBLIC BROADCASTING SERVICE, *et al.*,

*Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

*Defendants.*

Case No. 1:25-cv-01722-RDM

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiffs provide the following statement of material facts as to which there is no genuine issue.

1.     The Public Broadcasting Service ("PBS") is a non-profit membership organization comprising 336 local public television broadcast stations throughout the United States and its territories.  Decl. of Paula Kerger (Ex. A) ¶ 1 ("Kerger Decl.").

2.     Lakeland PBS is a non-profit community licensed public television station and a PBS member station.  Decl. of Jeff Hanks (Ex. B) ¶ 1 ("Hanks Decl.").

3.     PBS develops and acquires television programming and other video content for distribution through member stations and other PBS platforms.  Kerger Decl. ¶ 7.

4.     PBS also provides various support services for member stations.  For example, PBS manages the public television interconnection system, negotiates distribution arrangements with national cable and satellite systems and digital

1

streaming platforms, represents the interests of member stations in various regulatory proceedings, and provides numerous forms of fundraising support, among other services. In doing so, PBS enables member stations to leverage economies of scale to optimize their programming and operations. Kerger Decl. ¶ 12.

5.    PBS and PBS member stations have long been the recipients of millions of dollars annually in federal funds administered by CPB and by various agencies. Kerger Decl. ¶ 15.

6.    For 2025, PBS has a budget of $373.4 million. PBS will secure its entire budget from three primary sources: (i) dues from member stations; (ii) public and private grants; and (iii) revenue from passive income sources. Kerger Decl. ¶ 16. PBS member station dues comprise 61% of PBS's budget ($227 million). CPB grants comprise another 16% ($59.8 million). Other federal grants comprise 6% ($20.7 million). *Id.* ¶ 17.

7.    Public television stations receive approximately $325 million in annual federal funding from CPB, nearly all of which goes to PBS member stations. Those funds, which comprise more than 50% of the overall budgets of certain member stations, are instrumental to enabling them to operate, to produce programming that serves their local communities, and to pay PBS dues. Kerger Decl. ¶ 18.

8.    On May 1, 2025, the President issued Executive Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025) (the "EO"), which purports to cease all direct and indirect federal funding for PBS, and contemporaneously published a document styled as a "Fact Sheet."

9.    The EO attempts to cut off federal funding to PBS because (as stated in the EO itself, and confirmed by the accompanying Fact Sheet and other materials) the President believes PBS provides "biased and partisan news coverage" and fails to "present[] a fair, accurate, [and] unbiased portrayal of current events to taxpaying citizens."  EO §§ 1, 2.

10.    The EO's termination of federal funding for PBS will limit PBS's ability to provide programming and services to member stations.  Kerger Decl. ¶ 20.

11.    Because many PBS member stations rely heavily on federal funding, many member stations will be unable to pay PBS dues (or will have to choose between paying PBS dues and incurring significant shortfalls in other areas) given the EO's prohibition on spending federal funds on such dues.  Kerger Decl. ¶ 21.

12.    Lakeland PBS relies heavily on PBS programming and services, which it cannot readily or affordably replace.  Hanks Decl. ¶¶ 9-11, 17.

13.    Lakeland PBS currently pays the entirety of its annual PBS dues using federal funds, which comprise roughly $1 million, or 37%, of Lakeland PBS's budget.  Hanks Decl. ¶ 13.

14.    Lakeland PBS cannot use non-federal funds to cover PBS dues without facing significant shortfalls in other areas given various restrictions.  Hanks Decl. ¶ 17.  Without paying PBS dues, Lakeland PBS would lose access to PBS content and services.  *Id.*

Dated: June 13, 2025

Respectfully submitted,

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen
   D.C. Bar No. 1002635
Pratik A. Shah
   D.C. Bar No. 497108
AKIN GUMP STRAUSS HAUER &
   FELD LLP
2001 K Street, NW
Washington, D.C. 20006
chenj@akingump.com
(202) 887-4000

*Counsel for Plaintiffs Public Broadcasting Service and Northern Minnesota Public Television, Inc. d.b.a. Lakeland PBS*