# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC BROADCASTING SERVICE, *et. al.*,

                      Plaintiffs,

         v.

DONALD TRUMP, *et. al.*,

                  *Defendants*.

Civil Case No. 1:25-cv-01722-RDM

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, AND AMERICAN CIVIL LIBERTIES UNION OF MINNESOTIA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

INTERESTS OF AMICI CURIAE ..................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    I.   PBS's programming is constitutionally protected speech ............................................ 4

    II.  The Executive Order is motivated by an unconstitutional, viewpoint-based
        animus. ................................................................................................................... 5

    III. The Executive Order leverages direct and indirect federal funding to
        unconstitutionally punish PBS ................................................................................. 8

          A.  The Executive Order unconstitutionally terminates all federal funding
             for PBS ............................................................................................................. 9

             1.  Federal defunding of PBS constitutes retaliation ................................. 9

             2.  The Executive Order unconstitutionally regulates speech
                  outside of the scope of the relevant federal programs ........................ 10

          B.  The Executive Order unconstitutionally prohibits broadcasters from
             using Community Service Grants to license PBS's programming ................ 11

             1.  The Executive Order's limitation on broadcasters constitutes
                  retaliation ........................................................................................... 11

             2.  The Executive Order imposes an unconstitutional viewpoint-
                  based restriction on a program designed to facilitate private
                  speech ................................................................................................. 12

          C.  The Executive Order unconstitutionally deters local public
             broadcasters from using nonfederal funds to license PBS's
             programming ................................................................................................... 15

CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Accuracy in Media, Inc. v. FCC,*
   521 F.2d 288 (1975) ............................................................................................. 13

*Agency for International Development v. Alliance for Open Society International, Inc.*,
   570 U.S. 205 (2013) ............................................................................................. 10

*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ............................................................................. 3

*Arkansas Writers' Project, Inc. v. Ragland,*
   481 U.S. 221 (1987) ............................................................................................. 12

*Arkansas Educational Television Commission v. Forbes*,
   523 U.S. 666 (1998) ......................................................................................... 4, 7

*Community-Service Broadcasting of Mid-America, Inc. v. FCC,*
   593 F.2d 1102 (D.C. Cir. 1978) ..................................................................... 13, 14

*Corporation for Public Broadcasting v. Trump,*
   No. CV 25-1305 (RDM), 2025 WL 1617191 (D.D.C. June 8, 2025) .................... 14

*Crawford–El v. Britton*,
   523 U.S. 574 (1998) ............................................................................................. 3

*DKT International, Inc. v. U.S. Agency for International Development,*
   477 F.3d 758 (D.C. Cir. 2007) ....................................................................... 13, 15

*FCC v. League of Women Voters of California,*
   468 U.S. 364 (1984) ...................................................................................... *passim*

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ............................................................................................... 5

*Hartman v. Moore*,
   547 U.S. 250 (2006) ............................................................................................. 3

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
   515 U.S. 557 (1995) ............................................................................................. 7

*Jenner & Block LLP v. U.S. Department of Justice*,
   — F. Supp. 3d —, No. 25-cv-916 (JDB), 2025 WL 1482021 (D.D.C. May 23, 2025) .......... 17

*Legal Services Corporation v. Velasquez*,
   531 U.S. 533 (2001) .................................................................................... 3, 12, 15

*Los Angeles v. Preferred Communications, Inc.*,
476 U.S. 488 (1986)................................................................................................. 4

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018)................................................................................................... 3

*Miami Herald Publishing Company v. Tornillo*,
418 U.S. 241 (1974)................................................................................................. 7

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)............................................................................................. 7, 8

*NAACP v Claiborne Hardware Company*,
458 U.S. 886 (1982)................................................................................................. 4

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)............................................................................................... 12

*NEA v. Finley*,
524 U.S. 569 (1998)......................................................................................... 12, 15

*NRA v. Vullo*,
602 U.S. 175 (2024)..................................................................................... 3, 5, 16

*Pacific Gas & Electricity Company v. Public Utilities Commission of California*,
475 U.S. 1 (1986)..................................................................................................... 7

