**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PUBLIC BROADCASTING SERVICE, *et al.*,

    *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States *et al.*,

    *Defendants.*

Case No. 1:25-cv-01722-RDM

**FEDERAL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS'
SUMMARY JUDGMENT MOTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 3

I.      Statutory Background .................................................................................................. 3

        A.     CPB and the Public Broadcasting Act ............................................................ 3

        B.     The Consolidated Appropriations Act, 2023 .................................................. 5

II.     Factual Background .................................................................................................... 6

III.    Procedural Background................................................................................................ 7

LEGAL STANDARD................................................................................................................. 7

ARGUMENT ............................................................................................................................. 8

I.      PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.................................... 8

II.    PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL. ....................................... 10

        A.     Plaintiffs' First Amendment Claims Fail Because the Government Has
             Broad Powers to Choose How to Distribute Funding............................................ 10

             1.     Viewpoint Discrimination.................................................................... 11

             2.     First Amendment Retaliation................................................................ 14

             3.     Editorial Discretion ............................................................................. 16

III.    PLAINTIFFS' STATUTORY CLAIMS ALSO FAIL.......................................... 17

        A.     Plaintiffs Cannot Invoke the APA or *Ultra Vires* Review.................................... 18

             1.     Final agency action ............................................................................. 18

              2.     *Ultra vires* review. ............................................................................ 20

        B.     The EO Does Not Violate Any Statute. ................................................................ 21

CONCLUSION......................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Advoc. Christ Med. Ctr. v. Azar*,
    Civ. A. No. 17-cv-1519 (TSC), 2022 WL 2064830 (D.D.C. June 8, 2022)*, aff'd*
    80 F.4th 346 (D.C. Cir. 2023)................................................................................................8

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ...........................................................................................*passim*

*Appalachian Energy Grp. v. EPA*,
    33 F.3d 319 (4th Cir. 1994)................................................................................................19

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016)..........................................................................................15

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..........................................................................................................18

*Building & Const. Trades Dep't., AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002)............................................................................................22

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ..........................................................................................................19

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*,
    718 F.3d 922 (D.C. Cir. 2013)............................................................................................8

*City of N.Y. v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................................................................19

*Corp. for Pub. Broad. v. Trump*,
    ---F. Supp. 3d.---, 2025 WL 1617191 (D.D.C. June 8, 2025) ...............................6, 7, 23

*Dep't of Educ. v. California*,
    604 U.S.---, 145 S. Ct. 966 (2025) ...................................................................................19

*Edwards v. Aurora Loan Servs. LLC*,
    791 F. Supp. 2d 144 (D.D.C. 2011) ...................................................................................9

*EPA v. Brown*,
    431 U.S. 99 (1977)............................................................................................................19

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) ..........................................................................................................17

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 20

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................................... 17

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) ............................................................................................... 19

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ............................................................................... 19

*Leathers v. Medlock*,
  499 U.S. 439 (1991) ............................................................................................... 12

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................................... 24

*Maher v. United States*,
  314 F.3d 600 (Fed. Cir. 2002) ................................................................................. 9

*Miller v. Brown*,
  462 F.3d 312 (4th Cir. 2006) ................................................................................... 8

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .......................................................................................... 13, 17

*National Rife Ass'n of America v. Vullo*,
  602 U.S. 175 (2024) ............................................................................................... 14

*   *Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) .......................................................................................... 13, 14

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ............................................................................................... 8

*Nat'l Urban League v. Trump*,
  2025 WL 1275613 (D.D.C. May 2, 2025) ............................................................... 14

*Nevada v. Dep't of Energy*,
  457 F.3d 78 (D.C. Cir. 2006) ................................................................................. 8

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S.---, 145 S. Ct. 1762 (2025) .................................................................. 18, 20

*Nyunt v. Chairman, Broad. Bd. of Governors,*
     589 F.3d 445 (D.C. Cir. 2009)..................................................................18

*Racing Enthusiasts & Suppliers Coal. v. EPA,*
     45 F.4th 353 (D.C. Cir. 2022).................................................................19

*Rosenberger v. Rector & Visitors of the University of Virginia,*
     515 U.S. 819 (1995) ....................................................................... 13, 14

\* *Rust v. Sullivan,*
     500 U.S. 173 (1991).................................................................*passim*

*Scoggins v. Lee's Crossing Homeowners Ass'n,*
     718 F.3d 262 (4th Cir. 2013) ...................................................................8

*Select Specialty Hosp.-Akron, LLC v. Sebelius,*
     820 F. Supp. 2d 13 (D.D.C. 2011).............................................................8

*Texas v. United States,*
     523 U.S. 296 (1998) .................................................................................8

*Trump v. American Federation of Government Employee ("AFGE"),*
     2025 WL 1873449 (U.S. July 8, 2025)...................................................22

*Trump v. New York,*
     592 U.S. 125 (2020) .................................................................................8

*United States v. Am. Library Ass'n,*
     539 U.S. 194 (2003) ...............................................................................12

*Vera Inst. of Justice, et al v. U.S. Dep't of Justice,*
     Case No. 25-cv-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025)....................21

*Ysursa v. Pocatello Educ. Ass'n,*
     555 U.S. 353 (2009) ........................................................................ 12, 13

**Statutes**

31 U.S.C. § 503 ................................................................................................5

31 U.S.C. § 6307 ..............................................................................................5

31 U.S.C. §§ 6101-6106 ...................................................................................5

31 U.S.C. §§ 7501-7507 ...................................................................................5

47 U.S.C. § 390 ................................................................................................3

47 U.S.C. § 396 ................................................................................................. 3, 4, 23

47 U.S.C. § 398 .................................................................................................... 4, 23

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........................................................ 5, 6

Full-Year Continuing Appropriations and Extensions Act, 2025
  Pub. L. No. 119-4, 139 Stat. 9 ............................................................................6

