**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

PUBLIC BROADCASTING SERVICE, *et al.*,

                               *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

                               *Defendants.*

Case No. 1:25-cv-01722-RDM

**ORAL ARGUMENT
REQUESTED**

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR
<u>SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 4

    I.     THE CHALLENGE TO THE EXECUTIVE ORDER IS RIPE AND
           NOT MOOT ........................................................................................ 4

        A.    The Executive Order Is Causing Plaintiffs Concrete And Ongoing
             Harms That Make This Case Ripe ..................................................... 4

        B.    The Intervening Congressional Rescission Does Not Moot This
             Case .................................................................................................. 10

    II.    THE EXECUTIVE ORDER VIOLATES THE PUBLIC
           BROADCASTING ACT'S BAR ON POLITICAL INTERFERENCE ... 11

    III.   *VELAZQUEZ* FORECLOSES DEFENDANTS' ARGUMENT THAT
           THE FIRST AMENDMENT PERMITS THE EXECUTIVE
           ORDER'S VIEWPOINT DISCRIMINATION ....................................... 15

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

CASES:

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
589 F.3d 433 (D.C. Cir. 2009) ................................................................ 6

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................................... 19

*Board of Regents of Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) ............................................................................... 18

*Chamber of Com. of U.S. v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995) ................................................................ 5
74 F.3d 1322 (D.C. Cir. 1996) .............................................................. 14

*Corporation for Pub. Broad. v. FEMA*,
No. 25-cv-740, --- F. Supp. 3d ---, 2025 WL 1938198 (D.D.C. July 15,
2025).................................................................................................... 8, 9

*Corporation for Pub. Broad. v. Trump*,
No. 25-cv-1305, --- F. Supp. 3d ---, 2025 WL 1617191 (D.D.C. June
8, 2025)............................................................................................... 8, 11

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) .............................................................. 14

*Department of Educ. v. California*,
145 S. Ct. 966 (2025) .............................................................................. 5

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) .......................................................................... 12, 16

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................... 14

*In re Al-Nashiri*,
47 F.4th 820 (D.C. Cir. 2022) ................................................................ 5

*Jenner & Block LLP v. United States Dep't of Justice*,
No. 25-cv-916, --- F. Supp. 3d ---, 2025 WL 1482021 (D.D.C. May 23,
2025)...........................................................................................*passim*

*League of United Latin Am. Citizens v. Executive Off. of President*,
Nos. 25-cv-0946, 25-cv-0952, 25-cv-0955, --- F. Supp. 3d ---, 2025
WL 1187730 (D.D.C. Apr. 24, 2025) .................................................... 13

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ...................................................................................*passim*

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ........................................................................... 15

*National Endowment for Arts v. Finley,*
    524 U.S. 529 (1998) ........................................................................... 17

*National Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) ........................................................................... 19

*National Urban League v. Trump,*
    No. 25-cv-471, --- F. Supp. 3d ---, 2025 WL 1275613 (D.D.C. May 2,
    2025)............................................................................................... 4, 7, 8

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem,*
    No. 25-cv-306, --- F. Supp. 3d ---, 2025 WL 1825431 (D.D.C. July 2,
    2025)............................................................................................... 13, 14

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ..................................................................... 17, 18

*Russello v. United States,*
    464 U.S. 16 (1983) ............................................................................. 12

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ..................................................................... 17, 18

*Susman Godfrey LLP v. Executive Off. of President,*
    No. 25-cv-1107, --- F. Supp. 3d ---, 2025 WL 1779830 (D.D.C. June
    27, 2025).............................................................................................. 15

*Trump v. American Fed'n of Gov't Emps.,*
    No. 24A1174, 606 U.S. ---, 2025 WL 1873449 (U.S. July 8, 2025)...................... 12

*Turner v. United States Agency for Glob. Media,*
    502 F. Supp. 3d 333 (D.D.C. 2020) ...................................................... 6

*United States v. American Library Ass'n, Inc.,*
    539 U.S. 194 (2003) ........................................................................... 18

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Off. of
    President,*
    No. 25-cv-917, 2025 WL 1502329 (D.D.C. May 27, 2025).................................. 6, 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................ 14

<u>STATUTES</u>:

