**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL PUBLIC RADIO, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, <br> *in his official capacity as President of the United States of America*, *et al.*, <br><br> *Defendants.* | Civil Action No. 25-1674 (RDM) |
| | Consolidated Cases |
| PUBLIC BROADCASTING SERVICE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, <br> *in his official capacity as President of the United States of America*, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-1722 (RDM) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

These consolidated cases raise the question whether the First Amendment permits the executive branch to put an end to all federal funding across agencies and programs for two private entities—here, National Public Radio ("NPR") and the Public Broadcasting Service ("PBS")—merely because, in the President's view, "neither entity presents a fair, accurate, or unbiased portrayal of current events." *Ending Taxpayer Subsidization of Biased Media*, Exec. Order No. 14290 § 1, 90 Fed. Reg. 19415 (May 1, 2025) ("Exec. Order"). Asserting that "[n]o media outlet has a constitutional right to taxpayer subsidies[] and [that] the Government is

entitled to determine which categories of activities to subsidize," *id.* § 1, the President issued the Executive Order at issue, Executive Order 14290, and instructed all federal agencies to end "direct or indirect [federal] funding of NPR and PBS," *id.* § 3. A "Fact Sheet" issued along with the Executive Order further explains the President's rationale for taking this extraordinary step: the President believes that "NPR and PBS have fueled partisanship and left-wing propaganda with taxpayer dollars," and he believes that this is a "highly inappropriate and an improper use of taxpayers' money." *Fact Sheet: President Donald J. Trump Ends the Taxpayer Subsidization of Biased Media* (May 1, 2025) (hereinafter "Fact Sheet").[1]

The President may, of course, engage in his own expressive conduct, including criticizing the views, reporting, or programming of NPR, PBS, or any other news outlet with whom he disagrees. The government may also fund its own speech and may fund government programs that promote specific perspectives on issues of public importance, and it may decide which views or perspectives to convey—and which not to convey—in any such government speech or program. And it may impose limits on federal grants to ensure that they are deployed to further the legitimate purposes of the program and may pick and choose among applicants based on legitimate criteria. But the First Amendment draws a line, which the government may not cross, at efforts to use government power—including the power of the purse—"to punish or suppress disfavored expression" by others. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). As the Supreme Court and D.C. Circuit have observed on more than a dozen occasions, the government "may not deny a benefit to a person on a basis that infringes his constitutionally

---

[1] Available at https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-ends-the-taxpayer-subsidization-of-biased-media/ [https://perma.cc/9YXG-4ED2].

protected . . . freedom of speech even if he has no entitlement to that benefit." *E.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

Executive Order 14290 crosses that line. It does not define or regulate the content of government speech or ensure compliance with a federal program. Nor does it set neutral and germane criteria that apply to all applicants for a federal grant program. Instead, it singles out two speakers and, on the basis of their speech, bars them from all federally funded programs. It does so, moreover, without regard to whether the federal funds are used to pay for the nationwide interconnection systems, which serve as the technological backbones of public radio and television; to provide safety and security for journalists working in war zones; to support the emergency broadcast system; or to produce or distribute music, children's or other educational programming, or documentaries. And it applies to grants from the (now defunct) Corporation for Public Broadcasting ("CPB"), the Federal Emergency Management Agency ("FEMA"), the Department of Education, the National Endowment for the Arts ("NEA"), and all other federal agencies. To borrow a phrase from Judge Bates, Executive Order 14290 is simply "another lever in the President's arsenal [to punish or] to extinguish speech he dislikes." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 102–03 (D.D.C. 2025). Although there are many lawful reasons that the government might decline to make "a valuable governmental benefit" available to someone, punishing disfavored private speech is not one of them. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

Many of the government's counterarguments focus on the doctrines of ripeness and mootness. Although those arguments had little purchase early in the litigation, much has happened over the course of this and related litigation relating to the fate of the CPB and the Executive Order. Most notably, much (but not all) of the federal funding affected by the

Executive Order passed through the CPB, and—separate and apart from the Executive Order—the President requested that Congress defund the CPB.  In July 2025, Congress responded by rescinding the then-existing FY 2026 and FY 2027 appropriations to the CPB.  Rescissions Act of 2025, Pub. L. No. 119-28, 139 Stat. 467, 469–70.  Shortly after this occurred, and faced with the risk of losing millions of dollars in funding appropriated for prior fiscal years and already disbursed to the CPB to help pay for the Public Radio Satellite Interconnection System, NPR moved for a preliminary injunction and for partial summary judgment, seeking an order preventing the CPB from complying with the Executive Order by disbursing those funds to a newly created public radio entity— Public Media Infrastructure—in lieu of NPR.  After the Court expressed tentative agreement with NPR, the parties settled that dispute, and the CPB agreed to disburse over $35 million in federal funds to NPR for the operation and management of the interconnection system.  But faced with the rescission of its FY 2026 and FY 2027 appropriations, the CPB's days were numbered, and about a month ago, it filed Articles of Dissolution with the D.C. government.

Given these developments, the Court agrees with the Federal Defendants that Plaintiffs' statutory and constitutional challenges alleging unlawful interference in the workings of the CPB are now moot, as are Plaintiffs' claims seeking injunctive or declaratory relief against the CPB itself.  The CPB no longer exists, and no Court order declaring the Executive Order unlawful as applied to the CPB can afford NPR, PBS, or their member stations any meaningful relief.  But that does not end the matter because the Executive Order sweeps beyond the CPB.  It also directs that all federal agencies refrain from funding NPR and PBS—regardless of the nature of the program or the merits of their applications or requests for funding.  The message is clear: NPR and PBS need not apply for any federal benefit because the President disapproves of their "left-

wing" coverage of the news.  Because the First Amendment does not tolerate viewpoint discrimination and retaliation of this type, the Court will issue judgment against the federal-agency defendants declaring Section 3(a) of the Executive Order is unconstitutional and will issue an injunction barring those defendants from implementing it.

The Court will, accordingly, **GRANT** in part, **DENY** in part as moot, and **DENY** in part without prejudice NPR, Aspen Public Radio, Colorado Public Radio, and KSUT Public Radio's Motion for Summary Judgment, NPR Dkt. 21; will **GRANT** in part, **DENY** in part as moot, and **DENY** in part without prejudice PBS and Lakeland PBS's Motion for Summary Judgment, PBS Dkt. 12; and will **GRANT** in part on grounds of mootness, **DENY** in part, and **DENY** in part without prejudice the Federal Defendants' Cross-Motions for Summary Judgment in both cases, NPR Dkt. 30, PBS Dkt. 22.

## I. BACKGROUND

### A.    Factual background

For purposes of resolving the pending cross-motions for summary judgment, the Court relies on the following undisputed facts, as well as those historical facts that are subject to judicial notice.  *See* Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Evid. 201.

1.    *The federal government and public broadcasting*

"The history of noncommercial, educational broadcasting in the United States is as old as broadcasting itself." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 368 (1984). Congress has long fostered public broadcasting by reserving certain frequencies for noncommercial stations and by providing financial assistance for the construction and maintenance of broadcasting facilities and the creation and dissemination of educational programming.  As early as 1962, before either NPR or PBS existed, Congress provided "direct financial assistance to noncommercial, educational broadcasting" and "authorized the former

Department of Health, Education, and Welfare (HEW) to distribute $32 million in matching grants . . . for the construction of noncommercial television facilities." *Id.*

Federal support for noncommercial broadcasting expanded with enactment of the Public Broadcasting Act of 1967, Pub. L. No. 90-129, 81 Stat. 365 (codified at 47 U.S.C. § 390 *et seq.*) (the "Act").  Title I of "the Act authorized over $38 million for continued HEW construction grants." *League of Women Voters*, 468 U.S. at 368–69.  Title II of the Act, in turn, "authorized" the "establish[ment] [of] a nonprofit corporation, to be known as the 'Corporation for Public Broadcasting', which [would] not be an agency or establishment of the United States Government," and would, instead, be incorporated by the CPB's initial Board of Directors "under the District of Columbia Nonprofit Corporation Act."  Public Broadcasting Act, § 201, 81 Stat. at 369; *see also* 47 U.S.C. § 396(b), (c)(4).  Those and future Board members were appointed by the President with the advice and consent of the Senate, although "[n]o[] more than" a bare majority of the Board could be "members of the same political party."  Public Broadcasting Act, § 201, 81 Stat. 369; *see also* 47 U.S.C. § 396(c)(1).

The 1967 Congress was acutely aware of the risk that federal funding, while critical, might transform independent stations into "forums devoted solely to programming and views that were acceptable to the Federal Government." *League of Women Voters*, 468 U.S. at 386.  As the Senate Report accompanying the Act emphasized "in the strongest terms possible," it was Congress's "intention that local stations be absolutely free to determine for themselves what they should or should not broadcast."  S. Rep. No. 90-222, at 11 (1967).  So, too, the House Report declared, the public broadcasting system should "provide the most effective insulation from Government control or influence over the expenditure of funds."  H.R. Rep. No. 90-572, at 15 (1967).

To that end, Congress structured the public broadcasting system to give public media entities as much autonomy as possible.  Foremost among these measures was Congress's creation of the CPB as a private nonprofit corporation charged with supporting public media entities through the development of infrastructure and the distribution of appropriated funds according to a statutorily prescribed formula.  47 U.S.C. § 396(g), (k); *see* H.R. Rep. No. 90-572, at 15 (1967).  To protect that autonomy, the Act forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over" educational television or radio broadcasting, "or over the Corporation or any of its grantees or contractors." 47 U.S.C. § 398(a); *see also League of Women Voters*, 468 U.S. at 388–89 (describing the "elaborate structure established by the Public Broadcasting Act . . . to insulate local stations from governmental interference"); *Corp. for Pub. Broad. v. Trump*, 786 F. Supp. 3d 142, 146 (D.D.C. 2025) (discussing how "Congress took . . . steps to ensure the Corporation's independence").

2.　　　*The Public Broadcasting Service, National Public Radio, and the local stations*

Congress recognized that, to be effective, local stations needed not only monetary support, but technical and operational support to establish and manage satellite interconnection facilities for the nationwide distribution of content.  To meet that need, the Act directed the CPB to "arrange, by grant to or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of public telecommunications services to public telecommunications entities."  47 U.S.C. § 396(g)(2)(E). The Public Broadcasting Service was created "in 1969 to operate and manage a nationwide program distribution system interconnecting public television stations and to provide a distribution channel for national programs to those stations."  Brian E. Humphreys, Cong. Rsch. Serv., R48545, Public Broadcasting: Background Information and Issues for Congress 13 (2026) (hereinafter "CRS Report"); *see also League of Women Voters*, 468 U.S. at 369 n.5.  National

Public Radio, in turn, was founded in 1970 to play a similar role in the production, acquisition, and distribution of noncommercial radio programming for "independent locally owned and operated public radio stations around the country."  NPR Dkt. 30-1 at 1 (Defs.' Resp. to Pls.' SUMF ¶ 3); *see also* CRS Report at 13; *League of Women Voters*, 468 U.S. at 369 n.5. "Although PBS and NPR have become nearly synonymous with public broadcasting in the United States, there are multiple other public organizations that serve the needs of independent, local broadcasting stations," including American Public Television ("APT"), "which claims to be the leading syndicator of high-quality, top-rated programming to the nation's public television stations," CRS Report at 15 (citation modified); American Public Media ("APM"), which "operates a network of 49 public radio stations," *id.*; and Public Media Infrastructure ("PMI"), which recently received a five-year grant from the CPB for interconnection purposes, *id.*; *see* NPR Dkt. 77 at 3.

Despite the important role played by PBS and NPR in producing and distributing programing, local stations retain control over all programming decisions.  CRS Report at 13; *see also* NPR Dkt. 30-1 at 11–12, 16, 20 (Defs.' Resp. to Pls.' SUMF ¶¶ 62, 66, 90, 118); PBS Dkt. 12-2 at 3, 5 (Hanks Decl. ¶¶ 8, 12).

     a.   <u>Public Broadcasting Service and Northern Minnesota Public Television</u>

PBS is a non-profit membership organization comprised of 336 local public television broadcast stations throughout the United States.  PBS Dkt. 12-1 at 2 (Kerger Decl. ¶ 1).  PBS develops and acquires television programming and other video content covering a wide range of topics, including history, culture, arts, science, public affairs, and children's education programming.  *Id.* at 4 (Kerger Decl. ¶ 7).  PBS is not a public television station, and it does not operate a station; instead, PBS member stations pay dues to PBS to receive access to PBS programming and other services, including development training, market research and

fundraising, national promotion of content, brand management, and audience insights and cross-platform data monitoring, among other things.  *Id.* at 4, 7–8 (Kerger Decl. ¶¶ 6, 12).  PBS content is free to the public and available to nearly 97% of the United States's population.  *Id.* at 4 (Kerger Decl. ¶ 7).  In addition to producing and distributing programming, PBS manages the public television interconnection system, the cloud-based, terrestrial broadband and satellite video distribution system that delivers video content to PBS Member Stations, *id.* at 7 (Kerger Decl. ¶ 12), and that transmits wireless emergency alerts from FEMA during emergencies, *see id.* at 8 (Kerger Decl. ¶ 13).