*Perkins Coie LLP v. U.S. Department of Justice*,
No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025) ....................... 5

*Perry v. Sindermann*,
408 U.S. 593 (1972)................................................................................................. 8

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983)............................................................................................... 12

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995)......................................................................................... 12, 15

*Rust v. Sullivan*,
500 U.S. 173 (1991)............................................................................................... 10

*Snyder v. Phelps*,
562 U.S. 443 (2011)................................................................................................. 5

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)............................................................................................... 12

*Thornhill v. Alabama,*
    310 U.S. 88 (1940) ............................................................................................ 5

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) ........................................................................................... 4

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President,*
    — F. Supp. 3d —, No. 25-cv-917 (RJL), 2025 WL 1502329 (D.D.C. May 27,
    2025)… ............................................................................................ 3, 10, 11, 16

**Statutes**

47 U.S.C. § 396 ...................................................................................................... 13

47 U.S.C. § 398 ...................................................................................................... 14

**Other Authorities**

Executive Order No. 14290, 90 Fed. Reg. 19,415 (May 1, 2025) ........................................ *passim*

*Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased
    Media*, White House (May 1, 2025) ...................................................................... 6

Press Release, The White House, *President Trump Finally Ends the Madness of NPR,
    PBS* (May 1, 2025) .............................................................................................. 6

S. Rep. No. 222 (1967) .......................................................................................... 14

## INTRODUCTION

Plaintiff Public Broadcasting Service ("PBS") is a non-profit membership organization. PBS "develops and acquires television programming and other video content for distribution through PBS Member Stations and other PBS platforms." PBS Statement of Undisputed Material Facts ¶ 3 ("PBS SUMF"). Its programs include *Mister Rogers' Neighborhood*, *Sesame Street*, *NOVA*, *Frontline*, and numerous Ken Burns documentaries. Declaration of Paula Kerger ¶ 7. "*PBS News Hour* is the only nightly hour-long television news program on a free broadcast (rather than cable) network in the country, with a nightly audience of 2.1 million viewers in 2025." *Id.* ¶ 11. Plaintiff Northern Minnesota Public Television, Inc. dba Lakeland PBS is a PBS member station. This case is about whether the President may defund PBS explicitly because he does not like its journalistic and editorial choices, causing serious, irreparable harm to PBS, threatening the financial stability of local broadcasters who rely on federal funds to license PBS's programming, and depriving local communities throughout the country of programming that may not be available from other sources.

Last month, President Trump issued an Executive Order, "Ending Taxpayer Subsidization of Biased Media," Exec. Order No. 14290, 90 Fed. Reg. 19,415 (May 1, 2025), directing the Board of the Corporation for Public Broadcasting ("CPB") and the heads of all federal agencies to terminate direct and indirect federal funding to PBS. As justification, the Executive Order accuses PBS of providing "biased and partisan news coverage."

On its face, the Executive Order retaliates against PBS in violation of the First Amendment. The Order retaliates against PBS in three ways: (1) it directs CPB and the heads of federal agencies to terminate their relationships with PBS; (2) it commands CPB to prevent local broadcasters from using CPB funds to license PBS's programming; and (3) it deters local public broadcasters from using nonfederal funds to license PBS's programming. Exec. Order No. 14290 §§ 2(b), 3(a)–(b).

And as explained on the face of the Order and further corroborated by the accompanying Press Release and Fact Sheet, the government imposed these punishments specifically because of the President's distaste for PBS's "biased and partisan" news coverage, including the words it chooses to use in coverage and what stories it chooses to highlight.

President Trump is free to voice his disagreement with PBS's programming, but the First Amendment prohibits the government from retaliating against any independent press or media organization—including by defunding it—because the President disagrees with its views. And in addition to being a textbook example of unconstitutional retaliation, the Executive Order also crosses important First Amendment limits on the government's spending power, including the prohibition against viewpoint discrimination in the disbursement of federal subsidies. Because the Order violates the First Amendment in multiple ways, this Court should permanently enjoin its enforcement.[1]

### INTERESTS OF AMICI CURIAE[2]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties of all Americans. The ACLU of the District of Columbia ("ACLU-DC") is the ACLU's Washington, D.C. affiliate. The ACLU of Minnesota ("ACLU-MN") is the ACLU's Minnesota affiliate. The ACLU and ACLU-DC have frequently appeared in this Court, as counsel to parties or as amicus, in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of

---

[1] Amici do not here express a position on the statutory or other constitutional arguments raised by PBS in its motion for summary judgment. Nor do Amici here express a position on whether President Trump can constitutionally remove CPB's Board.