Further Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-47, 138 Stat. 460 (2024)............................................................ 3, 6

Public Broadcasting Act of 1967,
  Pub. L. No. 90-129, 81 Stat. 365 (1967) (*codified at* 47 U.S.C. § 390 *et seq.*) .........................3

## Rules

Federal Rule of Civil Procedure 56(a) .........................................................................7

## Regulations

2 C.F.R. Part 200 ....................................................................................................5

2 C.F.R. § 200.339-43 ...............................................................................................5

2 C.F.R. § 200.340................................................................................................ 5, 20

*Ending Taxpayer Subsidization of Biased Media*,
  Executive Order No. 14,290, 90 Fed. Reg. 19,415 (May 1, 2025) ................................*passim*

## Other Authorities

Brian E. Humphreys, Cong. Rsch. Serv., R48545, Public Broadcasting: Background Information and
  Current Issues for Congress (2025),
  https://www.congress.gov/crs-product/R48545 ....................................................4

## INTRODUCTION

In Executive Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media* ("the EO"), the President directed the Corporation for Public Broadcasting ("CPB") to terminate direct and indirect funding to National Public Radio ("NPR") and the Public Broadcasting Service ("PBS") and instructed federal agencies to identify and terminate any direct or indirect funding to these two organizations. 90 Fed. Reg. 19,415 (May 1, 2025) ("Exec. Order No. 14,290"). Both directives were qualified by an instruction to proceed only as consistent with applicable law. *Id.*  As the EO explained, those directives reflected the President's determination that NPR and PBS do not "present[] a fair, accurate, or unbiased portrayal of current events to taxpaying citizens."  *Id.* § 1. Plaintiffs—PBS and certain local member stations—have now sued to challenge the EO.  This Court should deny their motion for summary judgment, and instead grant Federal Defendants' motion for summary judgment and dismiss this case.

At the outset, Plaintiffs' claims are not ripe for judicial review; there is no genuine case or controversy that warrants judicial intervention at this time.  As Plaintiffs acknowledge, CPB disputes the President's authority to direct its funding decisions, and that relationship is the subject of separate litigation before this Court.  For now, however, CPB has not acted to terminate funding for Plaintiffs; indeed, Plaintiffs' motion includes no factual material suggesting that they have suffered any loss of funding by virtue of the EO.  Nor have the other agency Defendants—the Department of the Treasury and the Department of Education ("ED")—caused Plaintiffs any ripe injury.  Plaintiffs apparently included Treasury in the suit for fear it will not disburse funds to CPB, yet Treasury has not refused to disburse any such funds.  As to ED, CPB was the direct recipient of ED's terminated grant, and CPB gave funds from that grant to PBS.  CPB's appeal of ED's termination of its grant is pending, and Plaintiffs do not directly

seek to challenge that termination here. *See* ECF No. 12-3 (Plaintiffs' Proposed Order).  The

bottom line is that Plaintiffs may object to the EO in principle, but there is no ripe, concrete

dispute in practice.  On that basis alone, the Court should dismiss this action without prejudice.

If the Court reaches the merits, it should reject Plaintiffs' claims.  Starting with

constitutional claims, Plaintiffs argue that the EO violates the First and Fifth Amendments by

ceasing their federal subsidization.  That misapprehends both constitutional provisions.  As to the

First Amendment, it is well established that when the government acts as a *patron*—rather than

as a *regulator*—it may consider the content and viewpoint of the work it is subsidizing.  That is

all that happened here: the challenged EO does not purport to substantively regulate PBS or

anyone else, much less to dictate its content.  The EO merely chooses not to fund Plaintiffs with

taxpayer dollars.  It thus neither impermissibly discriminates based on Plaintiffs' viewpoint nor

retaliates against them based on protected speech.  Nor does the challenged EO violate Plaintiffs'

associational rights—it does not limit such rights at all; again, it merely declines to subsidize

them, which has long been constitutionally permitted.  As for the Fifth Amendment, Plaintiffs do

not articulate a cognizable property interest to which the Due Process Clause attaches.  Federal

grants and subsidies are not, and have never been, treated as property interests that trigger

constitutional protection before they can be terminated or ceased.

Turning to Plaintiffs' statutory claims, they fail too.  At the outset, the President himself

(and thus the EO itself) is not subject to injunctive relief, either under the APA or generally.  The

only way Plaintiffs could challenge the EO on statutory grounds would be to seek to vacate

implementation acts by federal agencies as contrary to law under the APA.  But Plaintiffs cannot

do that here, because no agency Defendant has yet taken any actionable final agency action

against Plaintiffs.  Nor does that absence of final agency action somehow mean the "Hail Mary"

remedy of an *ultra vires* claim available. Finally, even if there had been final agency action—

and there is not—the scattershot collection of statutory violations Plaintiffs allege are not

persuasive on the merits.

For all of these reasons, Plaintiffs are not entitled to summary judgment. Instead, the

Court should dismiss the action.

## BACKGROUND

### I.    Statutory Background[1]

#### A.  CPB and the Public Broadcasting Act

CPB was created by Congress in the Public Broadcasting Act of 1967 (the "PBA"). Pub.

L. No. 90-129, 81 Stat. 365, *codified at* 47 U.S.C. § 390 *et seq.* Congress designed CPB to

advance various governmental purposes, including serving the "public interest" by

"encourag[ing] the growth and development of public radio and television broadcasting" and

"nonbroadcast telecommunications technologies for the delivery of public telecommunications

services." 47 U.S.C. § 396(a)(1), (2). CPB does so primarily by using appropriated taxpayer

funds, drawn from a Public Broadcasting Fund administered by the Secretary of the Treasury, to

issue grants supporting public broadcasting, in a manner prescribed by statute. *See id.* § 396(k);

*see also, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 407, 138

Stat. 460, 696. CPB is required to promote specific types of programming—for example,

"instructional, educational, and cultural" programming. 47 U.S.C. § 396(a)(1). But Congress

---

[1] Plaintiffs' Complaint alleges a claim that Defendants' purported actions were arbitrary and capricious under the APA. But Plaintiffs motion for summary judgment is silent about arbitrary and capricious claims, in fact the words arbitrary and capricious do not appear anywhere in their motion. Rather, Plaintiff appears to be bringing contrary to law and violation of constitutional right claims.