47 U.S.C.
  § 396(a)(3) ....................................................................................... 16
  § 396(g)(1)(D) .................................................................................. 11
  § 396(k)(7) ....................................................................................... 11
  § 398(a) ...................................................................................... 11, 12
  § 398(c) ...................................................................................... 11, 12

<u>OTHER AUTHORITIES</u>:

Exec. Order No. 14,246, *Addressing Risks From Jenner & Block*, 90
  Fed. Reg. 13,997 (Mar. 25, 2025) ..................................................... 13

Exec. Order No. 14,290, *Ending Taxpayer Subsidization of Biased
  Media*, 90 Fed. Reg. 19,415 (May 1, 2025) .................................*passim*

H.R. 4, 119th Cong. (2024) ...................................................................... 10

Project Abstract, Project Title: *Learn Together: Connecting Children's
  Media and Learning Environments to Build Key Skills for Success*
  (last visited July 24, 2025) .................................................................. 9

U.S. Dep't of Educ., *Ready to Learn Programming, Awards* (last visited
  July 24, 2025) ...................................................................................... 9

**INTRODUCTION**

Defendants admit that in issuing Executive Order No. 14,290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19,415 (May 1, 2025) (the "EO"), "the President considered [the Public Broadcasting Service's ("PBS")] conduct and the content of its material," and "determined that it was inappropriate to provide taxpayer subsidies to entities that he determined failed to 'present[] a fair, accurate, or unbiased portrayal of current events.'" Br. 10, 15 (quoting EO § 1). That is exactly the type of political interference with public media that the Public Broadcasting Act expressly prohibits, and the type of supposed governmental "un-biasing" of speech and press that the First Amendment protects against. The EO is plainly unlawful, and this Court should declare it *ultra vires* and enjoin its implementation.

Faced with that reality, Defendants seek to avoid the merits altogether. They argue that because the Corporation for Public Broadcasting ("CPB") and federal agencies have yet to implement the EO's directives targeting Plaintiffs, any challenge to those directives is not ripe. But Defendants are wrong on the law and on the facts. The EO presumes to bind both CPB (whose Board members the President is actively attempting to oust) and federal agencies, and commands in no uncertain terms that *all* direct and indirect federal funding to PBS shall cease. Yet in Defendants' view, Plaintiffs apparently must wait to bring an after-the-fact Tucker Act damages action in the Court of Federal Claims, instead of seeking pre-implementation review in this Court to prevent an unlawful termination of funding. That cannot be correct. The EO poses an imminent financial threat to Plaintiffs, inflicts massively disruptive uncertainty *now*, and chills speech across the media landscape. Furthermore,

contrary to Defendants' representations, federal agencies have already paused or even cut off funding in the wake of the EO. That is more than sufficient to create a ripe dispute that this Court can resolve without awaiting the materialization of further harms—especially in light of the expressive rights at risk. Congress's intervening rescission of certain funds appropriated to CPB also does nothing to moot Plaintiffs' claims; the EO continues to restrict (among other things) CPB from providing non-rescinded federal funds to PBS, member stations from expending non-rescinded federal funds with PBS, and federal agencies from providing non-rescinded federal funds that would flow to PBS absent the EO.

On the merits, Defendants barely try to reconcile the EO's directives with the Public Broadcasting Act's explicit insulation of CPB and its grantees from political interference. While they reference the President's power to appoint CPB Board members, they do not explain how that relates to whether the President (or any other government actor) can *also* interfere with funding and content decisions. In fact, the Act expressly forbids such interference. Unable to overcome the Act's "concededly broad" protections, Defendants ask the Court to ignore the EO's commands because the EO states that it must be implemented as "allowed by" and "consistent with" law. But such boilerplate language cannot thwart challenges to manifestly unlawful executive orders. Although *some* executive orders confer discretion that leaves room for lawful implementation, there are no circumstances in which *this* EO's categorical directives can be lawfully implemented.

Defendants also misunderstand the claims and relief at issue. For example, Defendants protest that the President is not subject to injunctive relief and that review must be of final agency action under the Administrative Procedure Act ("APA"). But Plaintiffs do not ask the Court to enjoin the President or to review specific agency actions; they ask the Court to declare the EO unlawful and to enjoin its implementation by other officials—as contemplated by a mountain of precedent addressing *ultra vires* presidential actions. Although Defendants invoke the demanding standard for *ultra vires* review of *agency* action outside the APA, such a standard is inapposite for *ultra vires* challenges to executive orders that exceed the President's authority.