In 2025, PBS had a budget of $373.4 million, which came from three primary sources: (i) dues from PBS member stations; (ii) public and private grants; and (iii) revenue from passive income sources.  *Id.* at 9 (Kerger Decl. ¶ 16).  PBS member station dues comprised 61% of PBS's budget ($227 million); CPB grants comprised another 16% ($59.8 million); and other federal grants made up an additional 6% ($20.7 million).  *Id.* at 9 (Kerger Decl. ¶ 17).  Historically, CPB grants made up a significant portion of the overall budgets of many PBS member stations, which used those funds, in part, to obtain PBS programming.  *Id.* at 9–10 (Kerger Decl. ¶ 18).

Plaintiff Northern Minnesota Public Television, Inc., which does business as Lakeland PBS ("Lakeland"), is one of 336 PBS member stations.  PBS Dkt. 12-2 at 2 (Hanks Decl. ¶¶ 1–2).  It was founded in 1979 as a non-profit community licensed[2] public television station serving approximately 7,500 square miles in northern and central Minnesota.  *Id.* at 2 (Hanks Decl. ¶¶ 2–3).  Lakeland produces its own local programming, including *Lakeland News*, the region's only

---

[2] Community licensees are independent, locally owned and operated broadcasters.  NPR Dkt. 30-1 at 10, 19 (Defs.' Resp. to Pls.' SUMF ¶¶ 56, 109).

program covering local news, weather, and sports, and *Lakeland Learns*. *Id.* at 3 (Hanks Decl. ¶ 7). Its national programming comes predominantly from PBS, which supplies 56% of the programming on Lakeland's main channel and 100% of the programming on Lakeland's 24/7 channel dedicated to educational children's programming. *Id.* at 3–4 (Hanks Decl. ¶¶ 8–9). Lakeland also relies on PBS for a variety of essential services, including content management and delivery, digital infrastructure, technical training and support, cybersecurity training and education, and fundraising. *Id.* at 4 (Hanks Decl. ¶¶ 10–11). In the past, Lakeland has paid the entirety of its annual PBS dues using federal grants awarded by the CPB. *Id.* at 5–6 (Hanks Decl. ¶¶ 13, 17). In 2025, CPB grants made up roughly 37% of Lakeland's budget. *Id.* at 5 (Hanks Decl. ¶ 13).

      b.   <u>National Public Radio and the local radio stations</u>

National Public Radio is a nonprofit media organization that produces, acquires, and distributes programming to locally owned and operated public radio stations across the country. NPR Dkt. 30-1 at 1 (Defs.' Resp. to Pls.' SUMF ¶¶ 1, 3). NPR currently has 246 member stations, which collectively operate more than 1,000 public radio signals and hundreds of digital platforms, across the country. *Id.* at 3 (Defs.' Resp. to Pls.' SUMF ¶ 11). NPR is not itself a public radio station, nor does it operate one. *Id.* at 1 (Defs.' Resp. to Pls.' SUMF ¶ 2). NPR member stations pay an individualized membership "core fee" to license NPR's flagship content, such as *Morning Edition*, *All Things Considered*, and *Weekend Edition*, and receive access to other services, including music licensing support, data on audience insights and analytics, and fundraising materials. *Id.* at 3, 12 (Defs.' Resp. to Pls.' SUMF ¶¶ 12, 14, 64, 69). Member stations may also license additional NPR programming for a further fee. *Id.* at 3, 12, 17, 21 (Defs.' Resp. to Pls.' SUMF ¶¶ 13, 65, 96, 121). In addition to creating and distributing programming, NPR also manages the Public Radio Satellite System ("PRSS"), a satellite and

10

terrestrial content distribution system that delivers audio content to 379 participating public radio stations. *Id.* at 4, 6 (Defs.' Resp. to Pls.' SUMF ¶¶ 19–20, 31). The PRSS also delivers presidential alerts from FEMA. *Id.* at 6 (Defs.' Resp. to Pls.' SUMF ¶ 32).

NPR is funded through a combination of membership and licensing fees from local public radio stations, public and private grants, sponsorships, and individual donations. *Id.* at 7–8 (Defs.' Resp. to Pls.' SUMF ¶ 40). In FY 2024, NPR received approximately 31% of its annual operating revenue from membership fees and licensing agreements with NPR member stations and other public radio stations. *Id.* at 8 (Defs.' Resp. to Pls.' SUMF ¶ 41). NPR also received approximately $11.1 million in grants from the CPB for programming and to support the PRSS. *Id.* at 8 (Defs.' Resp. to Pls.' SUMF ¶ 42). NPR has received NEA grants in each of the past 27 years, and it has received "Grants for Arts Projects" funding, in particular, in each of the prior four annual funding cycles. NPR Dkt. 37-2 at 2–3 (Defs.' Resp. to Pls.' SAUMF ¶ 236).

Plaintiff Aspen Public Radio is a non-profit community licensed public radio station serving rural communities in Colorado. NPR Dkt. 30-1 at 10–11 (Defs.' Resp. to Pls.' SUMF ¶¶ 55–57). It has been an NPR member station since 1990. *Id.* at 11 (Defs.' Resp. to Pls.' SUMF ¶ 60). In addition to 92 hours of NPR programming per week, *id.* at 11 (Defs.' Resp. to Pls.' SUMF ¶ 63), Aspen Public Radio broadcasts local news reported by a team of local journalists and programming from other distributors of national and international news, *id.* at 11 (Defs.' Resp. to Pls.' SUMF ¶ 59). Because it covers a rural location with mountainous terrain, Aspen Public Radio listeners rely on FM radio infrastructure to receive life-saving information about road closures, mud slides, and wildfire threats, among other emergency information. *Id.* at

11

13 (Defs.' Resp. to Pls.' SUMF ¶ 70).  In 2025, CPB funding accounted for approximately 10.8% of Aspen Public Radio's budget.  *Id.* at 13 (Defs.' Resp. to Pls.' SUMF ¶ 76).

Plaintiff Colorado Public Radio ("CPR") is a non-profit community licensed public radio station serving 90% of Colorado's population.  *Id.* at 14 (Defs.' Resp. to Pls.' SUMF ¶¶ 80–82).  It has been an NPR member station since 1973.  *Id.* at 16 (Defs.' Resp. to Pls.' SUMF ¶ 89).  In addition to 65 hours of NPR programming per week, CPR also provides local and regional news coverage and programs dedicated to classical music, interviews and on-air performances of local musicians and visiting artists, and new music discovery with a focus on Colorado-based musicians and groups.  *Id.* at 15–17 (Defs.' Resp. to Pls.' SUMF ¶¶ 86–88, 92–93, 97).  CPR is the only Colorado-based media organization with a full-time journalist in Washington, D.C. devoted to reporting on the work of the Colorado congressional delegation, and it is part of a collaborative contingent of reporters covering the Colorado Capitol.  *Id.* at 15 (Defs.' Resp. to Pls.' SUMF ¶¶ 87–88).  CPR is an essential, reliable source of information in the event of a natural disaster, severe weather, or other emergency situation.  *Id.* at 17 (Defs.' Resp. to Pls.' SUMF ¶ 99).  In FY 2025, CPB funding constituted approximately six percent of CPR's budget. *Id.* at 17–18 (Defs.' Resp. to Pls.' SUMF ¶ 100).

Plaintiff KSUT Public Radio ("Tribal Radio") is a non-profit community licensed public radio station serving approximately 27,000 square miles in mostly rural areas of Colorado, including all or part of the Southern Ute Indian Tribe, Ute Mountain Ute Tribe, Navajo Nation, and Jicarilla Apache Nation.  *Id.* at 18–19 ( Defs.' Resp. to Pls.' SUMF ¶¶ 104, 106, 109–10).  It has been an NPR member station since 1984.  *Id.* at 20 (Defs.' Resp. to Pls.' SUMF ¶ 117).  In addition to approximately 41 hours of NPR content per week, KSUT airs national programming produced by other organizations, such as APM, Public Radio International, and Native Voice 1.

12

*Id.* at 20–21 (Defs.' Resp. to Pls.' SUMF ¶¶ 116, 124).  It also offers 46 hours of original programming each week, including news, public affairs programs, Native American traditional and contemporary music, special Tribal meetings, and interviews with elected Tribal officials. *Id.* at 22 (Defs.' Resp. to Pls.' SUMF ¶ 125).  KSUT works with regional emergency services to provide listeners with timely, accurate information about flash flooding, wildfires, road closures, and other emergencies.  *Id.* at 23 (Defs.' Resp. to Pls.' SUMF ¶¶ 132–36).

Aspen Public Radio, Colorado Public Radio, and KSUT Public Radio (the "local radio stations") choose to air NPR programming based on their editorial judgment that NPR programs fit the needs and interests of the communities they serve.  *Id.* at 11–12, 16, 20–22 (Defs.' Resp. to Pls.' SUMF ¶¶ 62, 66, 90, 118–19, 127).  All three member stations have historically used CPB grants to help pay their NPR membership and programming fees, *id.* at 14, 18, 24 (Defs.' Resp. to Pls.' SUMF ¶¶ 77, 101, 142), and to support their participation in the PRSS, *id.* at 14, 18, 24 (Defs.' Resp. to Pls.' SUMF ¶¶ 78, 102, 143).  Historically, CPB grants made up between 30% and 50% of the overall budgets of many public radio stations. *Id.* at 10 (Defs.' Resp. to Pls.' SUMF ¶¶ 53–54).

3.    *Executive Order 14290 and related actions*

Throughout 2024 and 2025, President Trump repeatedly announced his desire to defund NPR and PBS based on his disapproval of their speech.  On April 10, 2024, he wrote on social media: "NO MORE FUNDING FOR NPR, A TOTAL SCAM! . . . THEY ARE A LIBERAL DISINFORMATION MACHINE.  NOT ONE DOLLAR."  *Id.* at 25 (Defs.' Resp. to Pls.' SUMF ¶ 149).  On March 25, 2025, he announced at a press conference that he would "love to" defund NPR and PBS because they are "biased," *id.* at 25 (Defs.' Resp. to Pls.' SUMF ¶ 146), and, then, on March 27 and April 1, 2025, he posted messages encouraging Republicans to "defund" and "dissociate themselves from NPR [and] PBS," characterizing both organizations as

13

"arms of the Radical Left Democrat Party" and "Radical Left 'Monsters,'" *id.* at 25 (Defs.' Resp. to Pls.' SUMF ¶¶ 147–48) (capitalization normalized); *see also id.* at 26 (Defs.' Resp. to Pls.' SUMF ¶ 150) ("On April 15, 2025, OMB Director Russell Vought stated during an interview that NPR's journalism 'is worse than' 'left-wing indoctrination,' and accused NPR of 'dividing on the basis of wokeism.'").

Beginning in April 2025, President Trump's disapproval of the CPB, NPR, and PBS ripened into executive action. On April 28, 2025, the Deputy Director of Presidential Personnel emailed three CPB Board members, informing them that they were terminated, effective immediately. *Id.* at 26 (Defs.' Resp. to Pls.' SUMF ¶ 151). The CPB and the purportedly terminated Board members disputed the lawfulness of those terminations in two cases filed in this Court. *Corp. for Pub. Broad. v. Trump*, No. 25-cv-1305 (D.D.C. filed Apr. 29, 2025); *United States v. Ross*, No. 25-cv-2261 (D.D.C. filed July 15, 2025). In the first of these cases, the plaintiffs moved for an emergency order enjoining the President, the Office of Management and Budget, and others "from taking any action to give effect to the purported termination[s] . . . or otherwise to interfere with or to attempt to control the [CPB], pending final resolution of the case." *Corp. for Pub. Broad.*, 786 F. Supp. 3d at 145. The Court denied that motion, principally on the grounds the plaintiffs had failed to show that they were likely to prevail on their challenge to the terminations and that the CPB was unlikely to suffer any irreparable harm because it could continue to function, notwithstanding the purported terminations. *Id*. at 150–57.

Just three days after he terminated the three Board members, on May 1, 2025, President Trump issued Executive Order 14290, titled "Ending Taxpayer Subsidization of Biased Media." The Executive Order begins by declaring that "Government funding of news media in this

14

environment is not only outdated and unnecessary but corrosive to the appearance of journalistic independence." Exec. Order § 1. "At the very least," the Executive Order asserts, "Americans have the right to expect that if their tax dollars fund public broadcasting at all, they fund only fair, accurate, unbiased, and nonpartisan news coverage." *Id.* In the President's view, neither NPR nor PBS "presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." *Id.* The Executive Order was accompanied by a fact sheet and a press release identifying specific instances in which NPR's and PBS's speech purportedly "fueled partisanship and left-wing propaganda." Fact Sheet; *President Trump Finally Ends the Madness of NPR, PBS* (May 2, 2025), https://www.whitehouse.gov/articles/2025/05/president-trump-finally-ends-the-madness-of-npr-pbs/ [https://perma.cc/W7D8-QMGB] (hereinafter "Press Release").