[2] Pursuant to Local Civil Rule 7(o)(5), counsel for Amici certify that no counsel for a party authored this brief in whole or in part, and no person other than Amici, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

rights it grants. The ACLU-MN has similarly litigated important cases involving constitutional rights in federal court in Minnesota; its interest in this case stems from the participation of a local public broadcaster in Minnesota whose rights are infringed by the Executive Order. The ACLU and its affiliates have also participated as counsel or amici curiae in many consequential First Amendment cases, including those involving retaliation and viewpoint discriminatory denials of government subsidies. *See, e.g.*, *NRA v. Vullo*, 602 U.S. 175 (2024) (counsel); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (amicus); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, — F. Supp. 3d — , No. 25-cv-917 (RJL), 2025 WL 1502329 (D.D.C. May 27, 2025) (amicus).

## ARGUMENT

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual [or organization] to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford–El v. Britton*, 523 U.S. 574, 592 (1998)); *accord, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To make out a First Amendment retaliation claim, a plaintiff must show that: (i) it engaged in constitutionally protected expression; (ii) there is a causal connection between the plaintiff's protected speech and the retaliatory actions taken against it by the government; and (iii) the government's retaliatory action would be sufficient to deter a person of ordinary firmness in the plaintiff's position from speaking again. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). PBS easily satisfies all three factors in this case.

Separately, the Order violates PBS's First Amendment rights by 1) restricting speech outside of the scope of any federal funding, 2) imposing viewpoint-based restrictions on federal programs that exist to facilitate private speech, and 3) deterring other private actors from using their own money to license PBS's speech.

3

I.      **PBS's programming is constitutionally protected speech.**

PBS's original programming, as well as local public broadcasters' "editorial discretion in the selection and presentation of [their] programming," constitutes "speech activity" under the aegis of the First Amendment. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). *See also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("Through 'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.'" (quoting *Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986))).

"[T]he press, of which the broadcasting industry is indisputably a part, carries out a historic, dual responsibility in our society of reporting information and of bringing critical judgment to bear on public affairs." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 382 (1984) (citation omitted). As such, "broadcasters are engaged in a vital and independent form of communicative activity," *id.* at 378, and they "are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming," *Forbes*, 523 U.S. at 673. Creators and distributors of broadcast programming, such as PBS, also play an obviously expressive role. "As a result, the First Amendment must inform and give shape to the manner in which [the federal government] exercises its regulatory power in this area." *League of Women Voters of Cal.*, 468 U.S. at 378.

First Amendment concerns are even more pressing here because PBS's award-winning national public affairs programming, Kerger Decl. ¶ 11, is core "expression on public issues," which "has always rested on the highest rung of the hierarchy of First Amendment values." *League of Women Voters of Cal.*, 468 U.S. at 381 (internal quotation marks omitted) (quoting *NAACP v Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)); *accord, e.g., Snyder v. Phelps*, 562 U.S. 443,

452 (2011) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964))). "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940). These liberties are essential for the press to fulfill its duty "to supply the public need for information and education with respect to the significant issues of the time." *Id.*

## II.    The Executive Order is motivated by an unconstitutional, viewpoint-based animus.

The Executive Order expressly targets PBS for punishment—including the loss of all direct and indirect government funding for PBS, as well as the threatened loss of CPB funding for any local public broadcaster that uses its own funds to license PBS's programming—because of PBS's protected speech. In particular, the retaliation is based on PBS's viewpoint, which President Trump openly despises. As this District recently observed, the First Amendment's prohibition on retaliation "extends to retaliation against individuals for the specific viewpoint expressed by their First Amendment protected activities, since the government may not 'use the power of the State to punish or suppress disfavored expression.'" *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857, at *26 (D.D.C. May 2, 2025) (quoting *NRA v. Vullo*, 602 U.S. 175, 188 (2024)). Indeed, "[r]etaliation and threats of retaliation to effectuate viewpoint discrimination 'is uniquely harmful to a free and democratic society.'" *Id.*  (quoting *Vullo*, 602 U.S. at 187).