"prohibited" CPB from owning or operating broadcast stations or producing its own programming. *Id.* § 396(g)(3).

CPB is overseen by a board consisting solely of Presidential appointees who are confirmed by the Senate. The PBA provides that nothing in the statute "shall be deemed . . . except to the extent authorized in subsection (b), to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over the Corporation or any of its grantees or contractors, or over the charter or bylaws of the Corporation, or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity." *Id.* § 398(a) (emphasis added).

CPB provides funds, directly and indirectly, to NPR and PBS.  *See* Brian E. Humphreys, Cong. Rsch. Serv., R48545, Public Broadcasting: Background Information and Current Issues for Congress 10 (2025), https://www.congress.gov/crs-product/R48545.  NPR "was created by the CPB in 1970 as a news-gathering, production, and program-distribution company governed by its member public radio stations." *Id.*  NPR produces radio programs for its members, although member stations retain control over programming decisions. *Id.*  By contrast, PBS "operate[s] and manage[s] a nationwide program distribution system interconnecting public television stations." *Id.*  PBS does not produce programming directly, but "aggregates funding for the creation and acquisition of programs by and for the stations and distributes programs through its satellite distribution system" to local public television stations. *Id.*  NPR and PBS are distinct from the member stations that actually distribute content directly (*e.g.*, WAMU in Washington, D.C.)  Public broadcasters may use CPB funds to "pay membership dues and program acquisition fees" to PBS and NPR,  but "there are no authoritative estimates of indirect

federal funding levels of the PBS and NPR nonprofit organizations through dues and fees." *Id.*
NPR and PBS also "receive some direct federal funding from the CPB." *Id.*

Lakeland PBS is a PBS member station "that provides essential broadcast services to unserved and underserved people, in reliance on PBS programming and services.  Pls. Mem., ECF No. 12 at 22; ECF No. 12-2 at 3-4 (Hanks Decl. ¶¶ 3-4, 10). "Based in northern and central Minnesota, Lakeland PBS has been a member station since it began operating in 1979." ECF No. 12-2 at 3-4. (Hanks. Decl. ¶¶ 2-3); Pls. Mem., ECF No. 12 at 20.

ED terminated an existing grant to CPB (but not to PBS) on May 2, 2025. The termination letter to CPB states that the grant was terminated "pursuant to, among other authorities, 2 C.F.R. § 200.339-43, and the termination provisions in your grant award."  *See* Administrative Record ("AR"), AR at PBSAR-00001. The grant award to CPB incorporated 2 C.F.R. Part 200 as well as numerous other authorities. Termination of Federal Awards Under 2 C.F.R. § 200.340(a)(4).  *See* AR at PBSAR-00159 - PBSAR-00163.

The Office of Management and Budget ("OMB") has promulgated regulations for the termination of federal grants pursuant to its statutory authority. *See* 31 U.S.C. §§ 503, 6101-6106, 6307, and 7501-7507.  A Federal award may be terminated "in part or in its entirety" by "the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4). The terms and conditions of the Federal award must "clearly and unambiguously specify all termination provisions[.]" *Id.* §200.340(b).

### B.    The Consolidated Appropriations Act, 2023

The Consolidated Appropriations Act, 2023 ("2023 Act") appropriated $535,000,000 for CPB for fiscal year 2025. Pub. L. No. 117-328, Div. H, Tit. IV, 136 Stat. 4459, 4901 (2022).

Pursuant to the 2023 Act, payment to CPB is "as authorized by the Communications Act of 1934, an amount which shall be available within limitations specified by that Act." *Id.* With the exception of certain restrictions on funding not at issue here, *id.*, the Act is a lump-sum appropriations that imposes no specific requirements on further distributions (i.e., line-items). The Further Consolidated Appropriations Act, 2024 and the Full-Year Continuing Appropriations and Extensions Act, 2025 similarly provide lump-sum appropriations for the succeeding fiscal years. *See* 138 Stat. at 696 and Pub. L. No. 119-4, Tit. I, 139 Stat. 9.

## II.    Factual Background

On May 1, 2025, President Trump issued Executive Order No. 14,290, titled *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025). Section 1 of the EO contains the President's findings, including that "Americans have the right to expect that if their tax dollars fund public broadcasting at all, they fund only fair, accurate, unbiased, and nonpartisan news coverage," and "[n]o media outlet has a constitutional right to taxpayer subsidies, and the Government is entitled to determine which categories of activities to subsidize." Exec. Order No. 14,290 § 1.

Sections 2 and 3 of the EO, respectively, call for CPB to terminate direct and indirect funding to NPR and PBS "to the maximum extent allowed by law," *id.* § 2, and for federal agencies to identify and terminate any direct or indirect support for PBS or NPR "consistent with applicable law." *Id.* § 3.