Defendants' First Amendment arguments are equally unavailing. They concede that the EO discriminates based on viewpoint (and interferes with editorial and journalistic discretion, retaliates, and places restrictions on Lakeland PBS and other member stations on the same basis). But they argue that government spending is not subject to traditional First Amendment scrutiny. Remarkably, Defendants do not even mention—let alone overcome—the Supreme Court's holding that the government may not engage in viewpoint discrimination when it "expends funds to encourage a diversity of views from private speakers." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). That principle is dispositive here: because the Act is a quintessential example of such a program, the EO violates the First Amendment.

The Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion, declare the EO unlawful, and enjoin its implementation.

## ARGUMENT

## I.    THE CHALLENGE TO THE EXECUTIVE ORDER IS RIPE AND NOT MOOT

Seeking to avoid the merits, Defendants argue that Plaintiffs' "lawsuit is an academic exercise." Br. 9. The law and the facts show otherwise.

### A.    The Executive Order Is Causing Plaintiffs Concrete And Ongoing Harms That Make This Case Ripe

**1.** As Judge Kelly of this Court recently explained, when an executive order "pointedly tell[s] agencies to terminate grants and contracts in specified circumstances," any "ripeness concerns" are "overstate[d]." *National Urban League v. Trump*, No. 25-cv-471, --- F. Supp. 3d ---, 2025 WL 1275613, at *12 (D.D.C. May 2, 2025). By the same token, when "*Defendants* are the ones speculating by suggesting that the agencies will disregard these clear mandates," the "assertion that the agencies might implement the provisions in uncertain ways does not create a ripeness problem." *Id.* That reasoning applies with full force to the EO, which "do[es]n't mince words" in articulating a mandatory and "straightforward directive," *id.*: "I *** instruct the CPB Board of Directors (CPB Board) and all executive departments and agencies (agencies) to cease Federal funding for *** PBS." EO § 1; *see id.* § 2(a) ("The CPB Board shall cease direct funding to *** PBS[.]"); *id.* § 2(b) ("The CPB Board shall cease indirect funding to *** PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for *** PBS."); *id.* § 3(a) ("The heads of all

agencies shall identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of *** PBS.").

For similar reasons, the legality of the EO does not turn on any "contingent future event." *Contra* Defs.' Br. 8. "[A] case is ripe when it presents a concrete legal dispute [and] no further factual development is essential to clarify the issues, and the issue has crystallized sufficiently for purposes of judicial review." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (alteration in original) (ellipsis and internal quotation marks omitted). In this case, Plaintiffs' claims concern "[p]urely legal questions"—whether the EO's directives to cease all federal funding to PBS are consistent with the Public Broadcasting Act and the First Amendment—that are "presumptively [fit] for judicial review." *Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (second alteration in original). Awaiting CPB or APA final agency action that terminates funds will not alter that conclusion.[1]

Indeed, adopting Defendants' contrary position would preclude plaintiffs from obtaining meaningful relief from an executive order that threatens imminent termination of federal funds—no matter how unlawful and harmful. According to Defendants, no challenge can be brought *before* the termination actually occurs. Yet *after* termination, they contend, the only recourse is to recover damages in the Court of Federal Claims. *See* Br. 19 (citing *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025)). The upshot is that funding recipients like Plaintiffs cannot obtain

---

[1] To be clear, Plaintiffs' suit seeks a declaration that the EO is *ultra vires* and to enjoin its implementation; it does not to seek traditional APA relief against discrete agency actions. *See* pp. 13-15, *infra*.

an injunction or other relief to prevent implementation of an unlawful executive order and avoid serious ongoing harms.  Ripeness principles do not support that too-early-until-it's-too-late negation of pre-implementation review of executive orders.

**2.**    Trying another tack, Defendants assert that the EO has yet to cause Plaintiffs any harm.  Moreover, according to Defendants, the EO does not even threaten concrete or imminent injury.  *See* Br. 9.  Those assertions are entirely unfounded.