Among an array of other criticisms, the Fact Sheet asserts that NPR "refused to cover the Hunter Biden laptop story, . . . despite [the fact] that it was highly relevant to the presidential election;" NPR "repeatedly insisted [that] COVID-19 did not originate in a lab and refused to explore [that] theory;" NPR ran "stories defending looting and suggesting that crime fears are racist;" NPR "described its diversity, equity, and inclusion (DEI) practices as 'inseparable' from its content;" NPR "asked its editors to avoid the term 'biological sex' when discussing transgender issues;" the "PBS News Hour used versions of the term 'far-right' 162 times, but 'far-left' only 6 times" over a six-month period; NPR and PBS featured queer, transgender, or nonbinary characters; PBS presented "a one-sided narrative to 'address racism' amid the Black Lives Matters riots;" and PBS's "coverage of the 2024 Republican National Convention was 72% negative, while its coverage of the 2024 Democratic National Convention was 88% positive." Fact Sheet.

15

To end taxpayer subsidization of the "biased" coverage of NPR and PBS, the Executive Order "instruct[s] the CPB Board of Directors . . . and all executive departments and agencies . . . to cease Federal funding for NPR and PBS." Exec. Order § 1. This directive is sweeping. It directs all federal agencies to stop providing funding to NPR and PBS, regardless of the agency, the nature of the grant, or the use of the funds. The Executive Order, then, goes on to provide specific instructions to the CPB and to all executive agencies.

Section 2 of the Executive Order speaks to the CPB Board and instructs it to "cease direct funding to NPR and PBS, consistent with [the] Administration's policy to ensure that Federal funding does not support biased and partisan news coverage." Exec. Order § 2(a). To effectuate this instruction, the Executive Order directs "[t]he CPB Board [to] cancel existing direct funding to the maximum extent allowed by law and [to] decline to provide future funding." *Id.* Section 2 also instructs the CPB Board to "cease indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS." *Id.* § 2(b). Among other things, this instruction required the CPB to ensure that NPR and PBS member stations did not use funding received from the CPB to pay NPR or PBS dues or to acquire programming— regardless of the subject matter—from NPR or PBS. *Id.*

Section 3 sweeps more broadly and directs that all federal agencies "shall identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS." *Id.* § 3(a). To the extent that "applicable law" prevents an agency from terminating any existing "grants, contracts, or other funding instruments entered into with NPR or PBS"—that is, if "applicable law" prevents an agency from terminating a grant or contract— the agency is required to "determine whether NPR and PBS are in compliance with the terms of

16

those instruments," and, if the agency finds some "noncompliance," it must "take appropriate steps under the terms of the instrument." *Id.* § 3(b).  In other words, all federal agencies must put an end to all "direct or indirect" funding of NPR and PBS, and, if any binding commitments remain in place, the agency must determine whether the agreement is subject to termination for noncompliance.  Finally, Section 3 also directs the Secretary of Health and Human Services to determine whether PBS, NPR, "or any successor organization" are complying with Title VII of the Civil Rights Act of 1964.  *Id.* § 3(c).

On May 2, 2025, the day after the President issued Executive Order 14290, the National Endowment for the Arts informed NPR that the agency had terminated two grants, one which supported literary content and the other which supported the production and distribution of music programming.  NPR Dkt. 30-1 at 30 (Defs.' Resp. to Pls.' SUMF ¶ 173); NPR Dkt. 30-8 at 3–4 (Defs.' SUMF ¶¶ 17–18, 29–30).  The termination notice explained that NPR's projects "no longer effectuate[] agency priorities" as determined "by the President."  NPR Dkt. 30-5 at 20–21, 23–24.

Also on May 2, the Department of Education notified the CPB that it was terminating the "Ready to Learn" grant, which had awarded $78 million jointly to the CPB and PBS to produce educational content for children.  PBS Dkt. 31-2 at 2 (Kerger 2d Decl. ¶ 7); PBS Dkt. 31-1.  The termination notice indicated that the Ready to Learn grant conflicted with the priorities and policy preferences of the current administration and "constitute[d] an inappropriate use of federal funds."  PBS Dkt. 1-1 at 2.  The termination led to a shortfall of millions of dollars in the Ready to Learn budget and resulted in the termination of 22 employees on the PBS KIDS team.  PBS Dkt. 31-2 at 2 (Kerger 2d Decl. ¶ 8).  Later in May, FEMA paused the Next Generation Warning System Grant ("NGWS") Program, which is awarded to CPB and then distributed in significant

17

part to PBS member stations, for about three weeks.  PBS Dkt. 31-2 at 2 (Kerger 2d Decl. ¶ 6); *see generally* CRS Report at 12–13 (summarizing the NGWS grant program).

Finally, on July 15, 2025, the NEA informed NPR that it had denied NPR's application for funding under the NEA's "Grants for Arts Projects" program.  NPR Dkt. 34-2 at 2 (Kwon 2d Decl. ¶ 7).  The NEA offered no explanation for the decision and, instead, merely wrote: "We regret to inform you that the following application submitted to the National Endowment for the Arts [Application # 1940242-34] is not among those selected for Grants for the Arts Projects funding."  NPR Dkt. 34-4 at 2.

## B.    Procedural history

On May 27, 2025, NPR, Aspen Public Radio, Colorado Public Radio, and KSUT Public Radio ("NPR Plaintiffs") filed suit against President Trump, the Office of Management and Budget and its Director, the Department of the Treasury and the Secretary of the Treasury, the National Endowment for the Arts and its Chair, and the Corporation for Public Broadcasting. *See* NPR Dkt. 1 at 1–2 (Compl.).  Three days later, PBS and Lakeland PBS ("PBS Plaintiffs") filed a similar suit against President Trump, the Office of Management and Budget and its Director, the Department of the Treasury and the Secretary of the Treasury, the Department of Education and the Secretary of Education, the Department of Homeland Security and the Secretary of Homeland Security, and the Federal Emergency Management Agency and its Administrator.  *See* PBS Dkt. 1 at 1–2 (Compl.).  Both the NPR Plaintiffs and the PBS Plaintiffs challenge the lawfulness of Executive Order 14290 on both statutory and constitutional grounds and seek both declaratory and injunctive relief.  *See* NPR Dkt. 46-1 at 42 (Am. Compl. ¶¶ 209–20); PBS Dkt. 1 at 47 (Compl. Prayer for Relief).  In both cases, Plaintiffs moved for summary judgment, *see* NPR Dkt. 21; PBS Dkt. 12, and the Federal Defendants (that is, all defendants in

18

both cases other than the CPB) cross-moved for summary judgment, *see* NPR Dkt. 30; PBS Dkt. 22.  Meanwhile, the landscape underlying the litigation shifted in significant respects.

First, on July 24, 2025, while the parties were briefing the cross-motions for summary judgment, the President signed into law a bill rescinding the CPB's appropriations for FY 2026 and FY 2027.  *See* Rescissions Act of 2025, 139 Stat. at 469–70.  Since 1975, Congress had "provided two-year advance appropriations to the CPB in order to separate programming decisions from pressures of the appropriations process and to better allow for long-term planning of content development."  CRS Report at 7.  Consistent with that practice, in March 2024, Congress appropriated $535 million to the CPB for FY 2026, *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, 138 Stat. 460, 696, and, in March 2025, appropriated a similar amount to CPB for FY 2027 by continuing resolution, *see* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, 139 Stat. 9, 10–15.  Just four months after appropriating the funds for FY 2027, however, Congress enacted the Rescission Act of 2025 and withdrew the funding for both FY 2026 and FY 2027.

Left without funds to continue operations, the CPB announced on August 1, 2025, that it intended to wind down its operations by January 2026.  *See* NPR Dkt. 73 at 26; CRS Report at 1.  On September 15, 2025, the CPB Board decided to award $57.9 million in pre-FY 2026 funds to Public Media Infrastructure for public radio interconnection, NPR Dkt. 57-2 at 31, 34–35 (Pls.' PI SUMF ¶¶ 185, 208), even though NPR had managed the PRSS for decades and was previously told that it would receive the funding, *id.* at 3, 10 (Pls.' PI SUMF ¶¶ 13, 58–59, 62).  CPB formally notified NPR of this decision on September 23, 2025.  *Id.* at 35 (Pls' PI SUMF ¶ 212).

Three days later, NPR moved for a temporary restraining order barring the CPB "from taking further steps to implement Executive Order 14290 . . . , including by distributing funds appropriated by Congress for satellite interconnection purposes to any entity or entities other than NPR." NPR Dkt. 38 at 1. It argued that President Trump issued Executive Order 14290 "seeking to punish [NPR] on the basis of its speech, including by pressing the [CPB] to carry out that violation of the Constitution" and that the CPB was "poised to do the Order's bidding, in contravention of both the First Amendment and the express mandates of the [PBA]." NPR Dkt. 38-1 at 6. After an emergency hearing, *see* NPR Min. Entry (Sept. 30, 2025), the Court converted NPR's motion for a temporary restraining order into a motion for a preliminary injunction, *see* NPR Dkt. 42 at 21, and also granted the parties' request to consolidate NPR's pending motion for a preliminary injunction with a motion for partial summary judgment, to be considered alongside CPB's anticipated cross-motion for partial summary judgment, *see* NPR Min. Order (Oct. 7, 2025).

The NPR Plaintiffs then filed an amended complaint adding additional claims against the CPB related to the withholding of satellite interconnection funding. *See* NPR Dkt. 46-1 (Am. Compl.); NPR Min. Order (Oct. 7, 2025) (granting motion for leave to file amended complaint). After expedited discovery and summary judgment briefing, the Court held an evidentiary hearing and a motions hearing on NPR's motion for preliminary injunction and the parties' cross-motions for summary judgment. *See* NPR Min. Entry (Oct. 28, 2025). The Federal Defendants—although parties to the case—chose not to participate in those proceedings. *See* NPR Dkt. 73 at 5–6. At a subsequent status conference, the Court expressed its view that "at least as a preliminary matter," NPR had "made a very substantial showing" in support of its claim that the CPB's decision to distribute satellite interconnection funding to an entity other

than NPR was "motivated by a desire to show some compliance" with the President's "efforts to penalize NPR for its speech and for the content of its speech." NPR Dkt. 74 at 11–12. Because the CPB continued to maintain that it was acting for reasons unrelated to the Executive Order, however, and out of an abundance of caution, the Court scheduled a bench trial on NPR's claims against the CPB relating to the CPB's "withholding of interconnection funds to NPR." NPR Dkt. 72 at 1. The trial was set to commence on December 1, 2025. *Id.*

That trial never took place. Instead, on November 17, 2025, NPR and the CPB stipulated to the dismissal of NPR's claims against the CPB relating to the distribution of interconnection funding. NPR Dkt. 77 at 3. NPR and the CPB agreed that Executive Order 14290 is "unconstitutional" and "precisely the type of governmental interference designed to impact media programming or program judgments that Congress by its plain terms sought to prevent in creating CPB as it did." *Id.* at 2. The CPB further "agree[d] [that] it [would] not implement or enforce the Executive Order unless and until it is ordered or required to do so by a court of competent jurisdiction." *Id.* at 3. The CPB remained a defendant in the case, however, for "purposes of Plaintiffs' claims for declaratory and injunctive relief barring implementation or enforcement of the Executive Order." *Id.* The Federal Defendants took no position regarding the lawfulness of that stipulation.

Returning to the pending cross-motions for summary judgment, the Court held a motions hearing in *NPR v. Trump* on December 4, 2025. *See* NPR Min. Entry (Dec. 4, 2025). Then, on February 9, 2026, the Court informed the parties in both *NPR v. Trump* and *PBS v. Trump* that it was inclined to consolidate the cases for purposes of resolving the identical legal issues presented by the pending summary judgment motions in both cases. *See* NPR Min. Order (Feb. 9, 2026); PBS Min. Order (Feb. 9, 2026). After providing the parties ample opportunity to raise

objections to the proposed consolidation of the cases, the Court consolidated the cases on February 20, 2026.  *See* NPR Min. Order (Feb. 20, 2026); PBS Min. Order (Feb. 20, 2026).

Finally, on February 27, 2026, the CPB filed Articles of Dissolution with the D.C. government, and the corporate dissolution took effect on February 28, 2026.  Corp. for Pub. Broad., Articles of Dissolution for Domestic Nonprofit Corporation (filed Feb. 27, 2026) [https://perma.cc/JQ5F-QSFD].  As a result, after almost fifty-eight years in operation, the CPB no longer exists.

## II. LEGAL STANDARD

Summary judgment is warranted if a party can "show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  The Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)).  "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent." *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018) (internal quotation marks and citation omitted).