President Trump's viewpoint-based animus against PBS is evident on the Executive Order's face. Although Section 1 of the Order purports to disavow any interest in "[w]hich viewpoints . . . PBS promote[s]," this disclaimer is belied by the rest of the Order. Exec. Order No. 14290 § 1. The next sentence states that PBS does not "present[] a fair, accurate, or unbiased portrayal of current events," and the following sentence directs all "agencies to cease Federal

funding for . . . PBS." *Id.* § 1. Section 2 of the Executive Order similarly asserts that PBS's funding is being cut because President Trump considers its news coverage to be "biased and partisan." *Id.* § 2(a). And the Order itself is titled "Ending Taxpayer Subsidization of *Biased* Media" (emphasis added).

The Order's accompanying Fact Sheet and Press Release reinforce the conclusion that the Order is premised on President Trump's personal disapproval of PBS's programming. The Fact Sheet asserts that PBS has "fueled partisanship and left-wing propaganda with taxpayer dollars," and that it makes "significant in-kind contributions to the Democrat party and its political causes." *Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media*, White House (May 1, 2025) https://perma.cc/RMZ4-7Y7Q. The Fact Sheet cites the number of times *PBS News Hour* used the term "far-right" versus "far-left" over a six-month period, PBS programming that featured drag performers and transgender individuals, a *Sesame Street* co-sponsored town hall presenting racial justice issues for children, and PBS's coverage of the 2024 Democratic and Republican National Conventions. *Id.* The Order's accompanying Press Release accuses PBS of "spread[ing] radical, woke propaganda disguised as 'news'," characterizes PBS's journalism as "trash," and features further criticisms of particular PBS programming, such as a PBS-produced documentary making the case for racial reparations. Press Release, The White House, *President Trump Finally Ends the Madness of NPR, PBS* (May 1, 2025) https://perma.cc/H4TG-L9MW.

The Executive Order attempts to cloak its viewpoint-based animus by accusing PBS of leftwing bias, suggesting that it is serving as a corrective for distorted media, rather than unconstitutionally retaliating for the exercise of protected speech. But "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas."

*Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024). To the contrary, "in case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn," or vice versa, "in order to rejigger the expressive realm." *Id.* at 733 (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Bos., Inc.*, 515 U.S. 557 (1995)). That is because government-imposed "balancing" is itself viewpoint discrimination.

In *Miami Herald Publishing*, for instance, the Court held that "[t]he choice of material to go into a newspaper," including its "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment," a "crucial process" that the First Amendment categorically protects against "governmental regulation," 418 U.S. at 258, and by extension, viewpoint-based retaliation. Similarly, in *Forbes*, the Court rejected a viewpoint discrimination claim against state public broadcasters, reasoning that "even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based," and that requiring courts to adjudicate claims of bias "would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." 523 U.S. at 673–74. Thus, the Court admonished in *League of Women Voters of Cal.*, "if the public's interest in receiving a balanced presentation of views is to be fully served, we must necessarily rely in large part upon the editorial initiative and judgment of the broadcasters who bear the public trust," rather than government regulation or, worse yet, retaliation. 468 U.S. at 378.

The alternative—a legally enforceable prohibition on "bias," as defined by the whims and caprices of federal officials—would invite government meddling in the editorial process. And "on the spectrum of dangers to free expression, there are few greater than allowing the government to

change the speech of private actors in order to achieve its own conception of speech nirvana." *NetChoice*, 603 U.S. at 741–42. That is precisely what the Executive Order seeks to do here by punishing PBS for purported bias.