CPB has expressed that it will not comply with the EO.  *See* related case "*National Public Radio, et al., v. Trump, et al*., No. 1:25-cv-01674, Mem. of Law in Supp. of Pls.' Mot. for Summ. J. at 14, ECF No. 21-1 (D.D.C. June 13, 2025).  The scope of the President's control over CPB is the subject of separate litigation.  *See Corp. for Pub. Broad. v. Trump*,  ---F. Supp. 3d.---,

2025 WL 1617191 (D.D.C. June 8, 2025) (Moss, J)).  Treasury has not taken any action to reduce funding to CPB.  Moore Decl. ¶ 7.  Plaintiffs identify one grant to CPB that was terminated after the EO was issued.  Pls. Mem., ECF No. 12, at p. 26.  PBS was an indirect recipient of that grant, as CPB disbursed funds from its ED award to PBS to develop and distribute programming content called " Ready to Learn."  *Id.; see also* AR at PBSAR-00001, AR at PBSAR-00575. ED terminated that grant to CPB on May 2, 2025.  *See* AR at PBSAR-00001.  CPB filed an appeal with ED challenging the termination.  *See*, AR, Bates PBSAR-00571.  CPB's appeal of that termination is pending.   Plaintiffs do not allege, much less establish, that either of the remaining government agencies, the Department of Homeland Security or FEMA, have taken any action with respect to the EO.  *See* Pls. Mem. ECF No. 12, at p. 20, n.11.

### III.    Procedural Background

PBS and Northern Minnesota Public Television, Inc., *d.b.a.* Lakeland PBS sued President, the Office of Management and Budget, the Department of Education, the Department of Homeland Security, FEMA, the Department of the Treasury, and officials from some of these agencies.  Compl. ECF No. 1.  Plaintiffs allege the Defendants violated certain statutes and the First and Fifth Amendments in issuing and implementing the EO.  Plaintiffs have moved for summary judgment.  Pls. Mem., ECF No. 12.

### LEGAL STANDARD

In an APA case, the Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply. Rather, the district court sits as an appellate tribunal, reviewing the administrative record. "[S]ummary judgment 'serves as a mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and is otherwise consistent with the APA

standard of review.'" *See Advoc. Christ Med. Ctr. v. Azar*, Civ. A. No. 17-cv-1519 (TSC), 2022

WL 2064830, at *5 (D.D.C. June 8, 2022) (quoting *Select Specialty Hosp.-Akron, LLC v.

Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011)), *aff'd*, 80 F.4th 346 (D.C. Cir. 2023).

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE NOT RIPE FOR REVIEW.

Article III only permits the Court to adjudicate those claims that are ripe for review.

*Texas v. United States*, 523 U.S. 296, 300–01 (1998) (Ripeness "requir[es] us to evaluate both

the fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration.") (citation omitted); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S.

803, 808 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial

power and from prudential reasons for refusing to exercise jurisdiction.").  Ripeness requires that

an alleged injury be "certainly impending."  *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d

922, 927 (D.C. Cir. 2013).  Meanwhile, a claim is not ripe if it is "dependent on 'contingent

future events that may not occur as anticipated, or indeed may not occur at all.'"  *Trump v. New

York*, 592 U.S. 125, 131 (2020).  With respect to APA claims, "[a] case is fit for adjudication

when the action in controversy is final and not dependent on future uncertainties." *Scoggins v.

Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Miller v. Brown*,

462 F.3d 312, 319 (4th Cir. 2006)).  Finality is a prerequisite for ripeness—agency action that is

not final is not ripe for review, *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006).

Because Plaintiffs' claims are "dependent on contingent future events that may not occur

as anticipated, or indeed may not occur at all," *Trump*, 592 U.S. at 131, they are nonjusticiable.

As explained, Plaintiffs seek relief from this Court from the prospect that CPB or the Defendant

agencies will cut off their funding as a result of the EO. Pls. Mem., ECF No. 12, pp. at 11, 27 of 47. Yet CPB's relationship with the federal government, and the degree of control that the government may exercise over it, are currently hotly disputed questions in separate litigation before this Court. *See Corp. for Public Broad. v. Trump*, No. 25-1305 (RDM) (D.D.C.). For now, CPB has not taken action to terminate funding for NPR or PBS, as their failure to allege otherwise amply demonstrates. Any dispute over potential CPB terminations of funding is therefore not ripe.

As for the agency Defendants, none has taken concrete, cognizable action against Plaintiffs. To the extent Plaintiffs interpret the EO as directing the Treasury Department to withhold funding from CPB if CPB fails to comply with the EO, Pls. Memo., ECF No. 12, pp. 28 of 47, the EO does not include such a direction. To the contrary, Treasury has continued to make payments to CPB since the EO was issued. Moore Decl. ¶¶ 7-8. Any dispute with Treasury is therefore also premature, hypothetical, and unripe.

Defendants acknowledge ED terminated a grant to CPB—not PBS—on May 2, 2025. But Plaintiffs lack Article III standing to enforce an agreement to which they are not a party. *See, e.g.*, *Edwards v. Aurora Loan Servs. LLC*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *Maher v. United States*, 314 F.3d 600, 605 (Fed. Cir. 2002). And Plaintiffs offer no evidence that they expect (or expected) to receive any grants from ED in the future. There is no Article III injury here, let alone a ripe dispute.

In short, this lawsuit is an academic exercise. Plaintiffs may feel offended by the EO, but they offer no evidence that it has given rise to any concrete or imminent injury to any Defendant. There is simply no need for any judicial intervention at this juncture. The Court should thus dismiss the case.

II.    **PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL.**

If this Court does nonetheless reach the merits, it should reject Plaintiffs' claims, starting

with the constitutional claims.  The EO does not violate the First Amendment, because the First

Amendment does not require the Government to *subsidize* speech on equal terms, and the EO

relates solely to such subsidization.

      **A.    Plaintiffs' First Amendment Claims Fail Because the Government Has Broad Powers to Choose How to Distribute Funding.**

In the EO, the President determined that it was inappropriate to provide taxpayer

subsidies to entities that he determined fail to "presents[] a fair, accurate, or unbiased portrayal

of current events to taxpaying citizens."  Exec. Order No. 14,290 § 1.  Plaintiffs assert that the

issuance and implementation of the EO violates the First Amendment.  They contend that the

President acted because of  disagreements with Plaintiffs' journalistic content—more

specifically, that those actions (1) were based upon Plaintiffs' viewpoint; (2) retaliated against

Plaintiffs because of the content of their journalism; and (3) infringed on Plaintiffs' freedom to

freely associate.