For starters, Plaintiffs are suffering "injur[ies] to [their] constitutional right[s] to express [themselves] without fear of government reprisal." *Jenner & Block LLP v. United States Dep't of Justice*, No. 25-cv-916, --- F. Supp. 3d ---, 2025 WL 1482021, at *14 (D.D.C. May 23, 2025) ("*Jenner & Block*").  The principle that plaintiffs need not await completed government action applies with special force to implementation of "laws burdening expressive rights." *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009).  And where government action has "a chilling effect on speech," the "Court need not wait" for anyone to fully "implement the order." *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Off. of President*, No. 25-cv-917, 2025 WL 1502329, at *10 (D.D.C. May 27, 2025) ("*WilmerHale*"); *see Turner v. United States Agency for Glob. Media*, 502 F. Supp. 3d 333, 359 (D.D.C. 2020) ("[A] subjective chill of First Amendment rights, paired with a credible threat of imminent, adverse government action against the claimant, may create a cognizable injury.").

Here, the EO "seeks to chill" speech through the "threat of invoking *** means of coercion *** to achieve the suppression of disfavored speech." *Jenner & Block*, 2025 WL 1482021, at *1, *15 (emphasis and internal quotation marks omitted). The EO sends all broadcasters an unmistakable message: those who develop and/or air public programming must conform that programming to the President's preferences—or risk reprisal. *See, e.g.*, ACLU *Amicus* Br. 8, 16.

Plaintiffs are also suffering specific and immediate business harms. In the face of the EO's directives to prevent millions of federal dollars from reaching PBS, Plaintiffs have faced massive uncertainty regarding programming options and development, and significant disruptions to their planning, finances, and operations. *See* Supp. Decl. of Paula Kerger ¶ 4 ("Supp. Kerger Decl."); Supp. Decl. of Jeff Hanks ¶ 4 ("Supp. Hanks Decl."); *see also WilmerHale*, 2025 WL 1502329, at *10 (holding challenge ripe because executive order "creates significant uncertainty"). The EO makes it more difficult for them to make short-term and long-term commitments with respect to programming development, enter into contracts generally, hire and retain employees, allocate resources, and carry out other basic operational functions. Supp. Kerger Decl. ¶ 4; Supp. Hanks Decl. ¶ 4. Similarly, by losing the ability to provide federal funds to PBS (*e.g.*, to use federal funds to pay PBS membership dues), CPB grantees like Lakeland PBS face the "forced choice" between "chang[ing] their programming" or experiencing financial and operational shortfalls (assuming they can even continue to operate). *National Urban League v. Trump*, 2025 WL 1275613, at *11; *see* Decl. of Jeff Hanks ¶ 17, ECF No. 12-2 ("Hanks Decl."). Because those

injuries are happening *now*, "the mere existence of the order" harms Plaintiffs. *Jenner & Block*, 2025 WL 1482021, at *14.

Defendants' argument that CPB has so far declined to follow the EO's instructions because "CPB's relationship with the federal government" is "hotly disputed *** in separate litigation" does not bear on Plaintiffs' ongoing expressive and business injuries. Br. 9. Nor does it negate the imminent threat that the EO's funding restrictions pose. The EO's basic premise is that CPB must follow the President's instructions. Defendants cannot rely on the *merits* argument that CPB is independent—and thereby "disclaim the [EO]'s potency at accomplishing its stated aim"—to defeat Plaintiff's ability to raise that argument in the first place. *Jenner & Block*, 2025 WL 1482021, at *14; *cf. National Urban League*, 2025 WL 1275613, at *12. The CPB-related threat to Plaintiffs, moreover, is not theoretical: the President is affirmatively effectuating the EO by removing CPB Board members and, in a new government lawsuit filed after its opposition here, challenging CPB's designation of replacements. *See Corporation for Pub. Broad. v. Trump*, No. 25-cv-1305, --- F. Supp. 3d. ---, 2025 WL 1617191, at *1 (D.D.C. June 8, 2025); Compl., *United States v. Ross*, No. 25-cv-2261 (D.D.C. July 15, 2025) (seeking to oust CPB board members).

Defendants are also off-base in suggesting that federal agencies have not implemented the EO. For several weeks, the Federal Emergency Management Authority ("FEMA") cut off Next Generation Warning System Grant Program funding to CPB, which passes a significant portion of that funding to public broadcasting stations. *See Corporation for Pub. Broad. v. FEMA*, No. 25-cv-740, ---

F. Supp. 3d ---, 2025 WL 1938198, at *1, *4 & n.3 (D.D.C. July 15, 2025).  As FEMA explained in a declaration submitted to this Court, the action was undertaken "to 'ensure compliance with' [the EO]."  *Id.* at *4 n.3.  Consequently, Defendants can hardly claim that FEMA has yet to "take[] any action with respect to the EO."  Br. 7.