The movant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the movant carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (citations and internal quotation marks omitted). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment in favor of the moving party. *Liberty Lobby*, 477 U.S. at 249–50.

Here, both Plaintiffs and Defendants agree that the case is suitable for resolution on summary judgment.

23

**III. ANALYSIS**

The NPR and PBS Plaintiffs challenge the Executive Order on both statutory and constitutional grounds.  *See* NPR Dkt. 21-1; PBS Dkt. 12.  They argue, as the Court recognized in *Corp. for Pub. Broad.*, that Section 2 of the Executive Order squarely violates the Public Broadcasting Act, which "forbids 'any department, agency, officer, or employee of the United States' from exercising 'any direction, supervision, or control over . . . the [CPB]' and from exercising 'any direction, supervision, or control over the content or distribution of public telecommunications programs and services, or over the curriculum or program instruction of any educational institution or school system,'" 786 F. Supp. 3d at 144–45 (citations omitted) (quoting 47 U.S.C. § 398(a), (c)).  NPR Dkt. 21-1 at 28–33; PBS Dkt. 12 at 31–34.  Plaintiffs also argue that the Executive Order is unlawful in its entirety because it discriminates and retaliates against them based on their viewpoint and editorial choices, in violation of the First Amendment.  *See* NPR Dkt. 21-1 at 35–45; PBS Dkt. 12 at 35–42.  Finally, the NPR Plaintiffs argue that the Executive Order is also "incompatible with the NEA's governing statute," NPR Dkt. 21-1 at 34–35, and that it violates their associational rights, *id.* at 45–46, and the Due Process Clause, *id.* at 48–50.

Unsurprisingly, the CPB has failed to respond to the NPR Plaintiffs' motion; indeed, even when the CPB existed, it admitted that the Executive Order is unconstitutional.  *See* NPR Dkt. 47 at 13 (Answer to NPR Am. Compl. ¶ 161).  That, then, leaves the Federal Defendants, who both oppose Plaintiffs' motions for summary judgment and cross-move for summary judgment in Defendants' favor.  The Federal Defendants argue that the Court should not reach the merits because, in their view, Plaintiffs' claims are either unripe—since there is no telling whether any federal agency will deny an otherwise sufficient application for funding based on

24

the Executive Order—or moot—since the CPB no longer exists.  NPR Dkt. 30-9 at 8–9; NPR

Dkt. 37 at 10; PBS Dkt. 22-1 at 14–15; PBS Dkt. 32 at 7–12.  They also argue that Plaintiffs lack

a cause of action to pursue their statutory claims.  NPR Dkt. 30-9 at 26–30; PBS Dkt. 22-1 at 23–

27.  But if the Court does reach the merits, the Federal Defendants continue, the Court should

uphold the Executive Order because the President acted within his statutory authority and

because the government is free to decide, without limitation, what speech to fund.  NPR Dkt. 30-

9 at 9–10.

## A.    Justiciability

Before turning to the merits of the parties' cross-motions for summary judgment, the

Court must determine whether it has subject-matter jurisdiction over Plaintiffs' claims.  Under

Article III of the Constitution, federal courts "may only adjudicate actual, ongoing

controversies," *Honig v. Doe*, 484 U.S. 305, 317 (1988), and that "actual controversy must be

extant at all stages" of the proceeding and "not merely at the time the complaint is filed," *Preiser*

*v. Newkirk*, 422 U.S. 395, 401 (1975) (citation modified).  "In an attempt to give meaning to

Article III's case-or-controversy requirement" as it applies throughout the course of a litigation,

"the courts have developed a series of principles termed 'justiciability doctrines,' among which

are standing[,] ripeness, [and] mootness." *Nat'l Treasury Emps. Union v. United States*, 101

F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

The standing inquiry focuses on whether the plaintiff has "a personal stake in the

outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction."

*Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (emphasis in original)

(quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  To establish standing, a

plaintiff must satisfy three elements.  First, the plaintiff must show that it suffered, or faces an

imminent threat of suffering, an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

25

(1992).  Second, the plaintiff must show that there is a causal connection between its injury-in-fact and the challenged conduct.  *Id.*  Third, the injury must be redressable "by a favorable decision."  *Id.* at 561.

Unlike the standing inquiry, which focuses on whether the plaintiff is the proper party to sue, the "twin doctrines" of ripeness and mootness ask whether the suit has been brought at the proper time.  *See Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997).  "Ripeness is a legal doctrine that prevents courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."  *Hight v. U.S. Dep't of Homeland Sec.*, 135 F.4th 996, 1012 (D.C. Cir. 2025) (citation modified).  Although the ripeness doctrine has both Article III and prudential elements, at its constitutional core, the doctrine overlaps the traditional rules of standing; the plaintiff must face "an injury-in-fact that is imminent or certainly impending."  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (citation modified).  While ripeness considerations prevent federal courts from adjudicating inchoate disputes, the mootness doctrine encompasses the requirement that a live case or controversy exist "throughout [the] existence" of the case.  *Arizonans for Off. Eng.*, 520 U.S. at 68 n.22 (citation modified).  It requires a federal court to refrain from deciding a once-live controversy "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (citation modified).

"The party invoking federal jurisdiction bears the burden of establishing" each of the elements of Article III standing although "the manner and degree of evidence required" varies with "the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  Because this litigation is at the summary judgment stage, Plaintiffs cannot rest on mere allegations; they must

26

demonstrate, based on undisputed evidence, that the Executive Order has caused, or poses an imminent threat of causing, them to suffer a cognizable injury-in-fact and that a successful outcome to the litigation will redress that actual or imminent injury. *See California v. Texas*, 593 U.S. 659, 675 (2021). In addition to carrying the burden of establishing standing, the party invoking the court's jurisdiction also bears the burden of showing "that each claim is ripe for adjudication." *Garcia v. Acosta*, 393 F. Supp. 3d 93, 103 (D.D.C. 2019); *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (explaining that ripeness has roots in "Article III limitations on judicial power" (citation modified)).

In contrast, a "party seeking dismissal on grounds of mootness bears the initial burden," and only after that party has carried that burden does the burden shift to "the opposing party . . . to prove that a mootness exception applies." *Reid v. Hurwitz*, 920 F.3d 828, 832 (D.C. Cir. 2019). As with standing and ripeness, courts "analyze mootness on a claim-by-claim basis," *League of United Latin Am. Citizens v. Exec. Off. of the President*, ___ F. Supp. 3d ___, ___, 2026 WL 252420, at *23 (D.D.C. Jan. 30, 2026) (citing *Coal. of Airline Pilots Ass'ns v. Federal Aviation Administration*, 370 F.3d 1184, 1189–90 (D.C. Cir. 2004)), and form-of-relief-by-form-of-relief basis, *see Nepal v. U.S. Department of State*, 602 F. Supp. 3d 115, 123–24 (D.D.C. 2022) (citing *In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997)). But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation"—or in the claim or form of relief at issue—"the case is not moot." *Knox v. Serv. Emps. Int'l. Union*, 567 U.S. 298, 307–08 (2012) (citation modified); *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (same).

Here, Plaintiffs rely on two asserted injuries to establish their standing to challenge the Executive Order. First, they argue that "the Order is inflicting ongoing First Amendment harms" by "chilling Plaintiffs' speech and affecting their ongoing operations." NPR Dkt. 34 at 17; *see*

27

*also* PBS Dkt. 31 at 11.  Second, they contend that the Order precludes them from receiving federal funding of any kind.  NPR Dkt. 34 at 20; *see also* PBS Dkt. 31-2 at 3 (Kerger 2d Decl. ¶ 9).  The Federal Defendants maintain that Plaintiffs' challenges to the Executive Order are non-justiciable because they are unripe, NPR Dkt. 30-9 at 14–16; PBS Dkt. 22-1 at 14–15, or likely to become moot "once the CPB winds-itself down," NPR Dkt. 37 at 10; PBS Dkt. 32 at 9.  As required, the Court will consider these contentions on a claim-by-claim and form-of-relief-by-form-of-relief basis.

       1.    *Mootness*

Both the NPR and PBS Plaintiffs bring statutory and constitutional challenges to the Executive Order on the grounds that the Public Broadcasting Act insulates the CPB from interference from federal officers and employees, and that the First Amendment prohibits the President from instructing the CPB to "cancel existing direct funding . . .  and . . . decline to provide future funding" to NPR and PBS based on the viewpoint of their past speech.  *See* NPR Dkt. 46-1 at 37–49 (Am. Compl. ¶¶ 138–91); PBS Dkt. 1 at 31–46 (Compl. ¶¶ 81–135).  To the extent that Plaintiffs seek injunctive or declaratory relief against the CPB barring implementation or enforcement of the Executive Order, "events [have] outrun the controversy," thereby mooting these claims.  *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 514 F. Supp. 3d 290, 298 (D.D.C. 2021) (citation modified).

On June 24, 2025, the President signed into law a bill rescinding CPB's funding for FY 2026 and FY 2027.  *See* Rescissions Act of 2025, 139 Stat. at 469–70.  Left without funding or congressional support, the CPB filed Articles of Dissolution on February 27, 2026.  Corp. for Pub. Broad., Articles of Dissolution for Domestic Nonprofit Corporation (filed Feb. 27, 2026) [https://perma.cc/JQ5F-QSFD].  As the CPB explained in a court filing in related litigation, the CPB unanimously voted to dissolve "[a]s a result of Congress' recission" of "roughly $1.1

billion in advance appropriations for CPB, effectively ending federal support for public media."
Joint Status Report at 2, *Corp. for Pub. Broad. v. Trump*, 786 F. Supp. 3d 142 (D.D.C. 2025)
(No. 25-1305), Dkt. 46.  Neither NPR nor PBS has challenged the CPB's decision to dissolve.
Nor have they alleged that the Executive Order—as opposed to the recission—caused the Board
to take this dramatic action.

Under these circumstances, the Court is persuaded that Plaintiffs' request for prospective
relief against the CPB is now moot.  Judge Friedrich recently faced a similar question in
*Pietrangelo v. Refresh Club, Inc.*, No. 18-cv-1943, 2024 WL 3400258 (D.D.C. July 12, 2024).
In that case, the plaintiff sued a business, known by the tradename "The Wing DC," under the
D.C. Human Rights Act, seeking monetary, injunctive, and declaratory relief.  *Id.* at *1.  While
the litigation was pending, The Wing ceased all business operations, prompting the Court to
inquire whether the plaintiff's claims for prospective injunctive and declaratory relief were moot.
*Id.* at *2.  After hearing from the parties, the Court concluded that those claims were moot.  *Id.* at
*6.  As the Court explained, "[s]imply closing [a business] is not sufficient to render [a] case
moot," at least when the business could decide to reopen, when some ongoing injury continues,
or when there is reason to believe that a party is seeking to manipulate the Court's jurisdiction.
*Id.* at *4 (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).  None of those provisos,
however, applied to The Wing's closure: the business did not merely close but was officially
dissolved under Delaware law; the board voted to wind down and liquidate; The Wing had no
plan or intention to reopen and the plaintiff's suggestion to the contrary was premised on
"nothing more than speculation;" the plaintiff was suffering no ongoing injury that might justify
prospective relief; and there was no reason to suspect that The Wing was manipulating the
Court's jurisdiction.  *Id.* at *5.

The same is true here, at least with respect to prospective relief against the CPB. Although the Public Broadcasting Act remains in place, it is unclear whether and how the CPB could reconstitute itself. The Act, for example, provides that "the *initial* Board of Directors shall serve as incorporators," 47 U.S.C. § 396(c)(4) (emphasis added), but, unsurprisingly, says nothing about re-incorporation. Moreover, even if a new Board might take steps to incorporate a new CPB, Board members must be appointed by the President and confirmed by the Senate—a prospect that seems highly unlikely while the Executive Order remains in effect. And even if a new Board were appointed, it would have no reason to seek to re-incorporate the CPB absent congressional funding—a prospect that also seems highly unlikely in the foreseeable future. In other words, although Congress has not repealed the Public Broadcasting Act, and it is possible that the CPB might someday come back into existence, CRS Report at 22–23, that prospect is entirely speculative. Finally, there is no reason to believe that the CPB dissolved to manipulate the Court's jurisdiction. As explained above, the CPB has represented to the Court that it decided to wind down its affairs because Congress rescinded its funding. That representation comports with common sense and, in any event, is uncontroverted.

Against this backdrop, the Court can discern no purpose that might be served by granting any relief against the CPB. The only relief that Plaintiffs seek—injunctive and declaratory relief—is prospective, and an order running against a non-existent non-profit corporation will do nothing to redress Plaintiffs' alleged injuries. *Cf. Samuels v. Rayford*, No. 91-0365, 1995 WL 376939, at *9 (D.D.C. Apr. 10, 1995) ("An injunction is not available here because [defendant hospital] no longer exists."); *Fed. Election Comm'n v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 85 (D.D.C. 2014) ("The Court will not order any relief against the now defunct Craig Committee, nor will it issue an injunction in this case.").