### III.  The Executive Order leverages direct and indirect federal funding to unconstitutionally punish PBS.

The threatened loss of tens of millions of dollars in annual funding would undoubtedly chill any reasonable media organization. The fact that the Executive Order here seeks to punish PBS through defunding—over which the government will argue it has more legitimate control—does not alter the analysis. The withholding of a benefit as punishment for disfavored expression may constitute retaliation just as much as the imposition of a penalty. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding that, although the government may deny a benefit "for any number of reasons," it "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech").

The government will likely argue that it is merely ensuring that taxpayer dollars are no longer used to fund programming that, in President Trump's view, smacks of bias. But as discussed above, that is viewpoint-based animus against PBS's protected speech and constitutes unconstitutional retaliation for that reason alone. Additionally, the Order violates the First Amendment because none of the financial penalties directed at PBS are addressed to the expenditure of federal funds to promote government speech.

The Executive Order punishes PBS in three distinct ways, each of which independently violates the limits placed by the First Amendment on the government's exercise of its spending powers. First, it directs CPB and the heads of federal agencies to terminate all federal funding of PBS, without reference to any federal program designed to promote a particular government message. Second, it commands CPB's Board to prohibit local public broadcasters from using their

Community Service Grant ("CSG") funding to license PBS's programming—even though the Public Broadcasting Act makes clear that Congress intended CSG funds to subsidize the private programming choices of local public broadcasters, not to promote the federal government's preferred messages. Finally, it suggests that the federal government will defund any local public broadcaster that continues to associate with PBS, deterring broadcasters from using even their own funds to license PBS's programming.

### A.    The Executive Order unconstitutionally terminates all federal funding for PBS.

#### 1.    Federal defunding of PBS constitutes retaliation.

For 2025, PBS received $59.8 million (16% of its budget) in CPB grants. Kerger Decl. ¶ 17. It received $20.7 million (6% of its budget) in grants from federal agencies, including the Education Department, the Department of Homeland Security, and the Federal Emergency Management Agency. *Id.* ¶¶ 2, 17. These grants support a number of public services performed by PBS. "For example, PBS manages the public television interconnection system—a 24/7/365 cloud-based, terrestrial broadband and satellite video distribution system among PBS, PBS Member Stations, content distributors (e.g., American Public Television, National Educational Television Association), and digital platforms—for the benefit of PBS Member Stations." *Id.* ¶ 12. PBS also operates the PBS Warning, Alert & Response Network ("WARN"), which "ensures that public television stations meet the federal mandate to provide a nationwide backup to the Wireless Emergency Alert system." *Id.* ¶ 13.

The Executive Order directs CPB and federal agencies to end their relationships with PBS. Exec. Order No. 14290 § 2(a) (directing CPB's Board to "cease [providing] direct funding to . . . PBS"); *id.* § 3(a) (directing "[t]he heads of all agencies" to "terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of . . . PBS"). The Order cuts off

PBS's access to all federal funding, and bars PBS from obtaining any future federal funding, expressly because President Trump disapproves of PBS's programming. That is archetypal retaliation for PBS's protected expression, and it would chill any speaker of ordinary firmness from airing news coverage that might draw the President's ire.

### 2. The Executive Order unconstitutionally regulates speech outside of the scope of the relevant federal programs.

Apart from amounting to unconstitutional retaliation, the Executive Order's directive to defund PBS is also not a legitimate exercise of the government's spending power. While the First Amendment allows the government to spend federal funds to promote a particular message as a form of government speech, *see Rust v. Sullivan*, 500 U.S. 173, 193 (1991), it does not allow the government "to leverage funding to regulate speech outside the contours of the program itself," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).

Here, President Trump's complaints about PBS's programming are irrelevant to PBS's administration of the public television interconnection system or PBS WARN. And the Executive Order does not explain why PBS's speech renders it unsuitable to compete for federal grants to provide expressive services, such as educational programming, regardless of the focus or scope of the federal program at issue. Because the Order does not even attempt to explain why PBS is unsuited to a particular governmental program, even as it categorically bans PBS from all government funding, it necessarily "goes beyond defining the limits of the federally funded program[s]," and instead expressly excludes PBS from government benefits because of its protected speech. *Id.* at 218.