All three flavors of the First Amendment claim fail, because the Supreme Court has long

been clear that when the Government acts as patron to subsidize speech—as opposed to when it

acts as sovereign to regulate it—First Amendment concerns are substantially diminished. *See*

*Rust v. Sullivan*, 500 U.S. 173 (1991), *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570

U.S. 205 (2013) ("*AID*").  That principle does not change just because the Government is

subsidizing journalism as opposed to a different type of speech.  Were it otherwise, the

Government would be unable to consider the quality or value of the speech it uses taxpayer

dollars to fund—including whether that speech is "fair, accurate, or unbiased."  That is not the

law.  Indeed, the very premise of the PBA is otherwise.  This Court should not adopt Plaintiffs'
novel and far-reaching position.

### 1.    Viewpoint Discrimination

Plaintiffs argue that the EO imposes unconstitutional viewpoint-based burdens on the
local public stations and PBS.  Pls. Mem., ECF No.12, p. at 30**.**  But this argument fails because
principles of viewpoint discrimination do not constrain the Government's discretion to subsidize
speech where, as here, the Government's limitations relate solely to what the grantees may do
with federal funds.  Simply put, the Government is permitted to have policy priorities, and it
does not violate the First Amendment to affirmatively fund only programs that align with those
policies.

It is well established that government spending is not subject to traditional First
Amendment scrutiny.  As the Supreme Court explained in *Rust*, "[t]he Government can, without
violating the Constitution, selectively fund a program to encourage certain activities it believes to
be in the public interest . . . . In so doing, the Government has not discriminated on the basis of
viewpoint; it has merely chosen to fund one activity to the exclusion of the other." 500 U.S. at
193.  Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal
funding, its recourse is to decline the funds. This remains true when the objection is that a
condition may affect the recipient's exercise of its First Amendment rights." *AID*, 570 U.S. at
214; *see also id.* (collecting cases).

In this context, the Government violates the First Amendment only if it attempts to
"leverage funding to regulate speech *outside* the contours of the program[s] itself." *Id.* at 214-15
(emphasis added).  For example, the Government cannot condition federal funds on a pledge to
adopt a policy "explicitly opposing prostitution and sex trafficking," *id.* at 210; that

11

impermissibly regulates speech even on the recipients' "own time and dime." *Id.* at 218-19. But the Government remains free to "specify the activities [it] wants to subsidize," and thus could (for example) prohibit using federal funds to "promote or advocate [for] the legalization or practice of prostitution or sex trafficking." *Id.* at 217-18.

Under these principles, the EO is constitutional. It does not impose an unconstitutional condition on Plaintiffs' speech; rather, as permitted under *Rust* and *AID*, the EO merely aligns the Government's sponsorship of activities with its policy priorities. None of its provisions seek to regulate a grantee/contractor's speech "outside the contours of " any such policy initiatives— *i.e.*, they do not prohibit entities from supporting any position they choose on their "own time and dime." *Id.* at 215, 218. The EO merely declines to extend federal funding for Plaintiffs' programs. The Supreme Court has repeatedly held that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that Government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (Government "is not required to subsidize First Amendment rights").

These Supreme Court doctrines establish that there is no First Amendment violation here. Start with funding to PBS itself. Plaintiffs claim the EO, " [b]y prohibiting CPB and all federal agencies from funding PBS, and prohibiting member stations from using federal funds to pay their PBS dues, the EO discriminates on the basis of viewpoint and editorial expression, retaliates against PBS on the same basis, and imposes an

unconstitutional condition on PBS member stations' federal funding." Pls. Mem., ECF No. 12, p. 35. But, as to the termination of PBS' funding, this is simply restating the activity that *Rust* itself permitted—the Government can choose what to subsidize using taxpayer funds without running afoul of the restrictions on viewpoint discrimination that would otherwise apply when the Government is acting as regulator. *Rust*, 500 U.S. at 193. And Government's decision not to subsidize First Amendment activities does not itself violate the First Amendment. *Ysursa*, 555 U.S. at 358.

Nor has the Government unconstitutionally burdened Lakeland PBS or prevented it from airing PBS content. Again, the EO merely prohibits *using federal funds* to license PBS programming. The EO does not prohibit those stations from licensing PBS programming with their *own* funds; to the contrary, Plaintiffs remain free to license such programming on their "own time and dime." *AID*, 570 U.S. at 218. The EO merely restricts what federal funds can be used for, and that funding determination is not subject to viewpoint restrictions. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998). This is not an unconstitutional burden—local member station such as Lakeland PBS are free to choose whatever programs they like as a matter of their independent editorial judgment; they simply cannot pay for PBS' programming with federal funds.

The distinction between government funding and government regulation renders much of Plaintiffs' brief in support of their motion irrelevant. Plaintiffs cite cases holding that the Government cannot take sides in ideological contests; but those cases did not emerge from, and do not apply to, the funding context. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719, 731 (2024).[2] Plaintiffs rely heavily on *Rosenberger v. Rector & Visitors of the University of Virginia*, 515

---

[2] *See* Pls. Mem., ECF No. 12, p. 37.

U.S. 819 (1995), for the proposition that "when the government 'expends funds to encourage . . .

*private* speech,' it 'may not discriminate based on the viewpoint of private persons whose speech

it facilitates." Pls. Mem.,  ECF No. 12 at p. 36 (quoting *Rosenberger*, 515 U.S. at 833-34).  But

as the Supreme Court explained just a few years later, "*Rosenberger* … found the viewpoint

discrimination unconstitutional not because funding of 'private' speech was involved, but

because the government had established a limited public forum."  *Finley*, 524 U.S. at 598-99

(Scalia, J., concurring); *see also id*. at 586.  PBS is not a limited public forum—and Plaintiffs do

not claim that it is.