Likewise, Defendants "acknowledge" that the Department of Education ("ED") "terminated" a significant Ready to Learn grant award the day after the EO issued. Br. 9.  Defendants claim that the Ready to Learn grant money was awarded only to CPB, not PBS.  But that is incorrect.  CPB and PBS jointly applied for the grant.  *See* Ex. A ("A Ready To Learn Grant Proposal from CPB and PBS").  That is why ED's website expressly names PBS as a beneficiary in addition to CPB.  *See* U.S. Dep't of Educ., *Ready to Learn Programming*, *Awards* (listing as grantees "Corporation for Public Broadcasting (CPB) with Public Broadcasting Service (PBS)").[2]  The website also links to a "Project Abstract" that lists the "Project Team" as "CPB and PBS."[3] Termination of the Ready to Learn grant cost PBS millions in outstanding funds, halted production of various key programs and projects, and resulted in the termination of 22 employees on the PBS KIDS team (among other operational impacts).  *See* Supp. Kerger Decl. ¶ 8.  Those facts amply demonstrate that the EO is causing concrete or imminent injuries to Plaintiffs that warrant judicial intervention.

---

[2] https://perma.cc/5Z6E-BSZ2 (last visited July 24, 2025).

[3] Project Abstract, Project Title: *Learn Together: Connecting Children's Media and Learning Environments to Build Key Skills for Success*, https://www.ed.gov/sites/ed/files/2020/12/S295A200004_CPB-and-PBS_Abstract.pdf (last visited July 24, 2025)

**B.    The Intervening Congressional Rescission Does Not Moot This Case**

After the government filed its brief, Congress approved the rescission of funds appropriated to CPB for fiscal years 2026 and 2027.[4]  To the extent Defendants might argue otherwise in their reply, that action does not moot Plaintiffs' claims.  CPB has significant appropriated funds from prior fiscal years that it has not yet disbursed to PBS (including, *e.g.*, National Programming Service grant funding).  Supp. Kerger Decl. ¶ 9.  Similarly, the EO instructs CPB to revise retroactively the eligibility criteria for 2025 grants (and even the criteria for 2024 grants) that go to public television stations, to prevent PBS member stations from providing federal funds to PBS.  *See* EO § 2(b).  Because some member station dues for 2025 remain outstanding, that aspect of the EO continues to impact PBS and member stations as well.  Supp. Kerger Decl. ¶ 9.

In any event, the rescission of future CPB appropriations does not affect the EO's directive that federal agencies cease all funding to PBS.  *See* EO § 3.  Under the EO, PBS is effectively barred from applying for and receiving agency-administered grant funds, which ED, the National Science Foundation, the National Endowment for the Arts, the National Endowment for the Humanities, and the Department of Commerce have distributed to PBS for many years.  Supp. Kerger Decl. ¶ 9.

Accordingly, Plaintiffs' challenge to the EO continues to present a live controversy.

---

[4]  *See* H.R. 4, 119th Cong. (2024), https://www.congress.gov/bill/119th-congress/house-bill/4/all-actions (last visited July 25, 2025).

## II.    THE EXECUTIVE ORDER VIOLATES THE PUBLIC BROADCASTING ACT'S BAR ON POLITICAL INTERFERENCE

On the merits, Defendants fail to square the EO's directives to CPB with the Public Broadcasting Act.  Most importantly, among the numerous mechanisms that protect the independence of CPB and grantees from the federal government, *see, e.g.,* PBS Br. 4-10, the Act (i) expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunications, or over [CPB] or any of its grantees, *** or over *** any *** public telecommunications entity," including as to "the content or distribution of public telecommunications programs and services," 47 U.S.C. § 398(a), (c); (ii) confirms that funds allocated by CPB "may be used *at the discretion of the recipient* for purposes related primarily to the production or acquisition of programming," *id.* § 396(k)(7) (emphasis added); and (iii) instructs that CPB must "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the *maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities*," *id.* § 396(g)(1)(D) (emphasis added).