For the same reasons, the Court also lacks jurisdiction over Plaintiffs' request for declaratory relief against the President based on their claims related to the CPB. As the D.C. Circuit has explained, "[i]n determining whether a request for declaratory relief has become moot, 'the question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985) (emphasis omitted) (quoting *Preiser*, 422 U.S. at 402). In light of the dissolution of the CPB, any future injury that Section 2 of the Executive Order might cause is too speculative to warrant judicial intervention at this time, and a court order declaring Section 2 unlawful would not offer Plaintiffs any meaningful relief.[3]

Because the CPB no longer exists, and because no controversy sufficient to support the Court's jurisdiction continues to exist between the CPB and the NPR Plaintiffs, the Court will dismiss as moot the NPR Plaintiffs' remaining claims against the CPB, Count 1 of the PBS Plaintiffs' complaint, and both the NPR and PBS Plaintiffs' claims against the President as to Section 2.

    2.    *Ripeness*

The Federal Defendants also argue that Plaintiffs' challenges are not ripe (1) because the extent to which the CPB was subject to governmental control—and thus required to comply with the Executive Order—was a "hotly disputed question[] in separate litigation before th[e] Court," NPR Dkt. 30-9 at 15; PBS Dkt. 22-1 at 15, and (2) because "Plaintiffs' claims against the agency defendants for prospective relief . . . depend on the specifics of as yet unknown and merely

---

[3] To the extent that Plaintiffs seek to enjoin the Department of the Treasury from declining to disburse funds to the CPB based on the CPB's failure to comply with Section 2 of the Executive Order that request is moot for similar reasons.

potential future actions of individual agencies," NPR Dkt. 37 at 10; PBS Dkt. 32 at 9.  For the reasons explained above, the Court has already concluded that Plaintiffs' challenges to the CPB's implementation of the Executive Order are now moot.  The Court is unpersuaded, however, that Plaintiffs' broader First Amendment challenge to the Executive Order as retaliatory and viewpoint discriminatory is unripe.

The ripeness doctrine "subsume[s]" both constitutional and prudential considerations. *Am. Petroleum Inst.*, 683 F.3d at 386.  For constitutional purposes, a claim is not ripe if the alleged harm "may not occur," *Texas v. United States*, 523 U.S. 296, 300 (1998), or framed in the language of Article III standing, if the alleged injury-in-fact is not "imminent" or "certainly impending," *Nat'l Treasury Emps. Union*, 101 F.3d at 1427–28.  But "if [the] threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Id.* at 1428.  The prudential element of the ripeness doctrine, in contrast, asks whether "letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process." *Am. Petroleum Inst.*, 683 F.3d at 386 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)).

**a.**

Because the Federal Defendants do not meaningfully contest Plaintiffs' Article III standing to bring a facial First Amendment challenge to the Executive Order, the Court pauses only briefly to assure itself that Plaintiffs have satisfied the "irreducible constitutional minimum of standing." *Lujan*, 540 U.S. at 560.  They have.  As the D.C. Circuit recently observed in *Media Matters for Am. v. Paxton*, government retaliation for engaging in protected First

32

Amendment conduct constitutes a "concrete harm" in and of itself, at least when the "retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." 138 F.4th 563, 580–81 (D.C. Cir. 2025) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)). Here, moreover, the Federal Defendants admit that NPR understood that the Executive Order "put [it] on notice that it must adapt its journalistic and editorial choices to suit the government's preferences if it is ever to receive federal funding again," NPR Dkt. 30-1 at 32 (Defs.' Resp. to Pls.' SUMF ¶ 181); that the local radio stations received the same message, *id.* at 34, 36, 38 (Defs.' Resp. to Pls.' SUMF ¶¶ 191, 202–03, 217); and that the Executive Order has caused at least one local radio station to question whether it should "continue to acquire and air NPR programming," *id.* at 38 (Defs.' Resp. to Pls.' SUMF ¶ 219). That is enough to show that a person of ordinary firmness would be chilled from freely exercising his or her First Amendment rights by the challenged actions.

Although this First Amendment injury suffices for present purposes, Plaintiffs have standing for a second reason, which the Federal Defendants do not dispute and, instead, characterize as Plaintiffs' "clearest case for standing." Dkt. 80 at 64. To borrow Defendants' words, that basis for standing is premised on "the denial of grants going forward." *Id.* Because Plaintiffs seek only prospective relief, that theory of standing necessarily requires the Court to consider the future effect of the Executive Order. It does not, however, require proof that Plaintiffs would receive a specific grant but-for the Executive Order. Instead, the injury inheres in excluding Plaintiffs from any meaningful opportunity to compete for future grants, where they have a long track record of competing for and receiving the types of grants that the Executive Order now forecloses. In this respect, the theory of standing is the flip side of competitor standing, which "recogniz[es] that economic actors 'suffer [an] injury in fact when agencies lift

33

regulatory restrictions on their competitors or otherwise allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010). Here, Plaintiffs are injured because the Executive Order precludes them from even participating in the competition for federal grants or other financial benefits.

This theory of standing is well supported by precedent dating back at least to the Supreme Court's decision in *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200 (1995). *Adarand* involved a challenge to a federal procurement policy that favored "small businesses controlled by socially and economically disadvantaged individuals." *Id.* at 205 (citation modified). Before reaching the merits of the plaintiff's claim for prospective relief, the Court addressed standing. *Id.* at 211. As relevant here, the Court explained:

> Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." The aggrieved party "need not allege that he would have obtained the benefit but for the barrier in order to establish standing."

*Id.* (citation omitted) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666–67 (1993)). Instead, in order to satisfy the imminence requirement, the plaintiff must make "an adequate showing that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id.*

The same analysis applies here. Even more so than the program at issue in *Adarand*, the Executive Order discriminates against NPR and PBS by barring them—and only them—from receiving any federal grants or other funding, and it does so based on the President's disapproval of their speech. They are told, in effect, that they need not apply. Their injury is the "discriminatory classification [that] prevent[s] [them] from competing on an equal footing," *id.*

34

at 211 (citation modified)—and, indeed, that prevents them from competing at all.  As the Supreme Court confirmed in a more recent decision, "a claim of unlawful exclusion from an existing benefits program can be fit for judicial resolution," *Dep't of Educ. v. Brown*, 600 U.S. 551, 564 n.1 (2023), as reflected by the Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 454, 456 (2017), which adjudicated a church's claim that its categorical exclusion from a state grant program violated the First Amendment's Free Exercise Clause.

As in *Adarand*, moreover, Plaintiffs come to the case with a clear and lengthy track record of applying for, and receiving, just the types of grants that they are now precluded from receiving.  NPR reports and the Federal Defendants do not dispute, for example, that it "has been awarded 'Grants for Arts Projects' funding from NEA in each of the prior four annual funding cycles, and [it] has been awarded NEA grants *in each of the past 27 years*."  NPR Dkt. 37-2 at 2–3 (Defs.' Resp. to Pls.' SAUMF ¶ 236) (emphasis added).  Similarly, PBS reports and the Federal Defendants do not dispute that "[f]or many years, [it] has applied for and received . . . funds from the Department of Education, National Science Foundation, National Endowment for the Arts, National Endowment for the Humanities, and the Department of Commerce."  PBS Dkt. 31-2 at 3 (Kerger 2d Decl. ¶ 9).  That extensive history is more than sufficient to establish that a presidential directive to all federal agencies effectively debarring NPR and PBS from all federal grant programs, regardless of the merit of their applications, constitutes a cognizable injury-in-fact.  *See Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* the benefit had it been accorded the lost opportunity." (emphasis in

original) (citation modified)); *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 24 (D.D.C. 2018) ("Plaintiffs' asserted injury—in essence, that they have suffered due to the loss of the opportunity to be considered for a type of benefit or relief for which Congress made them eligible—is the type of injury that courts in this jurisdiction have recognized as cognizable for purposes of standing."). Nor is the Court persuaded that, under these circumstances, Plaintiffs need to take the entirely futile step of submitting yet additional grant applications merely to establish their standing to sue, when the President has "instruct[ed] . . . all executive departments and agencies . . . to cease Federal funding for NPR and PBS." Exec. Order § 1. The Court is satisfied that Plaintiffs would apply for federal grants, if eligible.

The Court, accordingly, is persuaded that Plaintiffs have standing to challenge to seek a judicial order enjoining the Federal Defendants from implementing the Executive Order.[4]

---

[4] The Court also notes that standing and ripeness—as opposed to mootness—are considered at the time suit was brought, and, here, Plaintiffs clearly had standing at the time they brought suit. Among other injuries, discussed above, they faced a presidential directive telling the CPB to put an end to all direct and indirect funding of NPR and PBS—a loss that, by any measure, would satisfy Article III's dictates. In response, the Federal Defendants merely argue that any suggestion that the CPB would follow the President's direction was unripe for review, since the CPB took the position—at least in litigation—that it was a private corporation that was not bound by the Executive Order. NPR Dkt. 30-9 at 15; NPR Dkt. 37 at 8–9. But it is difficult for the Federal Defendants to press this contention with much vigor, since, in the related case brought by the CPB, they argued just the opposite: that the President retained the authority to appoint and to remove—and hence power to control—CPB Board members and that the statutory restriction on executive branch interference with the CPB did not apply to the President. *See, e.g.*, Memorandum in Opposition at 20–21, *Corp. for Pub. Broad. v. Trump*, 786 F. Supp. 3d 142 (D.D.C. 2025) (No. 25-1305), Dkt. 39; *see also* NPR Dkt. 21-1 at 29. Substantial evidence presented in support of NPR's motion for a preliminary injunction barring the CPB from distributing interconnection funding, moreover, supported NPR's contention that—despite the CPB's litigation position—the CPB departed from decades of funding NPR because, and only because, the President disapproved of NPR's speech. *See generally* NPR Dkt. 57-2 (Pls.' PI SUMF). Finally, the Executive Order itself assumes that the President had the authority to issue instructions to the CPB, and the Federal Defendants have never conceded otherwise. At a minimum, then, a concrete dispute existed at the time these suits were brought about whether the Executive Order lawfully compelled the CPB to cease funding NPR and PBS.

**b.**

Rather than focus on Article III standing, the Federal Defendants devote their ripeness arguments to prudential considerations. The prudential ripeness doctrine directs federal courts to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys*, 387 U.S. at 149. At the outset, the Court notes that the Supreme Court has expressed skepticism about the "continuing vitality of the prudential ripeness doctrine," which is in tension with federal courts' "virtually unflagging" "obligation to hear and decide cases within its jurisdiction." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). But even assuming the doctrine's "continuing vitality," none of the Federal Defendants' arguments suggest that the present dispute is unfit for judicial review or that Plaintiffs will not suffer significant hardships absent prompt review.

The Federal Defendants' bottom line is that "Plaintiffs' claims against the agency defendants must wait until there is a concrete action to constitutionally challenge." NPR Dkt. 37 at 12. Put differently, they believe that Plaintiffs should be required to raise any objections they may have on a grant-by-grant basis. They press two principal arguments in support of that contention.

First, they argue that Plaintiffs fail to grapple with the discrete reasons why future grants might be denied. On their telling, it is always possible that a grant might be denied for some reason other than the Executive Order, and, absent an evidentiary record regarding each denial, it is not possible to determine whether the denial was caused by the Executive Order.

---

To the extent circumstances later changed, that raised a question of mootness, not ripeness, and as to mootness, the Federal Defendants bear the burden of proof, *Reid*, 920 F.3d at 832, which they have not carried with respect to Plaintiffs' facial challenge to the Executive Order.

Second, the Federal Defendants point to the saving clause in Section 3 of the Executive Order, which directs agencies to terminate funding "to the maximum extent consistent with applicable law," Exec. Order § 3(a). NPR Dkt. 37 at 11–12. They speculate that an agency might decide that the Executive Order cannot constitutionally be applied to a particular grant, NPR Dkt. 80 at 66, making a "guarantee against *any* future termination[]" of funding pursuant to the Executive Order unnecessary at this time, NPR Dkt. 37 at 12. Recognizing that Plaintiffs argue that the Executive Order cannot be constitutionally applied under any circumstances—a contention that, if true, would not be undermined by the presence of a saving clause—the Federal Defendants simply assert that Plaintiffs have failed to succeed on the merits of their facial challenge to the Executive Order. *Id.*

Neither argument is convincing.