This District's recent decision in *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, — F. Supp. 3d —, No. 25-cv-917 (RJL), 2025 WL 1502329 (D.D.C. May 27, 2025), is instructive. There, an executive order required all government contractors to disclose

their relationships with WilmerHale, with the strong implication that any contractors who maintained those relationships would lose future contracting opportunities. *Id.* at *16. The Court held that the restriction fell outside the government's power to condition federal funds, because the Executive Order did "not create or address a federally-funded program designed to advance a certain Government viewpoint," but instead "applie[d] to federal contracting writ large." *Id.* at *17. As the Court pointed out, "there can be no claim that all federal contracts together constitute a program designed to promote a specific Government message." *Id.*  So, too, here: The government cannot claim that PBS's categorical exclusion from federal funding is necessary to advance any particular federal program.

### B. The Executive Order unconstitutionally prohibits broadcasters from using Community Service Grants to license PBS's programming.

#### 1. The Executive Order's limitation on broadcasters constitutes retaliation.

The Executive Order also retaliates against PBS by barring local public broadcasters from using federal subsidies to license PBS's programming. In 2025, PBS received $227 million (61% of its budget) from local public broadcasters that pay PBS's member dues ("member stations"). PBS SUMF ¶ 6. Those stations, in turn, receive hundreds of millions of dollars in funding through CPB's Community Service Grants. "Public television stations receive approximately $325 million in annual federal funding from CPB, nearly all of which goes to PBS Member Stations." *Id.* ¶ 7. "Those funds, which comprise more than 50% of the overall budgets of certain member stations, are instrumental to enabling them to operate, to produce programming that serves their local communities, *and to pay PBS dues*." *Id.* (emphasis added).

The Executive Order seeks to categorically prohibit local public broadcasters from using CSG funds to license PBS's programming. It orders CPB's Board to "cease [providing] indirect funding to . . . PBS," "including by ensuring that [local public stations] do not use Federal funds

for . . . PBS." Exec. Order No. 14290 § 2(b). It further directs the Board to revise its CSG Eligibility Criteria "to prohibit direct or indirect funding of . . . PBS," and to "take all other necessary steps to minimize or eliminate its indirect funding of . . . PBS." *Id.*  This punitive action, denying PBS tens of millions of dollars in fees paid by local public broadcasters with CSG funds, would deter a speaker of ordinary firmness from making editorial decisions that President Trump may view as too "biased."

> **2.    The Executive Order imposes an unconstitutional viewpoint-based restriction on a program designed to facilitate private speech.**

In addition to punishing PBS and local public broadcasters through the denial of CSG subsidies, the Executive Order imposes an unconstitutional speaker- and viewpoint-based restriction on the use of CSG funds. *Cf. Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) ("Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011))).

"[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas,'" *NEA v. Finley*, 524 U.S. 569, 587 (1998) (alteration in original) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983)), nor may it "'manipulate" a subsidy "to have a 'coercive effect'" on private speech, *id.* (internal quotation marks omitted) (citing *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting)). Instead, "when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers," viewpoint-based restrictions and viewpoint-motivated retaliation against disfavored speakers are off the table. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (alteration in original) (quoting *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 834 (1995)). Here,

that means President Trump cannot prohibit local public broadcasters from using their CSG funds to license PBS's programming because he considers it "biased."

As the D.C. Circuit has already recognized, creating a federal program to facilitate private speech is precisely what Congress "did in funding public broadcasting." *DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 477 F.3d 758, 762 (D.C. Cir. 2007) (citing *League of Women Voters of Cal.*, 468 U.S. at 367–68). "A cardinal objective of the [Public Broadcasting] Act" was to "establish[] a private corporation" that "afford[s] maximum protection to [noncommercial] broadcasting from extraneous interference and control," including by the federal government. *League of Women Voters of Cal.*, 468 U.S. at 386–87 (internal quotation marks omitted) (quoting 47 U.S.C. § 396(a)(6) (1976 ed.)). Congress declared that CPB was meant to fund programming "responsive to the interests of [the] people," 47 U.S.C. *id*. § 396(a)(5) , and programming "that involves creative risks," *id*. § 396(a)(6), and it recognized that accomplishing these goals "depend[s] on freedom, imagination, and initiative"—not the repetition of pre-approved messages. *Id.* § 396(a)(3).[3]