Finally, Plaintiffs appear to contend their situation is like the condition characterized as

coercive in *National Rife Ass'n of America v. Vullo*, 602 U.S. 175, 198 (2024); Pls. Mem. ECF

No. 12, at 40.  A decision to decline to fund certain activities is not comparable to the threat of

inducing sanctions, as in *Vullo*.  As Judge Kelly noted recently: "because the government is not

constitutionally obligated to fund Plaintiffs' preferred speech or to contract with them for certain

purposes, the decision to stop funding that speech or contracting for those ends is not an example

of the government doing 'indirectly what' it 'is barred from doing directly.'"  *Nat'l Urban*

*League v. Trump*, 2025 WL 1275613, at *22 (D.D.C. May 2, 2025).

Accordingly, Plaintiffs' efforts to invoke strict scrutiny fail, and their viewpoint

discrimination claim must be rejected.

## 2.    First Amendment Retaliation

Next, Plaintiffs repeat their First Amendment claim using the language of retaliation.  Pls.

Mem., ECF 12 at p. 40.  To be clear, they do not claim that the President issued the EO to punish

them for specific content; rather, their theory is that the President acted because he disliked their

content. Pls. Mem., ECF No. 12 at pp. 11, 42 .  This is not a proper First Amendment retaliation

14

claim; it is the same viewpoint discrimination claim clothed in a different dress, and fails for the same reasons stated above.

For a claim of First Amendment retaliation, Plaintiffs must establish that (1) they engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; <u>and</u> (3) a causal link between the exercise of a constitutional right and the adverse action taken against plaintiffs exists. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). While Defendants do not dispute that Plaintiffs engaged in First Amendment protected conduct (i.e., journalism), Plaintiffs' retaliation claim fails because termination of funding based on a viewpoint the government does not want to subsidize is not a cognizable adverse action under the First Amendment.

Defendants do not dispute that the President considered PBS's conduct and the content of its material in issuing the EO; the EO is explicit on that point. *See* Exec. Order No.14,290 § 1. But that is not unconstitutional retaliation. The First Amendment allows the President to consider content when the Government is subsidizing (rather than regulating) speech. Indeed, were the law otherwise, the Government would be required to subsidize journalistic content (or, for that matter, any activity that expresses a viewpoint or a perspective) that it disagrees with, simply because the subsidized activity expresses *a* viewpoint. That perspective cannot be accorded with *Rust* and its progeny.

15

### 3. Editorial Discretion[3]

Plaintiffs argue that implementing and issuing the EO violates their First Amendment rights because doing so might abridge the editorial discretion of PBS and of their member stations. Pls. Mem., ECF No.12, pp. 36, 39, 42; ECF No. 1, pp. 37-38 (Compl. ¶¶ 104-110). But this argument misconstrues the relevant standard—the government is imposing no substantive restriction on any of the editorial activities of any of the Plaintiffs. It is merely declining to *fund* those activities with taxpayer dollars. As the Supreme Court explained in *Rust*, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." 500 U.S. at 193. This argument is merely another restatement of the same basic First Amendment argument, and fails for those same reasons.

None of the EO's directives impose any editorial restrictions on PBS itself. 90 Fed. Reg. 19,415 §§ 2, 3. The EO does not, for example, restrict what PBS or its members may say or do; it simply limits their ability to receive federal funding to pay for certain activities. The Plaintiffs are free to do whatever they like with non-federal funds. The government is not restricting activities on the members' "time and dime." *AID*, 570 U.S. at 218-19.

Ultimately, Plaintiffs' challenge that the EO erodes their First Amendment right to editorial discretion is baseless because the Government is not required to subsidize First Amendment rights overall. *Rust v. Sullivan*, 500 U.S. at 193. Here, *FCC v. League of Women Voters of Cal.*,

---

[3] Though Plaintiffs' complaint sets out a separate claim for infringement of Plaintiffs' First Amendment freedom of the press (*see* Count VI), their motion for summary judgment frames the EO's purported diminishment of their editorial discretion as an overall violation of Plaintiffs' freedoms of speech and of the press.

468 U.S. 364 (1984), upon which Plaintiffs rely, is instructive.  In that case, plaintiffs challenged

a section of the Public Broadcasting Act of 1967 forbidding any noncommercial educational

broadcasting station which receives a grant from the Corporation for Public Broadcasting to

"engage in editorializing."  The *League of Women* court struck the Government's condition on

federal funds to noncommercial broadcast television and radio stations because it prohibited *all*

editorializing, including with private funds.  Here, by contrast, the EO imposes no such

restrictions on private funds.  Similarly, neither the EO's issuance nor its implementation,

consistent with *Rust* and its progeny, would result in controlling PBS's judgment as to what

content to publish, omit, or prioritize.  For similar reasons,  Plaintiffs reliance on *Moody v.

NetChoice, LLC*, 603 U.S. 707, 732 (2024), in support of their editorial discretion-based

argument is misplaced.  Though *NetChoice* states that the Government cannot take sides in

ideological contests, it is likewise inapposite because that case neither emerged in, nor did it

apply to, the federal funding context.  Indeed, in the funding context, as discussed above, the

government can and does take sides on what federal funds can be used for. For these reasons,

Plaintiffs editorial discretion claim fails.

## III.    PLAINTIFFS' STATUTORY CLAIMS ALSO FAIL.

Plaintiffs also raise a host of statutory claims against the President and agency

Defendants, alleging violations of the PBA and other statutes. ECF No. 1 (Compl ¶¶ 108-118);

Pls. Mem., ECF. 12 at p. 22-26. At the threshold, Plaintiffs seek relief against the President, but

the APA does not apply to the President, nor is injunctive relief against the President proper.