All Defendants can muster in response is that the Act's "concededly broad language" prohibiting political interference "must be understood *** with th[e] understanding and limitation" that the Act also "provide[s] the President with appointment power *** [that] carries with it at least *some* ability to influence the affairs of the Corporation."  Br. 23 (quoting *Corporation for Pub. Broad*, 2025 WL 1617191, at *10).  "[S]*ome* ability" to exert influence through an "appointment power,"

however, is not an open invitation to allow other mechanisms of governmental influence that Congress did not contemplate. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[I]t is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  That is especially true given that the Act prohibits precisely the interference the EO contemplates: using funding restrictions to "exercise any direction, supervision, or control over public telecommunications, or over [CPB] or any of its grantees, *** or over *** any *** public telecommunications entity," including as to "the content or distribution of public telecommunications programs and services."  47 U.S.C. § 398(a), (c); *see FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 392 n.21 (1984) (recounting Congress's resolve to "provide adequate insulation against Government interference" in light of President Nixon's vetoing legislation relating to CPB funding structure).[5]

Defendants are left to argue that the EO contains language requiring it to "be implemented consistent with applicable law."  Br. 22 (citing EO § 5).  To be sure, where an executive order confers discretion on an agency and leaves room for lawful implementation (*e.g.*, when an order simply "directs agencies to plan reorganizations and reductions in force"), and where the order requires the agency action to be "consistent with applicable law," it is possible the order may be lawful.  *Trump v. American Fed'n of Gov't Emps.*, No. 24A1174, 606 U.S. ---, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring in grant of stay).  "But executive orders

---

[5] Defendants also discuss a provision of the Act concerning satellite interconnection funds.  *See* Br. 23.  Plaintiffs have not relied on that provision, which is pertinent to public radio only.

*** cannot be held to destroy themselves through saving clauses." *League of United Latin Am. Citizens v. Executive Off. of President*, Nos. 25-cv-0946, 25-cv-0952, 25-cv-0955, --- F. Supp. 3d ---, 2025 WL 1187730, at *20 (D.D.C. Apr. 24, 2025) (internal quotation marks omitted). "Courts have affirmed th[e] principle repeatedly" that "[i]f the executive order cannot possibly be implemented consistent with applicable law, a command to do so in a saving clause is meaningless." *Id.*; *see also id.* at *20 n.27 (collecting cases).

Here, the EO's straightforward, non-discretionary directive to cut off direct and indirect funding to PBS because the President dislikes PBS content collides unavoidably with the Act (not to mention, the First Amendment). Simply put, there is no scenario in which the EO can be implemented lawfully, short of "destroy[ing] [it]sel[f]" by not being implemented at all. *League of United Latin Am. Citizens*, 2025 WL 1187730, at *20. As such, the inclusion of "usual boilerplate" language, *cf. Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306, --- F. Supp. 3d ---, 2025 WL 1825431, at *30 (D.D.C. July 2, 2025), cannot save the EO from scrutiny—any more than the inclusion of similar language in a litany of executive orders that courts have declared unlawful, *see, e.g.*, *Jenner & Block*, 2025 WL 1482021 (declaring unlawful Executive Order No. 14,246, *Addressing Risks From Jenner & Block*, 90 Fed. Reg. 13,997 (Mar. 25, 2025), which purported to require "implement[ation] consistent with applicable law").

Defendants' remaining arguments reflect their confusion about Plaintiffs' claims and the governing law. In Defendants' view, "[t]he *only* way Plaintiffs could

challenge the EO on statutory grounds would be to seek to vacate implementation acts by federal agencies as contrary to law under the APA." Br. 2 (emphasis added). But Plaintiffs' suit targets the legality of the EO itself, not any discrete agency action. "[N]on-statutory review of unlawful executive action existed long before the APA was enacted, and '[n]othing in the subsequent enactment of the APA altered' the understanding that '[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.'" *Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *30 (alterations except first in original) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). "Nor is there any merit to Defendants' suggestion that presidential actions lie beyond the scope of review, even when the relief is limited to enjoining the actions of subordinate government officials." *Id.* Indeed, "the D.C. Circuit engaged in precisely that form of review in *Reich*; it is the approach that Justice Scalia endorsed in his concurrence in *Franklin v. Massachusetts*; and it is what happened in *Youngstown Sheet & Tube Co. v. Sawyer*." *Id.* (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.") (Scalia, J., concurring in part and concurring in the judgment); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1325-1328 (D.C. Cir. 1996) (explaining court's ability to review executive order as lacking statutory authority and enjoin implementation of executive order).