The Federal Defendants' first argument merely rewrites Plaintiffs' claims into a straw man to be knocked down. Plaintiffs do not bring anticipatory as-applied challenges to hypothetical future grant denials and terminations—the lawfulness of which plainly cannot be determined at this time. Nor do they ask the Court to enjoin the agency defendants from denying them funding in the future. Rather, Plaintiffs raise a facial challenge to the Executive Order itself and seek to enjoin the agency defendants from implementing the Executive Order. As the Court has already concluded—and as the Federal Defendants do not meaningfully resist— Plaintiffs are suffering an ongoing injury "in the form of the loss of opportunity for consideration guaranteed by statute" on allegedly unlawful grounds. *Ramirez*, 338 F. Supp. 3d at 25; *see Adarand Constructors, Inc.*, 515 U.S. at 211. Having concluded that Plaintiffs have Article III standing to challenge the Executive Order because it precludes them from even competing for federal grants, the Court need not engage in the type of grant-by-grant fact-finding that the

38

Federal Defendants seem to contemplate.  Indeed, because federal agencies are currently precluded from providing federal funding to Plaintiffs, permitting further administrative development—or percolation—will do nothing to clarify the "purely legal" question presented for resolution.  *Alt. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003).  The Executive Order is neither tentative nor inchoate, and further administrative proceedings are unnecessary to "crystaliz[e]" the legal issue for resolution.  *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999).  The Federal Defendants' speculation that an agency might reject a particular grant application on other grounds has no bearing on Plaintiffs' facial challenge to the Executive Order.

The Federal Defendants' reliance on the "saving clause" included in Section 3(a) of the Executive Order is equally unavailing.  That clause directs agency heads to identify and terminate any direct or indirect funding of NPR and PBS "to the maximum extent consistent with applicable law."  Exec. Order § 3(a).  Citing this clause and the Supreme Court's recent stay of a preliminary injunction preventing implementation of Executive Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11 2025), in *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ___, ___, 145 S. Ct. 2635 (July 8, 2025) ("*AFGE*"), the Federal Defendants suggest that the Court should be wary of adjudicating facial challenges to qualified executive orders "that merely direct future agency actions consistent with the law."  NPR Dkt. 37 at 12.  In *AFGE*, however, the Supreme Court stayed the preliminary injunction based on its assessment of the merits of the plaintiffs' challenge to the executive order at issue there, which called for the development of plans for "large-scale reductions in force," 90 Fed. Reg. at 9670, not on ripeness grounds.  145 S. Ct. at 2635.  To be sure, the Supreme Court's order and Justice Sotomayor's concurrence took "no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant

39

to the Executive Order," *id*.; *see id.* (Sotomayor, J., concurring), but that is just the point: there is a difference between a facial challenge to an executive order and an as-applied challenge to a separate agency action taken to implement the order. The fact that the Supreme Court recently stayed an injunction based on its conclusion that the plaintiffs were unlikely to prevail on their facial challenge to an executive order, and without taking a position on any separate actions taken pursuant to the executive order, does not remotely suggest that facial challenges to executive orders with saving clauses are generally unripe.

Returning to the facts of this case, Plaintiffs argue that Executive Order 14290's instruction to all federal agencies to deny NPR and PBS funding violates the First Amendment and, accordingly, is facially unconstitutional. As Judge Kollar-Kotelly recently observed: "It is no answer to that facial challenge to say that the saving clause requires [agencies] to follow the law while following the President's order." *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 67 (D.D.C. 2025). Executive orders, like statutes, "cannot be held to destroy themselves through saving clauses," *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020) (three-judge court) (citation modified), and that is "for good reason," *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025). If use of the phrase "to the maximum extent consistent with applicable law" or merely "consistent with law" were sufficient to preclude a facial challenge to an Executive Order—or, for that matter, a facial challenge to a statute—"judicial review [would become] a meaningless exercise, precluding resolution of the critical legal issues," *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018).

Of course, if the Executive Order was subject to both lawful and unlawful applications, that would bear on the merits of Plaintiffs' facial challenge. But when assessing prudential

ripeness, like standing, the Court must assume that Plaintiffs will succeed on the merits of their facial challenge. *See Flynt v. Rumsfeld*, 355 F.3d 697, 702 (D.C. Cir. 2004) ("In order to test the ripeness and justiciability of the claims, we again assume that they are otherwise valid."). The Federal Defendants cannot avoid judicial review of the Executive Order merely by asserting that Plaintiffs have failed to prove that the Order is facially invalid.

To be sure, some executive orders leave room for agency discretion or "reflect genuinely open questions" about how they should be implemented, *Common Cause*, 506 F. Supp. 3d at 48. Executive Order 14290, however, is definitive. It does not call upon agencies to develop plans for implementing the Order or to establish procedures for treating different types of grants or funding under different rules; instead, it broadly instructs "all executive departments and agencies . . . to cease Federal funding for NPR and PBS." Exec. Order § 1. Whether that instruction violates the First Amendment (or relevant statutory authorities) poses a purely legal question that does not require further administrative development. The fact that an agency might someday be able to identify some constitutionally permissible reason for denying some particular grant to NPR or PBS does not relegate Plaintiffs' facial challenge to the Executive Order to the limbo of non-justiciability.

Finally, although delaying resolution of the present dispute would do nothing to clarify or to "crystalize" the issues before the Court, it would subject Plaintiffs to substantial hardship. As long as the Executive Order is in effect, Plaintiffs face the ongoing injury of exclusion from consideration for grants for which Congress made them eligible, based solely on the President's disapproval of the viewpoints that they have expressed. The Federal Defendants speculate that agencies might disregard the Executive Order's sweeping mandates, NPR Dkt. 37 at 11, but, putting aside the CPB, which was never a federal agency, *see* 47 U.S.C. § 396(b), and which no

longer exists, they offer no indication whatsoever that the executive officers subject to the Order will ignore their duty "to give effect to the policies embodied in the President's direction, to the extent allowed by the law," *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). To the contrary, the undisputed evidence shows that the implementing agencies have already acted in a manner consistent with the Executive Order and have suspended grant programs, *see* PBS Dkt. 31-2 at 2 (Kerger 2d Decl. ¶ 6); *see also* PBS Dkt. 32 at 9, have terminated individual grants, *see* PBS Dkt. 31-2 at 2 (Kerger 2d Decl. ¶ 7); NPR Dkt. 30-8 at 4 (Defs.' SUMF ¶ 30), and have denied grant applications, *see* NPR Dkt. 34-1 at 12 (Pls.' SAUMF ¶ 235); NPR Dkt. 37-2 at 2 (Defs.' Resp. to Pls.' SAUMF ¶ 235B). The Court sees no reason to require Plaintiffs to expend resources to submit futile grant applications and to subject themselves to additional First Amendment injuries before seeking judicial intervention.

The Court, accordingly, concludes that it has subject-matter jurisdiction to consider Plaintiffs' facial challenge to the Executive Order and further concludes that their challenge is ripe for review.[5]

---

[5] It is less clear that the local stations' claims are still live in light of the rescission of CPB's funding. The local stations were most clearly injured by the Executive Order's directions to CPB in Section 2(b), which, if implemented, would have placed their funding in jeopardy had they chosen to continue to associate with NPR and PBS. It is possible that the local stations have standing to challenge Section 3(a) of the Order. Section 3(a) requires agencies to cut off "indirect funding of NPR and PBS," Exec. Order § 3(a), which Section 2(b) interprets as funding to "licensees and permittees of public radio and televisions stations," Exec. Order § 2(b). So, Section 2(b) could result in the termination of the local stations' funding if they attempted to direct that funding to NPR and PBS. However, the local stations' declarations are not focused on the potential effects of Section 3(a) of the Executive Order, and in any event, because the Court concludes that NPR and PBS have standing to challenge Section 3(a), it need not decide whether the local stations have standing on their own. *See Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020). Section 1 of the Executive Order, moreover, is directed only at "funding for NPR and PBS." Exec. Order § 1.

## B.    Merits

Turning to the merits, the Court starts with common ground.  There is no dispute that "[t]he First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open'" and that "speech concerning public affairs . . . is the essence of self-government."  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (first quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); and then quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)).  Nor is there any dispute that the First Amendment prohibits government officials from "us[ing] the power of the State to punish or suppress disfavored expression."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).  Finally, the parties do not dispute that the Executive Order discriminates based on viewpoint.  Instead, the parties' disagreement turns on the extent to which the government—or, more precisely in this case, the President—has free reign to decide what speech to fund and what speech not to fund (even indirectly) when that decision penalizes disfavored, private speech.

On the Federal Defendants' view, the government is free to "consider the content and viewpoint of the [speech that] it is subsidizing," and the Executive Order is constitutional because it "merely chooses not to fund Plaintiffs with taxpayer dollars."  NPR Dkt. 30-9 at 9; PBS Dkt. 22-1 at 8.  On Plaintiffs' view, that principle goes only so far.  The government can, of course, fund its own speech, and it can establish government programs that convey a government-sponsored message.  But "when the government provides resources or support to 'facilitate private speech' rather than [to] 'promote a governmental message,' the First Amendment bars the government from discriminating based on 'viewpoint.'"  NPR Dkt. 34 at 29 (quoting *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542 (2001)).  Even more to the point, the government may not deny federal funding (or any other benefit) to a speaker in retaliation for conveying a message the government dislikes.  *Id.* at 34–35.  And, according to Plaintiffs, that is

43

precisely what the Executive Order does.  As explained below, Plaintiffs have the better reading of the governing caselaw and the Executive Order.

Plaintiffs invoke two bedrock principles of First Amendment jurisprudence.  First, the government may not use its authority—including its purse strings—to suppress viewpoints that it dislikes.  *Vullo*, 602 U.S. at 188.  As the Supreme Court has observed, "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional," even in the context of government funding.  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995).  Second, the First Amendment generally "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech."  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation modified).  To establish unlawful retaliation, a plaintiff must show that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation modified).

The Federal Defendants concede that the Executive Order is viewpoint based and that "the President considered [Plaintiffs'] conduct and the content [of their speech] in issuing the [Executive Order]."  NPR Dkt. 30-9 at 22; PBS Dkt. 22-1 at 21.  Indeed, as they acknowledge, "the [Executive Order] is explicit on that point."  NPR Dkt. 30-9 at 22; PBS Dkt. 22-1 at 21.  Nor do they dispute that the Executive Order singles out NPR and PBS based on their past speech and, on that basis alone, instructs all federal agencies to "cease Federal funding for NPR and PBS."  Exec. Order § 1; *see also id*. § 3(a).  On their telling, however, "that is not unconstitutional retaliation," NPR Dkt. 30-9 at 22; PBS Dkt. 22-1 at 21, because "the

44

Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it"—even if it premises its decision on the content of the speech or the viewpoint conveyed, NPR Dkt. 30-9 at 19; PBS Dkt. 22-1 at 18.  Applying that logic to Plaintiffs' retaliation claims, the Federal Defendants further contend that the "termination of funding based on a viewpoint the government does not want to subsidize is not a cognizable adverse action under the First Amendment."[6]  NPR Dkt. 30-9 at 22; PBS Dkt. 22-1 at 21.

The Federal Defendants are correct that federal funding is unique and that it implicates different considerations than might apply, for example, in a case in which the government seeks to regulate or even to criminalize speech.  But they go too far in suggesting that the President may single out private speakers for disfavored treatment or that terminating funding for private speech cannot constitute a cognizable retaliatory action under the First Amendment.  The Supreme Court's unconstitutional conditions caselaw provides useful guidance in divining the line between the government's legitimate interest in crafting government speech and government programs and the illegitimate use of the purse strings to discriminate against private speech

---

[6] The government also suggests in a footnote that the Executive Order cannot be retaliatory because it "is forward-looking—it restricts the use of funds moving forward."  NPR Dkt. 37 at 18 n.5.  That argument misunderstands the temporal dimension of retaliation claims.  To prevail on a claim of First Amendment retaliation, a plaintiff must show that the government took adverse action against it based on its past, protected expression.  *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("Relevant here, no one before us questions that, as a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions *after the fact for having engaged in protected speech*." (emphasis added) (citation modified)); *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  The temporal dimension of a retaliation claim is not whether the adverse action is discrete (e.g., termination of a specific contract) or prospective (e.g., instruction to agencies to deny future applications for funding), but whether the adverse action followed and was caused by protected activity.  Because the Order is explicitly targeted at Plaintiffs and Plaintiffs claim that the Order punishes them for their past protected speech, they have properly characterized the Order as retaliatory.

"because of its message," *Rosenberger*, 515 U.S. at 828, or to "punish or suppress disfavored expression," *Vullo*, 602 U.S. at 188.

The unconstitutional conditions doctrine holds that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). That principle applies, moreover, "even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AID*") (citation modified). "[W]hen the government speaks for itself," it "must be able to promote a program or espouse a policy in order to function." *Shurtleff v. City of Boston*, 596 U.S. 243, 247 (2022) (citation modified); *see also Velazquez*, 531 U.S. at 541 ("We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker."). And when Congress appropriates funds for a particular program, the government may ensure that those funds "are used in the manner Congress intends," *AID*, 570 U.S. at 213, including when used by "private speakers to transmit specific information pertaining to [the government's] own program," *Rosenberger*, 515 U.S. at 833. But when the government denies a person a government benefit (including meaningful access to a grant program) as punishment for that person's past private speech, it both violates the unconstitutional conditions doctrine and the prohibition on First Amendment retaliation. *See Sindermann*, 408 U.S. at 597–98 (applying the unconstitutional conditions doctrine in the context of a professor's claim that his college's "decision not to renew his contract was . . . made in retaliation for his exercise of the constitutional right of free speech"); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673–74 (1996) (applying the unconstitutional conditions doctrine to explain why the First Amendment protects independent

government contractors from being terminated in retaliation for exercising their First Amendment rights).