---

[3] In addition to authorizing CPB to facilitate "programs of high quality, diversity, creativity, excellence, and innovation . . . obtained from diverse sources," the Act also purports to require CPB's "strict adherence to objectivity and balance in all programs or series of programs of a controversial nature." 47 U.S.C. § 396(g)(1)(A). The D.C. Circuit, sitting *en banc*, has already determined that the "objectivity and balance" language "is applicable only to the CPB itself, and even then only to a narrower category of programming dealing with controversial issues." *Cmty.-Serv. Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1117–18 (D.C. Cir. 1978) (en banc). *See also Accuracy in Media, Inc. v. FCC*, 521 F.2d 288 (1975) (upholding FCC's determination that it lacked authority to enforce the "objectivity and balance" language in part because any other conclusion would raise substantial constitutional questions). If the Act were instead meant to impose this requirement on local broadcasters—or, perhaps worse yet, creators and distributors of broadcast content—"then it is clear that we have moved . . . to [the realm] of regulation aimed at suppressing free speech, which may be justified only by reference to the most compelling government interests." *Cmty.-Serv. Broad. of Mid-Am*, 593 F.2d at 1122. Thus, that provision of the Act cannot justify any viewpoint-based discrimination against Plaintiffs here.

Congress's determination to prevent government meddling in the selection of programming for public broadcasting is reflected everywhere in the Act's text, as well as its "elaborate structure," which "operates to insulate local stations from governmental interference." *League of Women Voters of Cal.*, 468 U.S. at 388. Indeed, the "unifying theme of the PBA's statutory provisions is that they substantially reduce the risk of governmental interference with the editorial judgments of local stations without restricting those stations' ability to speak on matters of public concern." *Corp. for Pub. Broad. v. Trump*, No. CV 25-1305 (RDM), 2025 WL 1617191, at *4 (D.D.C. June 8, 2025) (quoting *League of Women Voters of Cal.*, 468 U.S. at 390 (cleaned up)).

"Throughout the legislative process, and in the legislation itself, Congress made clear that it intended that the Board of Directors perform its duties outside the government and without government or political influence." *Id.* at *2 (citation omitted). Congress expressly legislated that "no 'department, agency, officer, or employee of the United States' may 'exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services.'" *Id.* at *2 (quoting 47 U.S.C. § 398(c)). Instead, "the ultimate decision as to whether an available program is broadcast is left to the local stations, which CPB is foreclosed from owning or operating under the statute." *Cmty.-Serv. Broad. of Mid-Am*, 593 F.2d at 1109.

The Act's legislative history, too, "clearly indicates that Congress was concerned with 'assur[ing] complete freedom from any Federal Government influence.'" *League of Women Voters of Cal.*, 468 U.S. at 394 (citation omitted). When the Act was passed, it was generally "recognized that [Federal financial] assistance should in no way involve the Government in programming or program judgments," and legislators "state[d] in the strongest terms possible that it is [their] intention that local stations be absolutely free to determine for themselves what they should or

14

should not broadcast." *Corp. for Pub. Broad.*, 2025 WL 1617191, at *3 (internal quotation marks omitted) (quoting S. Rep. No. 222, at 4, 11 (1967)).

The Public Broadcasting Act thus jealously protects the editorial autonomy of local public broadcasters that receive CSG funds to license programming for their stations. This central feature of the Act marks it out as a program to subsidize private speech, rather than a program to promote a government message. *See DKT Int'l, Inc.*, 477 F.3d at 762; *see also Velazquez*, 531 U.S. at 542–43 (holding that Legal Services Corporation Act was designed to facilitate private speech, where Congress provided funds for attorneys to represent the interests of indigent clients); *Rosenberger*, 515 U.S. at 834 (holding that a public university's student activities fund was designed to facilitate private speech by student groups); *Finley*, 524 U.S. at 587 (recognizing that the First Amendment prohibits viewpoint discrimination in funding for projects that exhibit "artistic excellence and merit").