*Franklin v. Massachusetts*, 505 U.S. 788, 801-03 (1992).  As for the agency Defendants,

Plaintiffs cannot succeed on an APA claim because no agency has taken final agency action.

Neither CPB nor any other agency has withheld grant funding from Plaintiffs. In the absence of

17

any implementing actions by CPB or other agencies, Plaintiffs cannot invoke the APA.  Nor can Plaintiffs satisfy the "Hail Mary" standard required for an *ultra vires* claim. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S.---, 145 S. Ct. 1762, 1776 (2025) ("*NRC*") (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). For all of these reasons, the Court has no occasion at this juncture to consider how the EO interacts with the array of statutes that Plaintiffs cite.  In all events, however, Plaintiffs' claims fail because the EO comports with the applicable statutory requirements.

### A.    Plaintiffs Cannot Invoke the APA or *Ultra Vires* Review.

Plaintiffs' statutory challenges take the form of APA claims against the agency Defendants.  The problem, however, is that none of the agency Defendants has taken final agency action subject to APA review.  Nor can Plaintiffs pursue a non-statutory *ultra vires* claim to circumvent that defect.

#### 1.  Final agency action

Review under the APA is limited to "final agency action."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 177–78 (citation omitted).  Plaintiffs cannot meet either prong of the test.

Plaintiffs purport seek judicial review of final agency actions implementing the EO, Pls. Mem., ECF. No. 12 at p. 30, but fail to specifically identify any final agency action with respect to the Treasury; indeed, their reference to Treasury is cursory.  Nor does Plaintiffs' motion for summary judgment seek relief based on ED's termination of the grant it awarded to CPB. Presumably, the Plaintiffs recognize that they would not meet basic thresholds of standing and

ripeness given PBS is an indirect recipient of the terminated grant.  Pls. Mem., ECF No. 12 at p.

26. There is therefore no Article III controversy over the termination of that grant (and if there

were, it would be properly brought in the Court of Federal Claims, *see Dep't of Educ. v.*

*California*, 604 U.S.---, 145 S. Ct. 966, 968 (2025)).

   Under *Bennett*'s first prong, the EO merely tasks agencies with taking future action

consistent with the law; it does not mark the consummation of the agencies' decision-making

process.  And Plaintiffs cannot point even to "a step" taken by an agency to implement the EO.

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948).; *see also EPA v.*

*Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated,

the final form of which has only been hinted at, would be wholly novel."); *Appalachian Energy*

*Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not

taken any action at this point triggering [the court's] power to review its position").  Notably,

CPB, who is not a plaintiff in this case, has its appeal challenging the termination pending at ED.

   Nor does the agency Defendants' potential future attempts to implement the EO satisfy

the second *Bennett* prong.  Prong two's language includes terms of art reflecting "a 'pragmatic'

inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing*

*Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022). The Court must

consider the "concrete impact the [agency action] had on [the Plaintiffs]."  *Indep. Equip. Dealers*

*Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also FTC v. Standard Oil Co. of Cal.*, 449

U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect

on the day-to-day business' of the complaining parties"); *City of N.Y. v. U.S. Dep't of Def.*, 913

F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into

the internal workings of the government, and is instead properly directed at the effect that agency

conduct has on private parties").  Plaintiffs cannot point to any impact stemming from the actions

of the Defendant agencies implementing the Order.  That is because there are none.

   **2.**  ***Ultra vires* review.**

   As an alternative to the APA, Plaintiffs ask the Court to conduct non-statutory *ultra vires*

review.  But they cannot remotely satisfy their demanding requirements. As the Supreme Court

emphasized only weeks ago, such review applies only (1) "when an agency has taken action

entirely 'in excess of its delegated powers and contrary to a '*specific prohibition*' in a statute"

and (2) "a statutory review scheme forecloses all other forms of judicial review."  *NRC*, 145 S.

Ct. at 1776. "Given all that . . . a [nonstatutory *ultra vires* claim] is essentially a Hail Mary

pass—and in court as in football, the attempt rarely succeeds." *Id.*: *see also Fed. Express Corp.*

*v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (such *ultra vires* claims are "confined

to extreme agency error where the agency has stepped so plainly beyond the bounds of its

statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention

of an equity court" (cleaned up)).

   Plaintiffs cannot meet this standard where there has been no action in the first place.

There are no allegations that CPB has complied with the EO.  In terminating the grant to CPB,

ED acted pursuant to its authority under the statute, 2 C.F.R. § 200.340, and under the terms of

the grant.  (But, again, Plaintiffs are not challenging that grant, would lack standing to do so, and

such a claim would be in the Court of Federal Claims in any event.) And Plaintiffs neither

alleged nor established that the Department of the Treasury has ceased funding CPB.

   Moreover, an *ultra vires* claim necessarily fails where there is an "alternative path to

judicial review."  *NRC*, 145 S. Ct. at 1776.  Here, the APA would apply *if* there had been final

agency action not channeled to the Court of Federal Claims.  The fact that there has not been one

does not create a back door to reviewability; it illustrates that this case is not amenable to review at all at this juncture. *Accord Vera Inst. of Justice, et al v. U.S. Dep't of Justice*, Case No. 25-cv-1643 (APM), 2025 WL 1865160, at *1 (D.D.C. July 7, 2025) ("The court cannot grant Plaintiffs relief because it lacks the power to hear their claims under the Administrative Procedure Act.").

**B. The EO Does Not Violate Any Statute.**

For the reasons above, there is no need for this Court to address whether the EO comports with all of the statutes that Plaintiffs have invoked. As explained, there is no justiciable controversy here, and certainly not a viable statutory claim under the APA to any final agency action. But if the Court does go further, it should reject Plaintiffs' arguments. The EO does not run afoul of any statute.