For those reasons, it makes no difference that "the President himself (and thus the EO itself) is not subject to injunctive relief." Defs.' Br. 2. In addition, the "demanding standard" that Defendants invoke for *ultra vires* challenges to "agency" action is simply "inapposite" when plaintiffs challenge presidential authority "in the vein of *Youngstown*." *Susman Godfrey LLP v. Executive Off. of President*, No. 25-cv-1107, --- F. Supp. 3d ---, 2025 WL 1779830, at *23 (D.D.C. June 27, 2025); *see also* Defs.' Br. 20-21. Finally, Defendants' argument that "none of the agency Defendants has taken final agency action subject to APA review," Br. 18, has no bearing on the Court's ability to declare the EO unlawful and enjoin its implementation.

## III. *VELAZQUEZ* FORECLOSES DEFENDANTS' ARGUMENT THAT THE FIRST AMENDMENT PERMITS THE EXECUTIVE ORDER'S VIEWPOINT DISCRIMINATION

Defendants' attempts to reconcile the EO with the First Amendment fare no better. Critically, they "do not dispute that Plaintiffs engaged in First Amendment protected conduct." Br. 15. Nor do they "dispute that the President considered PBS's conduct and the content of its material in issuing the EO; the EO is explicit on that point." *Id.* As Defendants admit, the President acted because of his view that PBS "fail[s] to 'present[] a fair, accurate, or unbiased portrayal of current events to taxpaying citizens.'" *Id.* at 10 (quoting EO § 1) (second alteration in original). That is textbook viewpoint discrimination and an unconstitutional intrusion into Plaintiffs' editorial and journalistic discretion—and retaliatory, to boot. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024) (reiterating that the government may not "decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased"); PBS Br. 27-34.

15

For each First Amendment claim, Defendants offer the refrain that "principles of viewpoint discrimination do not constrain the Government's discretion to subsidize speech." Br. 11; *see also id.* at 11-17. Yet Defendants do not cite, much less grapple with, the Supreme Court's admonition in *Legal Services Corp. v. Velazquez* that "[n]either the latitude for government speech nor its rationale applies to subsidies for private speech in every instance." 531 U.S. at 542.

To repeat what Plaintiffs emphasized in their opening brief (at 27-28): Although "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances *** in which the government use[s] private speakers to transmit specific information pertaining to its own program," that "latitude" does not apply when—as is unmistakably the case here—the government "instead expends funds to encourage a diversity of views from private speakers." *Velazquez*, 531 U.S. at 541-542 (internal quotation marks and citation omitted); *see, e.g.*, 47 U.S.C. § 396(a)(3) (memorializing the purpose to "expan[d] and develop[]" the "diversity" of public television programming, which "depend[s] on freedom, imagination, and initiative on both local and national levels"); *League of Women Voters*, 468 U.S. at 386 n.17 (underscoring Congress's insistence that provision of federal financial assistance "should in no way involve the Government in programming or program judgments" or in "the expenditure of funds" by grantees); *see also* PBS Br. 3-10, 29-30. Such a "program *** designed to facilitate private speech," *Velazquez*, 531 U.S. at 542, comes with a "requirement of viewpoint

neutrality in the Government's provision of financial benefits," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995).

Defendants' total failure to address *Velazquez*, which distinguishes each of Defendants' favored authorities, is fatal to their First Amendment defense. They invoke *Rust v. Sullivan*'s general statement that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest." 500 U.S. 173, 193 (1991). But as *Velazquez* explained, *Rust* addressed funding of what "amounted to governmental speech." 531 U.S. at 541. Defendants' emphasis on "[t]he distinction between government funding and government regulation" is the precise argument from the *Velazquez* dissent that failed to carry the day. Br. 13; *see Velazquez*, 531 U.S. at 552 (Scalia, J., dissenting) (arguing that "[r]egulations directly restrict speech; subsidies do not").