The question, then, is whether the viewpoint-based funding decision merely creates or disseminates the government's own speech or ensures that funds earmarked for a particular objective are used to express messages that are consistent with the government program at issue or whether, instead, the funding decision denies a private speaker access to federal funds either to coerce private speakers to tailor their speech to the government's liking or to punish those who have previously expressed views that the government does not like. As the Supreme Court has explained, "the relevant distinction that has emerged from [the] case[law] is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15. Although "[t]he line is hardly clear," *id.* at 215, courts may consider whether the limitation is proportionate, *see League of Women Voters*, 468 U.S. at 400 ("a noncommercial educational station that receives only 1% of its overall income from CPB grants is barred absolutely from all editorializing"); whether the grant recipient is permitted to "segregate its activities according to the source of its funding," *id.*; whether the limitation applies to the "grantee" or only to the "project" or program, leaving the grantee "unfettered in its other activities," *AID*, 570 U.S. at 217 (emphasis omitted) (citation modified); whether the condition applies to all applicants or singles out particular applicants based on their viewpoints; and whether the condition is tailored and germane to a legitimate government interest.

A less nuanced government decision, of course, demands a less nuanced analysis. It is difficult to understand, for example, how a directive that categorically bars two speakers from all

47

government grants, based on the viewpoints they have expressed in the past, can be defended based on principles of proportionality or segregability.  But however the relevant test is framed, the Court is persuaded that Executive Order 14290 clearly crosses the line from maintaining the proper functioning of a government program or defining government speech "to punish[ing] or suppress[ing] disfavored expression," *Vullo*, 602 U.S. at 188.

1.

First and foremost, the undisputed record shows that the Executive Order's direction that all federal agencies "cease Federal funding for NPR and PBS" seeks to punish Plaintiffs for their past speech, which according to the Executive Order failed to "present[] a fair, accurate, or unbiased portrayal of current events."  Exec. Order § 1; *see also id*. § 3(a).  To be sure, not every "refusal to fund protected activity"—even on viewpoint-based grounds—can "be equated with the imposition of a penalty on that activity."  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (citation modified).  But, by the same token, excluding a person or entity from eligibility for any federal grant, based on that person or entity's disfavored speech, can certainly constitute a constitutionally impermissible penalty.  *See AID*, 570 U.S. at 214.  As the Supreme Court has cautioned, the government may not "leverage its power to award [or deny] subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).  Simply put, "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts."  *Rosenberger*, 515 U.S. at 830 (citation modified); *see Finley*, 524 U.S. at 587 ("[E]ven in the provision of subsidies, the Government may not ai[m] at the suppression of dangerous ideas." (citation modified)); *see also Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 550 (1983) (same).  The Executive Order's direction that all federal agencies stop funding NPR and PBS—without regard for the nature or terms of the grant or funding program—bears all the

48

hallmarks of government action that is "frankly aimed at the suppression of [purportedly] dangerous ideas." *Speiser v. Randall*, 357 U.S. 513, 519 (1958) (citation modified).

Most obviously, the Executive Order singles out two—and only two—speakers for adverse treatment based on the viewpoint of their speech. Unlike Section 2, which applies only to grants and funding provided by the CPB, Section 3(a) pertains to the array of grants and funding provided by all "executive departments and agencies," Exec. Order § 1, or at least those that might interest producers or distributors of broadcast content. As a result, Section 3(a) sweeps in a vastly broader array of competing grant applicants and viewpoints than Section 2, and it, accordingly, raises heightened concerns about singling out NPR and PBS—among the field of applicants—for disfavored treatment. But even if the Court were to focus on entities involved in public broadcasting, it would not matter. The Executive Order does not take the federal government out of the business of subsidizing the producers and distributors of non-commercial television and radio. It leaves other national and local producers and distributors—including APM, APT, PMI, and hundreds of local radio and television stations—free to seek the federal funding that NPR and PBS are ineligible to receive.[7]

---

[7] *See, e.g.*, NPR Dkt. 30-1 at 11 (Defs.' Resp. to Pls.' SUMF ¶ 59) ("Aspen Public Radio broadcasts local news reported by a team of local journalists, as well as over two dozen national public radio programs, including from NPR and other distributors of national and international news."); *id.* at 15 (Defs.' Resp. to Pls.' SUMF ¶ 86) ("Since 1970, CPR has provided coverage of critical events in Colorado, including the 1999 shooting at Columbine High School, the 2008 Democratic National Convention in Denver, and the Aurora theater shooting in 2012 . . . ."); *id.* at 20 (Defs.' Resp. to Pls.' SUMF ¶ 116) ("KSUT airs news, music, and other programming, including original programming and national programming produced by NPR, American Public Media (APM), Public Radio International (PRX), and Native Voice 1 (NV-1)."); *id.* at 22 (Defs.' Resp. to Pls.' SUMF ¶ 125) ("Tribal Radio offers 46 hours of original programming each week, including news, [and] public affairs programs . . . ."); PBS Dkt. 12-2 at 3 (Hanks Decl. ¶ 7) ("Lakeland PBS's local programming is made by Lakeland PBS itself. It includes *Lakeland News*—the region's only program covering local news, weather, and sports . . . ."); *see also* CRS Report at 15.

The government's concession that the Executive Order singles NPR and PBS out based on the content of their reporting, NPR Dkt. 30-9 at 22; PBS Dkt. 22-1 at 21, is both unavoidable and all but dispositive. The First Amendment is sensitive to laws that apply only to "a small number of speakers" "within a single medium" on content-based grounds. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 660, 659 (1994). The Supreme Court's decision in *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, moreover, confirms that this "sensitivity" does not stop at laws *regulating* speech; it also extends to laws or programs *subsidizing* First Amendment activities. In *Regan*, the Court upheld provisions of the tax code that subsidized lobbying by veterans' organizations, but not by other charitable organizations, precisely because those provisions did not turn on "the content of any speech." *Id.* at 548. For that reason, the Court found "no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect." *Id.* Rather than consider content or viewpoint, the provision granting more favorable treatment to veterans' organizations effectuated the country's "long standing policy of compensating veterans for their past contributions." *Id.* at 550–51; *see Rosenberger*, 515 U.S. at 834 ("*Regan* relied on a distinction based on preferential treatment of certain speakers—veterans' organizations—and not a distinction based on the content or messages of those groups' speech.").

The Executive Order, in contrast, singles out for adverse treatment only two media organizations in a "landscape" that the Order itself recognizes as "filled with abundant, diverse, and innovative news options," Exec. Order § 1, and it does not do so based on a speech-neutral criterion, such as status as a "veterans' organization," *Rosenberger*, 515 U.S. at 834. Instead, it singles them out based on their "portrayal of current events." Exec. Order § 1. Targeting only two speakers is problematic in and of itself, but, here, it is particularly perilous because the

targeted speakers are members of the press, which receives special solicitude under the First Amendment, *see Turner Broad. Sys., Inc.*, 512 U.S. at 659–60; *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591–92 (1983) (invalidating tax on publications "because it single[d] out the press, [and] also because it target[ed] a small group of newspapers" without sufficient justification and therefore "resemble[d] . . . a penalty for a few of the largest newspapers"); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229, 234 (1987) (invalidating sales tax that "target[ed] a small group within the press" on content-based grounds without "compelling justification"); *see also League of Women Voters*, 468 U.S. at 382 (recognizing public broadcasters as members of the press), and they are targeted because the President dislikes their reporting. When the government "targets individual publications within the press," it bears the "heavy burden" of showing that it has a goal "unrelated to suppression of expression." *Minneapolis Star & Tribune Co.*, 460 U.S. at 585, 592–93.

The government cannot meet that hefty burden here. Both the text of the Executive Order and its accompanying materials leave no doubt that the challenged government action, unlike the tax code provisions at issue in *Regan*, targets a disfavored viewpoint, *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–65 (2011) (considering law's "stated purposes" and "formal legislative findings" to confirm that legislature designed law "to target [specific] speakers and their messages for disfavored treatment"), nor do the Federal Defendants argue to the contrary. The Order instructs federal agencies to deny Plaintiffs funding because "neither entity presents a fair, accurate, or unbiased portrayal of current events to taxpaying citizens." Exec. Order § 1. The Fact Sheet, in turn, denounces Plaintiffs for "fuel[ing] partisanship and left-wing propaganda," and it includes bullet points identifying specific instances of purportedly biased speech. *See* Fact Sheet. These include NPR's failure "to cover the Hunter Biden laptop story,"

51

NPR's insistence that "COVID-19 did not originate in a lab," NPR's "Valentine's Day feature around 'queer animals,'" PBS's "negative coverage" of "congressional Republicans" and comparatively "positive coverage of congressional Democrats," PBS's more frequent use of the phrase "far-right" than its use of the phrase "far-left," and PBS's negative "coverage of the 2024 Republican National Convention" and more positive "coverage of the 2024 Democratic National Convention." *Id.*

The accompanying press release also characterizes Plaintiffs' news coverage as "trash," provides examples of disfavored articles, and includes evidence intended to show that "NPR and PBS have zero tolerance for non-leftist viewpoints." *See* Press Release. It also accuses PBS of "cover[ing] up Joe Biden's clear mental decline" and criticizes one of its reporters for characterizing the President's "patriotic 2020 Mount Rushmore speech as a love letter to 'white resentment' that promoted the 'myth of America.'" *Id.* It also faults NPR for "prolifically report[ing] on the Russian collusion hoax," and it asserts that NPR's CEO "once called President Trump 'racist,' shared a photo of herself wearing a 'Biden for President' campaign hat, [and] serves on the board of a Soros-funded activist group."[8] *Id.*

---

[8] The President has also publicly expressed his disapproval of the "left-wing" character of NPR's speech since at least 2024. *See* NPR Dkt. 30-1 at 25–26 (Defs.' Resp. to Pls.' SUMF ¶ 149). In 2025, shortly before the Order was issued, he described both Plaintiffs as "arms of the Radical Left Democrat Party," and "Radical Left 'Monsters.'" *Id.* at 25 (Defs.' Resp. to Pls.' SUMF ¶¶ 147–48) (capitalization normalized); see also NPR Dkt. 21-8 at 3 (Townsend Decl. ¶ 8) ("NPR and PBS are a Radical Left Disaster, and 1000% against the Republican Party!" (quoting Donald J. Trump (@realDonaldTrump), Truth Social (June 12, 2025, 3:13 PM), https://truthsocial.com/@realDonaldTrump/posts/114671982391481893)). Just recently, the D.C. Circuit relied on remarkably similar facts as direct evidence of a state attorney general's retaliatory motive toward a media organization. *See Media Matters*, 138 F.4th at 580 (finding "ample evidence" of retaliatory motive where government official described plaintiff as "radical anti-free speech" and a "radical left-wing organization" (citation modified)).

It is difficult to conceive of clearer evidence that a government action is targeted at viewpoints that the President does not like and seeks to squelch. The Executive Order seeks to exclude NPR and PBS from receiving federal grants or other funding because they have provided more positive coverage of his political opponents than of his party and allies, because their news coverage, in his view, tips left, and because they were critical of him. On this record, there can be no doubt that the Executive Order does not target Plaintiffs merely because they have *a* viewpoint or consistent perspective and therefore fail to live up to some yet-to-be-attained platonic ideal of "unbiased" journalism, but because he views their speech as unfavorable to him and the Republican party. To be sure, the President is entitled to criticize this or any other reporting, and he can express his own views as he sees fit. He may not, however, use his governmental power to direct federal agencies to exclude Plaintiffs from receiving federal grants or other funding in retaliation for saying things that he does not like.

2.

The Federal Defendants concede that Sections 1 and 3(a) of the Executive Order terminate Plaintiffs' funding because they have expressed "viewpoint[s] the government does not want to subsidize." NPR Dkt. 30-9 at 22. But in their view, "declin[ing] to extend federal funding for Plaintiffs' programs" is consistent with the general rule that the government is not required to subsidize First Amendment rights. *Id.* at 19. For support, they invoke *Rust v. Sullivan*, where the Supreme Court held that "the Government can choose what to subsidize using taxpayer funds without running afoul of the restrictions on viewpoint discrimination that would otherwise apply when the Government is acting as regulator." *Id.* at 19–20.