The federal government itself has previously "assure[d]" the Supreme Court that "the vigorous expression of controversial opinions is . . . affirmatively encouraged by the Act," and has asserted its own substantial "interest in ensuring that the audiences of noncommercial stations" know that their broadcasts do not "reflect the official view of the government." *League of Women Voters of Cal.*, 468 U.S. at 395, 397. Because Congress chose to "facilitate private speech, not to promote a governmental message" when it enacted the Public Broadcasting Act, President Trump cannot impose speaker- and viewpoint-based restrictions on local public broadcasters' use of their CSG funds. *See Velazquez*, 531 U.S. at 542.

### C.    The Executive Order unconstitutionally deters local public broadcasters from using nonfederal funds to license PBS's programming.

In addition to barring local public broadcasters from using CSG funds to license PBS's programming, the Executive Order also threatens to cut federal funding from broadcasters that use

their own money to pay for PBS's speech. After instructing CPB's Board to revise the 2025 Television Community Service Grants General Provisions and Eligibility Criteria "to prohibit direct or indirect funding of . . . PBS," the Order further directs that, to the extent permitted by applicable law, "the CPB Board shall also prohibit parties subject to these provisions from funding . . . PBS after the date of this order." Exec. Order No. 14290 § 2(b). This threat to defund local public broadcasters who continue to associate with PBS would chill any media organization of ordinary firmness and, because it is motivated by animus against PBS's protected speech, amounts to unconstitutional retaliation.

Moreover, insofar as this provision seeks to prohibit local broadcasters from using nonfederal funds to license PBS's programming, it violates well-established First Amendment principles. *See League of Women Voters of Cal.,* 468 U.S. at 400 (holding that a provision of the Public Broadcasting Act prohibiting "editorializing" by any local public broadcaster that receives CPB grants violated the First Amendment because it prohibited such broadcasters "from using even wholly private funds to finance [their] editorial activity"). And even if the Executive Order does not expressly prohibit local public broadcasters from using nonfederal funds to license PBS's programming, it plainly threatens punishment against broadcasters that continue to associate with PBS. As the Supreme Court reaffirmed just last year, a government official like President Trump "cannot do indirectly what [he] is barred from doing directly"; in particular, President Trump cannot use threats of punishment to "coerce a private party to punish or suppress disfavored speech on [his] behalf." *Vullo*, 602 U.S. at 190.

Thus, courts in this District have held that President Trump's Executive Orders requiring government contractors to disclose their relationships with targeted law firms, with the strong implication that contractors who maintained those relationships would be penalized, violate the

First Amendment. *See Wilmer Cutler Pickering Hale & Dorr LLP*, 2025 WL 1502329, at \*16;

*Jenner & Block LLP v. U.S. Dep't of Just.*, — F. Supp. 3d —, No. 25-cv-916 (JDB), 2025 WL

1482021, at \*15 (D.D.C. May 23, 2025). Those principles apply even more forcefully here, where

the Executive Order itself spells out President Trump's intention to terminate federal funding to

public broadcasters who continue to associate with PBS.

## CONCLUSION

For the foregoing reasons, Amici respectfully submit that the Court should grant Plaintiffs'

motion for summary judgment.

Dated: June 20, 2025                                          Respectfully submitted,

Arthur B. Spitzer (D.C. Bar No. 235960)          */s/ Brian Hauss*
Scott Michelman (D.C. Bar No. 1006945            Brian Hauss (D.D.C. Bar No. NY0581)
Aditi Shah (D.C. Bar No. 90033136)               Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION                   Cecillia D. Wang (D.D.C. Bar No. CA00042)
 FOUNDATION OF THE DISTRICT OF                   Ben Wizner
 COLUMBIA                                        AMERICAN CIVIL LIBERTIES
529 14th Street, NW, Ste. 722                     UNION FOUNDATION
Washington, D.C. 20045                           125 Broad Street, 18th Floor
(202) 457-0800                                   New York, NY 10004
aspitzer@acludc.org                              (212) 549-2500
                                                 bhauss@aclu.org
Teresa Nelson
AMERICAN CIVIL LIBERTIES
 UNION OF MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
(651) 645-4097
tnelson@aclu-mn.org                              *Counsel for Amici Curiae*