Most fundamentally, the EO does not ask CPB or any other government agency to violate the law. The EO is clear: "The CPB Board shall cancel existing direct funding *to the maximum extent allowed by law* and shall decline to provide future funding." Exec. Order No. 14,290 § 2(a) (emphasis added). And again, in the context of indirect funding: "*to the extent permitted* by the 2024 Television Community Service Grants General Provisions and Eligibility Criteria, the 2024 Radio Community Service Grants General Provisions and Eligibility Criteria, *and applicable law*, the CPB Board shall also prohibit parties subject to these provisions from funding NPR or PBS after the date of this order." *Id.* § 2(b). The EO on its face thus does not conflict with any applicable law; it is meant to be applied and implemented consistent with that law. And given that the Order has not been implemented yet as to Plaintiffs, this Court cannot possibly evaluate whether the Order will be implemented in such a way as to violate any statute. The Supreme Court's recent stay decision in *Trump v. American Federation of Government Employee* ("*AFGE*"), accords with the conclusion that the EO is not itself reviewable final agency action.

606 U.S.---, 2025 WL 1873449 (U.S. July 8, 2025). In *AFGE*, the Court reviewed an Executive Order (and implementing OMB/OPM joint memorandum) that provided a framework for "agencies to plan reorganizations and reductions in force 'consistent with applicable law.'" *Id.* at *1 (citation omitted) (Sotomayor, J., concurring in the grant of stay).   In doing so, the Court distinguished between review of the Presidential direction to agencies to take action consistent with the law and the agency actions themselves. *See id.*; *see also id.* ("The District Court enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves."). As Justice Sotomayor noted in concurrence, because "[t]he [agency] plans themselves are not before this Court, at this stage, . . . we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law." I*d.* (Sotomayor, J., concurring in the grant of stay).

So too here: the challenged EO requires that it "shall be implemented consistent with applicable law" (Exec. Order No. 14,290 § 5(b)), and, under *AFGE*, the EO itself is thus not itself susceptible to APA challenge. *See also, e.g.*, *Building & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (noting an EO directed agencies to take action "to the extent allowed by law," and "[t]hus, if an exemptive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."). And, as discussed elsewhere, any action taken by agency Defendants has been consistent with the law. *See e.g.* AR at PBSAR-00159 - PBSAR-00163.

Even beyond that, none of Plaintiffs' specific objections has merit. *First*, nothing in the PBA precludes the EO. Plaintiffs' primary statutory argument is that the PBA prevents the

President, or those acting at his direction from supervising CPB among other similar acts:

"Congress forbade "any department, agency, officer, or employee of the United States

to exercise any direction, supervision, or control over public telecommunications, or

over [CPB] or any of its grantees, *** or over *** any *** public telecommunications

entity." Pls. Mem., ECF No. 12 at 32 (quoting 47 U.S.C. § 398(a)).  But, as the Court noted last

month, "Congress did provide the President with appointment power and that authority carries

with it at least *some* ability to influence the affairs of the Corporation." *Corp. for Pub. Broad.*,

2025 WL 1617191, at *10. Section 398(a)'s otherwise concededly broad language must be

understood—at least with respect to the President—with that understanding and limitation. And

because there has been no exercised control over CPB to date, Plaintiffs cannot establish a

violation of that provision.

     *Second*, Plaintiffs assert that the EO violates a provision of the PBA that governs the

disbursement of certain satellite interconnection funds ("SIF").  Pls. Mem., ECF. 12 at p. 21.

While the EO does not directly address that provision, it does make clear that its terms should be

implemented "to the maximum extent allowed by law." Exec. Order No. 14,290  § 2(a).  So, if

SIF funds are required by law to be disbursed to the local member stations, then the EO instructs

those funds to be disbursed (and Plaintiffs do not allege that they have been withheld).  But a

plain reading of the statute does not directly require that SIF funds be disbursed to PBS. The

relevant provision simply states that funds appropriated to the SIF shall be distributed "to those

public telecommunications entities participating in the public radio satellite interconnection

system *or* to the national entity they designate for satellite interconnection purposes."  47 U.S.C.

§ 396(k)(10)(D)(i) (emphasis added).  Distribution to the participating entities themselves would

satisfy the statute; the designated national entity (assuming it is PBS) is not statutorily required

to be funded under this provision.

*Finally*, Plaintiffs' cursory references to the various Appropriations Acts funding CPB do

not advance their arguments.  The Appropriations Acts merely provide lump-sum appropriations

to CPB; they do not require specific funding to PBS (or any other specific entity).  They

therefore impose no judicially enforceable restrictions on funding allocations.  "For this reason, a

fundamental principle of appropriations law is that where 'Congress merely appropriates lump-

sum amounts without statutorily restricting what can be done with those funds, a clear inference

arises that it does not intend to impose legally binding restrictions."  *Lincoln v. Vigil*, 508 U.S.

182, 192 (1993).  In other words, the only applicable function of the Appropriations Acts is to

specify an amount of appropriated funds—but the EO does not purport to require CBP to spend

*less* than that amount.

## CONCLUSION

For all the reasons stated, the Court should deny Plaintiffs' motion for summary

judgment; grant Defendants' cross-motion; and dismiss this action.


Dated:  July 11, 2025                                    Respectfully,


                                                         BRETT A. SHUMATE
                                                         Assistant Attorney General

                                                         YAAKOV M. ROTH
                                                         Principal Assistant Attorney General
                                                         Civil Division

                                                         ERIC J. HAMILTON
                                                         Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Carmen M. Banerjee*
CARMEN M. BANERJEE
(D.C. Bar #497678)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-3183
Fax: (202) 616-8460
Email: carmen.m.banerjee2@usdoj.gov

*Counsel for the Federal Defendants*