Defendants also argue that "*Rosenberger* \*\*\* found the viewpoint discrimination unconstitutional not because funding of 'private' speech was involved, but because the government had established a limited public forum." Br. 14 (ellipsis in original) (quoting *National Endowment for Arts v. Finley*, 524 U.S. 529, 598-599 (1998) (Scalia, J., concurring)). Here again, Defendants' argument (from a concurring opinion) runs straight into *Velazquez*, which subsequently explained that "the salient

17

point" in *Rosenberger* (and *Velazquez* itself) was that the "program was designed to facilitate private speech, not to promote a governmental message." 531 U.S. at 542.[6]

Thus, contrary to Defendants' contention, the private-versus-governmental speech distinction is far from "irrelevant" or "novel." Br. 11, 13. To quote one of the decisions that Defendants rely upon, "*Velazquez* held" that "viewpoint-based restrictions are improper when the [government] does not itself speak or subsidize transmittal of a message it favors *but instead expends funds to encourage a diversity of views from private speakers.*" *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 213 n.7 (2003) (plurality op.) (alteration in original) (internal quotation marks omitted); *accord Board of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229-230 (2000) (where purpose is "facilitating the free and open exchange of ideas," the "standard of viewpoint neutrality" is "controlling").

All that remains is Defendants' contention that the EO's prohibition on CPB grantees "using federal funds to license PBS programming" does not violate the First Amendment because stations "remain free to license such programming" with non-federal funds. Br. 13 (emphasis omitted). As an initial matter, that argument ignores the principle that "a government entity's threat of invoking *** means of coercion

---

[6] In arguing that "PBS is not a limited public forum," Br. 14, Defendants also misunderstand the Supreme Court's discussion of that line of precedent. In a "suit involv[ing] a subsidy, limited forum cases *** may not be controlling in a strict sense, yet they do provide some instruction" when the "program presumes that private, nongovernmental speech is necessary." *Velazquez*, 531 U.S. at 543-544. Even Justice Scalia appeared to accept the analogy, reasoning that "the scheme in *Rust* does not create a public forum" because it did not "encourag[e] a diversity of views." *Id.* at 553 (Scalia, J., dissenting) (citation omitted).

against a third party to achieve the suppression of disfavored speech violates the First Amendment." *Jenner & Block*, 2025 WL 1482021, at *15 (emphasis and internal quotation marks omitted) (quoting *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024)). The indirect funding restriction not only treads on member stations' First Amendment rights, but also is a form of discrimination and retaliation against PBS itself. *See* PBS Mot. 31-33.

In any event, Defendants' argument that member stations remain "free to choose whatever programs they like," Br. 13, ignores the coercive effects of the restriction. Although member stations' budgets are made up of a combination of federal, other public, and private funds, it is "[u]ndisputed" that prohibiting the use of federal funding to pay PBS membership dues would preclude access to PBS programming for many member stations or require them to choose between such access and significant financial and operational shortfalls. Defs.' Responses to Pls.' Statement of Undisputed Material Facts ¶¶ 11, 14, ECF No. 24-1; *see also* Decl. of Paula Kerger ¶¶ 18, 21, ECF No. 12-1; Hanks Decl. ¶¶ 13, 17. Accordingly, the practical effect of the indirect funding restriction is to dictate the programming member stations can air more broadly. In other words, the restriction unconstitutionally "seek[s] to leverage funding to regulate speech outside the contours of the federal program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013).[7]

---

[7] Defendants also make various references to additional constitutional claims. *See* Br. 2, 7 (addressing Fifth Amendment and "associational rights" arguments). Plaintiffs in this case did not bring any such claims.

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion for summary judgment, declare the EO unlawful, and permanently enjoin its implementation.


Dated: July 25, 2025                    Respectfully submitted,

                                        */s/ Z.W. Julius Chen*
                                        Z.W. Julius Chen
                                            D.C. Bar No. 1002635
                                        Pratik A. Shah
                                            D.C. Bar No. 497108
                                        AKIN GUMP STRAUSS HAUER &
                                            FELD LLP
                                        2001 K Street, NW
                                        Washington, D.C. 20006
                                        chenj@akingump.com
                                        (202) 887-4000

                                        *Counsel for Plaintiffs Public Broadcasting
                                        Service and Northern Minnesota Public
                                        Television, Inc. d.b.a. Lakeland PBS*