This argument fails at the outset because the *Rust* Court emphasized that it did not face "the case of a general law singling out a disfavored group on the basis of speech content," *Rust*, 500 U.S. at 194–95 (distinguishing the Court's decision in *Minneapolis Star & Tribune Co.*, 460

53

U.S. 575)—much less an executive order targeting specific speakers on the basis of viewpoint for exclusion from programs for which Congress made them eligible. To the contrary, the regulations at issue in *Rust* were "narrowly tailored to fit Congress' intent" that the funds at issue be used for a defined "public purpose[]." *Id.* at 195 n.4. There, the Court recognized that when Congress "appropriates public funds to establish a program[,] it is entitled to define the limits of that program" and to "insist[] that public funds be spent for the purposes for which they were authorized." *Id.* at 194, 196. Here, however, the Federal Defendants fail to explain—and the Court fails to comprehend—how the Executive Order's sweeping direction that all federal agencies cease funding NPR and PBS is "tailored to fit Congress' intent," *id.* at 195 n.4, regarding any federal program. They fail to explain, for example, how excluding NPR from receiving future NEA grants "[t]o support literary content on NPR platforms," NPR Dkt. 30-5 at 2, or "[t]o support the production and distribution of NPR's music programming," *id.* at 6, is tailored to ensure that the funds at issue "are used in the manner Congress intends," *AID*, 570 U.S. at 213. Nor do they explain why NPR's purportedly "biased" political reporting means that its production and distribution of programming like "Tiny Desk Concerts," NPR Dkt. 30-5 at 18, runs afoul of the NEA's authorizing statute.

More generally, neither the Executive Order nor the Federal Defendants' briefs establish that the ban on all financial support to NPR and PBS is necessary—or tailored—to satisfy the statutory mandate of any of the agencies covered by Section 3. That failure of explanation matters because *Rust*—and other Supreme Court decisions upholding a content or viewpoint-based funding restriction—are premised on the broad scope of Congress's Spending Clause authority, or the executive branch's obligation to implement Congress's policy choices. *See, e.g.*, *AID*, 570 U.S. at 213–14; *Finley*, 524 U.S. at 587–88; *Rust*, 500 U.S. at 195 n.4; *Regan*, 461

54

U.S. at 549–50.  Under the Spending Clause, "Congress has wide latitude to set spending priorities" to encourage actions it deems to be in the public interest.  *Finley*, 524 U.S. at 588. Congress may exercise its spending power selectively "to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."  *Rust*, 500 U.S. at 193.  And once Congress decides to "allocate funds for public purposes," it possesses the "ancillary power to ensure that those funds are properly applied to the prescribed use."  *Id.* at 195 n.4.

The Supreme Court has applied these principles to uphold statutes declining to subsidize certain categories of expressive conduct, such as lobbying, *Regan*, 461 U.S. at 549–51; *Cammarano v. United States*, 358 U.S. 498, 512–13 (1959), union political activities, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–59 (2009), and some campaigns for public office, *Buckley v. Valeo*, 424 U.S. 1, 105–06 (1976); *see Regan*, 461 U.S. at 549–50, on viewpoint-neutral grounds, while upholding statutes that subsidize activities, including speech, with a particular viewpoint to the exclusion of others, *see Rust*, 500 U.S. at 193 (upholding program "subsidiz[ing] family planning services which will lead to conception and childbirth, and declining to promote or encourage abortion" (citation modified)); *see also AID*, 570 U.S. at 217–18.  The Court has never, however, upheld executive action targeting specific speakers on viewpoint-based grounds for exclusion from programs funding First Amendment activities that Congress has already chosen to subsidize and for which those speakers are otherwise eligible.

The Executive Order's ban on all funding for NPR and PBS bears no resemblance to the funding restrictions upheld in previous cases.  It does not, for example, implement a congressional decision to take the government out of the business of subsidizing any and all production or distribution of broadcast content.  Nor does it implement a statute creating a

government program that selectively funds a defined mission or message.  Instead, it targets two specific speakers based on the President's disagreement with the substance of their past speech and without regard to whether the particular grant or funding program at issue has anything to do with how Plaintiffs portray "current events," Exec. Order § 1.  Yet, once Congress decides to fund a category of First Amendment activity, the executive branch "violates the First Amendment when it denies access to a speaker solely to suppress the point of view [it] espouses on an otherwise includible subject."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (discussing access to a nonpublic forum); *see Velazquez*, 531 U.S. at 543–44 (explaining that forum principles apply "when the government establishes a subsidy for specified ends").  Because the Executive Order is untethered to the needs or confines of any particular federal program, cases like *Rust* provide the Federal Defendants with no refuge.

Finally, it bears note that the Executive Order does not withdraw funding for Plaintiffs' journalism or impose a germane condition on their participation in particular federal programs; the Executive Order simply directs that all federal agencies cut off any and all funding to NPR and PBS.  The Federal Defendants fail to cite a single case in which a court has ever upheld a statute or executive action that bars a particular person or entity from participating in any federally funded activity based on that person or entity's past speech.  Perhaps that is because neither Congress nor any prior Administration has ever attempted something so extreme, or perhaps it is because any prior effort to do so has failed, *see*, *e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025); *Jenner & Block LLP. v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C. 2025).  But the most obvious reason is that any such individual ban, based on past speech, would almost certainly constitute the type of retaliation that

the First Amendment prohibits. *Cf. Speiser*, 357 U.S. at 518 (provision of state constitution that denied tax exemptions to claimants who engaged in seditious speech "penalize[d] them for such speech").

For Plaintiffs, that penalty is substantial. As envisioned by the Public Broadcasting Act, Plaintiffs devote much of their programming to "instructional, educational, and cultural" content, 47 U.S.C. § 396(a)(1). PBS Dkt. 12-1 at 6 (Kerger Decl. ¶ 11) (PBS's public affairs programming "compris[es] less than 10% of PBS's broadcast schedule"); NPR Dkt. 30-1 at 3, 24 (Defs.' Resp. to Pls.' SUMF ¶¶ 13, 177). Based on the record, it is most likely that Sections 1 and 3(a) will cut off federal funding that supports these non-reporting activities.[9]

*    *    *

For the foregoing reasons, the Executive Order's instruction that all federal agencies stop funding NPR and PBS constitutes a penalty for engaging in speech disfavored by the President and cannot be lawfully implemented by any executive department or agency. Any agency action implementing Sections 1 and 3(a) would injure Plaintiffs anew by retaliating against them for their exercise of First Amendment rights. Although facial invalidation is "manifestly[] strong medicine," *Finley*, 524 U.S. at 580 (citation modified), it is necessary here to eliminate the kind of naked "[g]overnment favoritism in public debate" that is incompatible with "liberty and democratic decisionmaking," *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (citation modified).

---

[9] Because Plaintiffs prevail on their argument that the Executive Order's direction that all federal agencies cease all federal funding of NPR and PBS violates their First Amendment rights to freedom of speech, the Court need not and does not decide the merits of their freedom of association, due process, or statutory claims.

57

3.

Although the parties devote little attention to the issue, the Court pauses briefly to discuss Sections 3(b) and 3(c) of the Executive Order. Section 3(b) directs federal agencies that are unable to terminate existing NPR or PBS grants or contracts—perhaps because the agencies are legally bound by existing "instruments"—to attempt to identify some "noncompliance" by NPR and PBS and, if the agency finds something, to "take appropriate steps under the terms of the instrument." Exec. Order § 3(b). In other words, this provision seems to say: If you are bound by a contract with NPR or PBS, see if you can find a way out. Section 3(c), in turn, instructs the Secretary of Health and Human Services to determine whether NPR or PBS are complying with Title VII's anti-discrimination mandate and, if necessary, to "take appropriate corrective action." Exec. Order § 3(c); *cf. Media Matters*, 138 F.4th at 584–85 (holding that plaintiffs were likely to succeed on their claim that a state attorney general had violated the First Amendment by investigating them for alleged fraudulent activity in retaliation for their exercise of First Amendment rights).

Because the parties have said little about these provisions in briefing or at argument, it is unclear whether they have caused or are likely to cause NPR or PBS any cognizable harm, and, absent any evidence on this question, the Court cannot discern whether the existence or enforcement of either provision is causing Plaintiffs any justiciable harm. The Court therefore declines to decide whether these provisions violate the First Amendment. However, if Plaintiffs believe that either Section 3(b) or 3(c) present a live case or controversy, they are free to move for partial summary judgment regarding the lawfulness of either or both provisions.

## C.    Remedy

Having determined that Section 3(a) of the Executive Order cannot lawfully be implemented, the Court turns to the question of remedy. In general, federal courts lack authority

58

to issue declaratory or injunctive relief against the President "in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality op.) (citation modified); *see, e.g.*, *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (holding that the court lacked jurisdiction over plaintiff's challenge to an executive order where plaintiff sought to enjoin only the president and not any executive officers). They may, however, "[r]eview [] the legality of Presidential action . . . in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment)); *see McCray*, 574 F. Supp. 3d at 11.

Here, both the NPR and PBS Plaintiffs have named agency defendants, in addition to the President, and they seek a declaratory judgment and a permanent injunction barring the Federal Defendants from implementing or seeking to enforce Executive Order 14290. NPR Dkt. 46-1 at 9–10, 52 (Am. Compl. ¶¶ 16–22, 209–10); NPR Dkt. 21-1 at 55; PBS Dkt. 1 at 5–7, 47 (Compl. ¶¶ 7–17, Prayer for Relief); PBS Dkt. 12 at 43. Defendants oppose the entry of any relief on the merits, but, beyond those arguments, they do not meaningfully contest any of the permanent-injunction factors. *See* NPR Dkt. 30-9 at 8–10 (arguing only that Plaintiffs' First Amendment claims should be dismissed for lack of jurisdiction and because the Executive Order is lawful); NPR Dkt. 37 at 7–8 (same); PBS Dkt. 22-1 at 7–9 (same for PBS); PBS Dkt. 32 at 6–7 (same). The Court will, accordingly, enter a judgment as to all agency defendants declaring that the Executive Order's direction to cease funding NPR and PBS is unlawful and unenforceable.

The Court will also enter a permanent injunction barring the agency defendants from implementing or enforcing that direction. A plaintiff seeking a permanent injunction must both prevail on the merits and "satisfy a four-factor test before a court may grant such relief." *Anatol*

59

*Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  It must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.* (quoting *eBay*, 547 U.S. at 391).  Where the defendant is the government, the third and fourth factors typically merge.  *Id.*  Entry of a permanent injunction is appropriate here because Plaintiffs are likely to suffer irreparable harm—"retaliation against them in response to their exercise of their First Amendment rights"—in the absence of injunctive relief.  *See Media Matters*, 138 F.4th at 585 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation modified)).  Moreover, because the government lacks any legitimate interest in enforcing an executive order that violates the First Amendment, the Court is persuaded that the balance of hardships and the public interest weigh in favor of granting injunctive relief.  *See*, *e.g.*, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (acknowledging "the obvious: enforcement of an unconstitutional law is always contrary to the public interest").

The Court will not, however, enter injunctive or declaratory relief against the CPB or the President.  As explained above, Plaintiffs' claims are moot to the extent that they pertain to the CPB's implementation or enforcement of Section 2 of the Executive Order.  In addition, although Plaintiffs name the President in his official capacity as a defendant in their complaints, NPR Dkt. 46-1 at 9 (Am. Compl. ¶ 16); PBS Dkt. 1 at 5 (Compl. ¶ 7), they have not specifically asked the Court to enter declaratory relief against the President or addressed the availability of

60

such an extraordinary remedy.  Although Supreme Court and D.C. Circuit precedent leave open the possibility that a declaration *might* be available against the President in *extraordinary* cases, *see McCray*, 574 F. Supp. 3d at 9–10, Plaintiffs have failed to demonstrate—or even to argue—that this case *might* justify such a remedy.  In any event, injunctive and declaratory relief running against the agency defendants suffices to afford Plaintiffs appropriate relief.

The Court also declines to issue declaratory or injunctive relief as to Section 3(b) or 3(c) of the Executive Order, at least at this time.  Because federal courts "do not exercise general oversight of the Executive Branch," *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025), any equitable relief must be "limited to the inadequacy that produced the injury in fact that the [Plaintiffs have] established," *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (citation modified).  As explained above, neither Plaintiffs nor the Federal Defendants have briefed whether Section 3(b) or Section (c) of the Executive Order is causing or will likely cause Plaintiffs a cognizable injury sufficient to support the entry of prospective relief.  Under these circumstances, the Court concludes that the proper course is to deny both Plaintiffs' and Defendants' motions for summary judgment in relevant part and to permit the parties, as appropriate, to renew their respective motions with respect to Section 3(b) and/or Section 3(c).

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part, **DENY** as moot in part, and **DENY** in part without prejudice Plaintiffs' motions for summary judgment, NPR Dkt. 21 and PBS Dkt. 12.  The Court will **GRANT** on grounds of mootness in part, **DENY** in part, and **DENY** in part without prejudice Defendants' motions for summary judgment, NPR Dkt. 30 and PBS Dkt. 22.  The Court will **PERMANENTLY ENJOIN** the agency defendants from implementing or enforcing Executive Order 14290's instruction to cease funding NPR and PBS.  Finally, the Court will **DIRECT** that the parties submit a joint status report proposing next steps, if any, including whether the Court should enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 31, 2026